IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CONSOLIDATED COMMERCIAL CONTROLS, INC. d/b/a ALLPOINTS FOODSERVICE PARTS & SUPPLIES, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 CV 4388 |
| v. | ) ) | Judge Virginia Kendall |
| 5 STAR SUPPLY LLC, 5 STAR MANAGEMENT GROUP, LLC, LINDA A. WILLIAMS, CLIFFORD G. WILLIAMS II, STEPHEN J. PURSEL, PHILIP J. CARUSO, AND ROBERT G. MASTROFRANCESCO, | ) ) ) ) ) ) ) | Magistrate Judge Michael T. Mason |
| Defendants. | ) | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**
_____

Bonita L. Stone
Jeffrey L. Rudd
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200 (telephone)
(312) 902-1061 (facsimile)

# INTRODUCTION

Plaintiff Consolidated Commercial Controls, Inc. d/b/a AllPoints Foodservice Parts & Supplies ("CCC") is entitled to the entry of a preliminary injunction against Defendants Linda A. Williams, Clifford G. Williams II, Stephen J. Pursel, Philip J. Caruso, and Robert G. Mastrofrancesco (the "Individual Defendants"), 5 Star Supply LLC, and 5 Star Management Group, LLC (collectively, "5 Star"). CCC has suffered and is continuing to suffer irreparable harm as a result of the Individual Defendants' scheme to exploit their prior employment with CCC and knowledge of its confidential information to launch a new competitive venture, 5 Star. Defendants' efforts to unfairly and unlawfully compete with their former employer must be enjoined, and CCC's motion for preliminary injunction granted.

# BACKGROUND FACTS

*CCC's Acquisition of ICS*

CCC is one of the leading suppliers of equipment, parts, accessories, components, and supplies to the foodservice industry. In 2007, CCC entered into discussions with the owners of International Commercial Supply Corporation, LLC ("ICS"), one of its chief rivals in the foodservice supply industry, concerning the possibility of CCC acquiring ICS. At this time, Defendant Linda Williams ("L. Williams") was employed by ICS as its Chief Financial Officer and Chief Operating Officer, and was also engaged in discussions with ICS's owners regarding her possibly acquiring ICS. CCC was ultimately successful in its efforts to acquire ICS and, on or about October 31, 2007, CCC acquired substantially all of ICS's assets, including its goodwill and confidential information, for approximately $31.5 million. (Compl. ¶¶ 13, 17-18).

Following the acquisition of ICS, CCC offered employment to each of the Individual Defendants – who were all previously employed by ICS at its headquarters in Winsted, Connecticut – in substantially similar positions to those that they held with ICS and offered each of the Individual Defendants an opportunity to receive substantial bonuses and perquisites, including integration bonuses, performance bonuses, increased salaries, and the opportunity to invest in CCC through its equity program. (Compl. ¶ 19).

*CCC's Business, Confidential Information, and Trade Secrets*

A significant portion of CCC's business – and that of its former competitor, ICS – is founded on its ability to provide replacement parts for commercial kitchen equipment quicker

and cheaper than its customers could obtain those parts from the original equipment manufacturer. Accordingly, a critical component of CCC's business success is acquiring these replacement parts from reliable vendors at the lowest possible price. To that end, CCC maintains business relationships with a cadre of key vendors and enters into supply agreements with those vendors which are frequently subject to provisions barring the parties from disclosing the terms of the agreement, including the prices that CCC is paying and any rebates or discounts that it is receiving. (Compl. ¶¶ 13-14).

Another essential aspect of CCC's business is its on-going customer relationships and the terms under which CCC supplies those customers. These prices are subject to intense negotiation and CCC's customers often receive substantial discounts on these prices based on a number of factors including the volume of products being purchased and whether the customer is a member of a larger buying group. For certain key customers, CCC is also party to purchasing agreements which contain provisions barring the parties from disclosing the terms of the agreement, including the prices, rebates, and discounts that the customer is receiving. (Compl. ¶ 15).

During their employment with both CCC and ICS, L. Williams, Stephen J. Pursel ("Pursel"), and Robert G. Mastrofrancesco ("Mastrofrancesco") were privy to substantial amounts of confidential and trade secret information concerning these businesses, including confidential information concerning their purchasing arrangements with key vendors and information concerning sales, including but not limited to the identities of their customers and pricing, volume, and margin information. Indeed, the scope and value of the confidential information possessed by these Individual Defendants only increased when they accepted leading roles in integrating the business operations of CCC and ICS. (Compl. ¶¶ 25-26).

Each was given extensive access to the new enterprise's efforts to reduce costs by examining the vendor arrangements that CCC and ICS maintained prior to the acquisition and the resulting matrix identifying those parts that CCC and ICS were both purchasing and where one of the entities was obtaining identical parts at a lower cost. As Chief Operating Officer responsible for CCC's and ICS's integrated business operations, L. Williams was also given access to CCC's business plan for 2008, which included target areas for increasing sales and detailed information regarding where the new enterprise could reduce costs and increase prices as a result of the synergies created by integrating ICS into CCC. (Compl. ¶¶ 26, 28).

3

*CCC's Efforts to Maintain the Security of Confidential Information and Trade Secrets*

CCC (and ICS before it) regards information concerning its vendor and customer relationships as confidential and trade secret information, and carefully safeguards this information by, among other things, limiting employee access on a need-to-know basis, implementing password protections, maintaining a confidentiality policy, and requiring employees to execute confidentiality agreements. (Compl. ¶ 16).

With respect to the Individual Defendants, during their employment with ICS, each of them received a copy of ICS's Employee Handbook, and signed a Handbook Receipt and Acknowledgement form under which they acknowledged receipt of the handbook and confirmed that they have read and understood its contents. These contents included a Proprietary Information/Confidentiality policy, which informed employees that "ICS has developed certain proprietary products and processes that are unique to ICS" and that "[k]eeping such information from competitors plays an important part in our success." (Compl. ¶¶ 20-21).

With the lone exception of Pursel, each of the Individual Defendants also signed an Employee Proprietary Information Agreement through which they agreed to maintain the confidentiality of ICS's confidential information and trade secrets:

> Confidentiality. I agree to keep confidential, except as ICS may otherwise consent in writing, not to disclose, or make any use of except for the benefit of ICS, at any time either during or subsequent to my employment, any trade secrets, confidential information, knowledge, data, or other information of ICS relating to products, processes, know-how, designs, customer lists, business plans, marketing plans and strategies, and pricing strategies or any subject matter pertaining to any business of ICS or any of its clients, licensees or affiliates, which I may produce, obtain or otherwise acquire during the course of my employment, except as herein provided. I further agree not to deliver, reproduce or in any way allow any such trade secrets, confidential information, knowledge, data or other information, or any documentation relating thereto, to be delivered or used by any third parties without specific direction or consent of duly authorized representative of ICS.

(Employee Proprietary Information Agreement, ¶ 1) (Compl. ¶ 22).

Through these agreements, the Individual Defendants also agreed to return any materials relating to their employment or relating to any confidential information, knowledge, or data of ICS upon the termination of their employment:

4

> Conflicting Employment; Return of Confidential Material . . . . In the event of my termination of employment with ICS for any reason whatsoever, I agree to promptly surrender and deliver to ICS all records, materials, equipment, drawings and data of any nature pertaining to any invention or confidential information of ICS or to my employment, and I will not take with me any description containing or pertaining to any confidential information, knowledge or data of ICS which I may produce or obtain during the course of my employment . . . .

(Employee Proprietary Information Agreement, ¶ 2) (Compl. ¶ 23).

During CCC's acquisition of ICS, these Employee Proprietary Information Agreements were assigned to CCC and are fully enforceable by CCC. (Compl. ¶ 24).

*The Abrupt Departures of the Individual Defendants*

Although CCC was aware that L. Williams was disappointed she was unable to personally acquire ICS's business, CCC was surprised by her announcement on March 31, 2008 that she was resigning effective April 10, 2008. CCC was further taken aback when Pursel announced on April 22 that he was resigning effective the very next day. Neither L. Williams nor Pursel disclosed their future business or employment plans to CCC. (Compl. ¶¶ 29-30).

CCC, however, was concerned the abrupt departures of two executives with close personal relationships with former ICS personnel could signal additional resignations and further feared that its goodwill and confidential information also could be in jeopardy. Accordingly, on May 1, 2008, CCC's President, John Hanby, sent letters to both L. Williams and Pursel reminding them of their contractual and legal obligations to not disclose CCC's confidential information or unlawfully interfere with its business. Neither L. Williams nor Pursel responded to these letters, exacerbating CCC's concerns regarding their activities and the continued security of its confidential information. Unbeknownst to CCC, on April 23, 2008, L. Williams had already formed Defendant 5 Star Supply LLC, with the intent of directly competing with CCC in the food service supply industry. (Compl. ¶¶ 31-33).

In a further effort to prevent the departure of additional personnel, on or about May 1, 2008, CCC offered substantial retention bonuses to Mastrofranceso and Philip Caruso ("Caruso") conditioned on them remaining employed by CCC through December 31, 2008 and on their execution of an agreement containing restrictions on them interfering with CCC's customer, vendor, and employment relationships for a period of one (1) year. Mastrofrancesco

5

and Caruso refused CCC's offer of a retention bonus claiming that they did not want to be bound by any restrictions following the end of their employment. CCC believes, prior to their resignations, L. Williams and Pursel had already informed Mastrofrancesco and Caruso of their intent to form a competing business and solicited them to leave CCC. CCC also verily believes L. Williams and Pursel informed Clifford Williams ("C. Williams"), who is L. Williams's husband, of their intent to form a competing business and solicited him to leave CCC as well. (Compl. ¶¶ 34-35).

Mastrofrancesco, Caruso, and C. Williams failed to disclose to CCC that they were aware of L. Williams's and Pursel's intent to form a competing enterprise or their solicitations. On June 24, 2008, all three employees abruptly announced they were resigning from CCC effective immediately. CCC believes each is currently employed by 5 Star in positions that are nearly identical to those that they held with CCC. (Compl. ¶¶ 36-37).

*The Individual Defendants' Theft of Computer Files*

After the resignations of the Individual Defendants, CCC undertook a forensic examination of their work computers which has revealed that a substantial number of files were transferred or deleted at or around the time of their resignations. In the days leading up to their resignations, L. Williams, Pursel, and Mastrofrancesco attached several portable memory devices to their work computers, including a portable hard drive capable of holding 120 GB of information. These devices appear to have been attached for the purpose of transferring files from their work computers for later use on behalf of 5 Star. On or immediately before their resignations, these Individual Defendants also deleted a substantial number of files from their work computers. (Compl. ¶¶ 39-42).

On July 17, 2008, after discovering the unlawful taking of computer files and deletions, CCC's counsel sent letters to each of the Individual Defendants reminding them of their contractual and legal obligations to CCC. In the letters to L. Williams, Pursel, and Mastrofrancesco, CCC's counsel informed them that CCC was aware of their efforts to download files from their work computers and demanded that they contact CCC's counsel to arrange for a forensic examination of any and all portable memory devices that have, at any time, been connected to a computer of CCC or ICS and any computers or portable memory devices to which any electronic documents of CCC or ICS have been transferred. CCC's counsel also demanded the immediate return of any and all property and hard copy documents

6

related to the business of CCC or ICS.  These Individual Defendants were also instructed that if a response was not received within five (5) business days, CCC would pursue its legal rights and seek a preliminary injunction to stop the continued misappropriation of its confidential and trade secretion information and to bar 5 Star from engaging in any activities in the foodservice supply industry.  (Compl. ¶¶ 43-44).

On July 24, 2008, CCC's counsel received a letter from an attorney purporting to represent 5 Star and the Individual Defendants.  Enclosed with this letter was a copy of a Complaint, filed in the United States District Court for the District of Connecticut, seeking a declaratory judgment.  In neither document did 5 Star or the Individual Defendants deny they had taken information from CCC or were using that information to compete.  (Compl. ¶ 45).

*Irreparable Injury and Need for Injunctive Relief*

CCC has already learned that 5 Star has been in contact with some of CCC's key vendors in an effort to obtain parts and supplies as a first step in establishing 5 Star as a competitive venture.  To secure the lowest possible prices and the greatest possible margins for 5 Star, L. Williams, Pursel, and Mastrofrancesco have relied, or will inevitably rely, upon their knowledge of CCC's vendor arrangements and the prices, discounts, and rebates that it was receiving.  As part of 5 Star's efforts to secure customer relationships, L. Williams, Pursel, and Mastrofrancesco have also relied, or will inevitably rely, upon their knowledge of CCC's key customers and their confidential pricing arrangements in an effort to undercut CCC and secure business on behalf of 5 Star.  The circumstances strongly suggest all of the Individual Defendants are also knowingly using confidential information obtained from the surreptitious downloads that L. Williams, Pursel, and Mastrofrancesco orchestrated shortly before their departures. (Compl. ¶¶ 46-48).

## Argument

**I.     Standards For Granting A Motion For Preliminary Injunction**.

Under Rule of the Federal Rules of Civil Procedure, to obtain preliminary injunctive relief, CCC must show: (1) it has no adequate remedy at law and will suffer irreparable harm if the relief is not granted; (2) the irreparable harm it would suffer outweighs the irreparable harm defendant would suffer if the injunction is not granted; (3) it has some likelihood of success on the merits; and (4) the desired injunction would not frustrate the "public interest." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386-88 (7th Cir. 1984); *see American Hosp. Supply*

*Corp. v. Hospital Prods.*, 780 F.2d 589, 612 (7th Cir. 1986) (affirming issuance of TRO and preliminary injunction).

CCC easily meets the foregoing standards. CCC requires injunctive relief to restrain Defendants from continuing to use its confidential and trade secret information, including sensitive information concerning its vendor and customer arrangements, to establish 5 Star as a competitor in the foodservice supply industry. Absent such relief, CCC faces significant damage to its business, vendor and customer relationships, and good will, none which is compensable in money damages. Allowing Defendants to exploit the present situation – created by their breaches of contract and fiduciary duty and theft of trade secrets – would unjustly reward them for their unlawful conduct and eviscerate the competitive advantages that CCC has secured at significant effort and expense. In effect, Defendants are seeking to recreate ICS, a business that CCC paid over $30 million to acquire, by using its confidential business information *and* extremely valuable information developed during the integration of CCC and ICS.

The law is rife with cases that have awarded injunctive relief to companies like CCC which have been victimized by unfair methods of competition through the disclosure of confidential and trade secret information. *See, e.g., Televation Telecomm. Sys., Inc. v. Saindon*, 522 N.E.2d 1359 (Ill. App. Ct. 1988) (affirming grant of preliminary injunction to prevent disclosure of trade secrets); *Tie Sys., Inc. v. Telcom Midwest, Inc.*, 560 N.E.2d 1080 (Ill. App. Ct. 1990) (affirming grant of preliminary injunction where former employees disclosed trade secrets); *Hexacomb Corp. v. GTW Enter., Inc.*, 875 F. Supp. 457 (N.D. Ill. 1993) (granting preliminary injunction to prevent misappropriation of trade secrets). As this wealth of case law demonstrates, CCC is entitled to injunctive relief against Defendants' efforts to unlawfully compete.

**II.    CCC Has No Adequate Remedy At Law And Will Suffer Irreparable Harm Unless Preliminary Injunctive Relief Is Granted.**

Unless injunctive relief is granted, CCC faces the disclosure of its confidential and trade secret information, damage which cannot be undone or adequately compensated in monetary damages. Indeed, for this reason, the Illinois Trade Secrets Act ("ITSA") specifically authorizes the issuance of injunctive relief to prevent the "actual or threatened misappropriation [of trade secrets]." 765 ILCS 1065/3.

8

Furthermore, through the improper use of its confidences, CCC also is confronted with the potential loss of present and future customers and its good will. Courts have repeatedly recognized irreparable injury exists wherever there is evidence of a possible loss of customers or erosion of goodwill. *See Merrill Lynch v. Cross*, No. 98 C 1435, 1998 WL 122780, at *2 (N.D. Ill. March 13, 1998) (granting temporary restraining order where former employer "will suffer irreparable harm…because [it] may lose clients and suffer loss to its goodwill and business reputation"); *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (affirming grant of temporary restraining order where plaintiff established it would otherwise suffer irreparable harm from loss of customers); *A-Tech Computer Servs., Inc. v. Soo Hoo*, 627 N.E.2d 21, 27 (Ill. App. Ct. 1993) (loss of customers, good will, and future profits "are so variable in nature that damages are hard to assess with any degree of accuracy"). This irreparable injury to CCC's business will necessarily result from Defendants' unlawful conduct. As such, this case requires equitable relief.

**III.     CCC Has Shown A Likelihood Of Success On The Merits.**

To establish a likelihood of success on the merits justifying injunctive relief, CCC need only demonstrate a "better than negligible" chance of succeeding on the merits. *Int'l Kennel Club, Inc. v. Mighty Start, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). The facts here unequivocally demonstrate that CCC meets that threshold.

**A.     CCC Can Demonstrate Misappropriation of Trade Secrets.**

A trade secret may consist of any "formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive independent value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Items such as customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have been shown to be trade secrets. *See, e.g., Cross*, 1998 WL 122780, at *2 (customer lists are entitled to trade secret protection under Illinois law); *Tie Sys.*, 560 N.E.2d at 1085 (dates on which customers would either renew contracts or buy additional services or products constituted trade secrets); *Outsource Int'l, Inc. v. George Barton & Barton Staffing Solutions*, 192 F.3d 662, 668 (7th Cir. 1999) (cost and pricing figures and comparable rates protectable as

9

trade secrets); *Burt Dickens & Co. v. Bodi*, 494 N.E.2d 817 (Ill. App. Ct. 1986) (customer policy expiration list constituted protectable trade secret). If such customer information is treated as confidential and secret by the employer such that it imparts economic value to the employer, and the employer's competitors, then it is properly classified as a "trade secret." *See Thermodyne Food Serv. Prod., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1306 (N.D. Ill. 1996) (trade secret must "be of economic value to both its owners and its competitors due to its secrecy").

The confidential information possessed, and which is being disclosed or will inevitably be disclosed, by Defendants L. Williams, Pursel, and Mastrofrancesco clearly falls within this definition of "trade secret." As CCC alleges, these Defendants were privy to highly confidential information concerning the business of ICS, including its purchasing arrangements and information concerning sales such as the identities of its customers and pricing, volume, and margin information. Through their subsequent employment with CCC and efforts to integrate ICS's business, these Defendants were also given additional information concerning CCC's business, its efforts to reduce costs by examining the vendor arrangements of CCC and ICS, and sales information of CCC to which they were not privy during their prior employment with ICS. If they have not done so already, it is inevitable these Defendants will disclose this highly confidential information in performing their job duties for 5 Star. *See Strata Marketing v. Murphy*, 740 N.E.2d 1166, 1178 (Ill App. Ct. 2000) (injunction should issue where a former employee "[could] not help but rely" on her former employer's confidential information in performing her job duties with a competitor); *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1270-72 (7th Cir. 1995) (injunction should issue where competitor is "unfairly armed with knowledge of [former employer's] plans [and] will be able to anticipate its distribution, packaging, pricing and marketing moves").

Furthermore, the evidence overwhelming suggests that these Defendants – in addition to inevitably disclosing CCC's trade secrets – also have actually misappropriated its trade secrets by transferring files from their CCC work computers in the days leading to their resignations and are using this information along with the remaining Individual Defendants on behalf of 5 Star. Worse yet, in an apparent effort to cover their tracks, these Defendants have also deleted numerous files from their work computers. When viewed in its entirety and following further discovery concerning the materials taken by these Individual Defendants,

10

there can be no doubt that CCC has shown more than a negligible chance that it will prevail on its claim that the Defendants have misappropriated trade secrets.

The evidence will also show CCC takes reasonable measures, under the circumstances, to maintain the secrecy of its information by limiting employee access on a need-to-know basis, implementing password protections, maintaining a confidentiality policy, and requiring employees to execute confidentiality agreements. *CUNA Mutual Life Ins. Co. v. Kuperman*, No. 97 C 6228, 1998 WL 409880, at *8 (N.D. Ill. July 7, 1998) (reasonable efforts to maintain confidentiality found where employee was required to sign employment agreement with confidentiality provision and to acknowledge and certify compliance with company policy on confidentiality). Because CCC has taken reasonable measures to keep its confidential information secure and because such information could be devastating in the hands of a competitor, the confidential information deserves trade secret protection.

**B.    CCC Can Establish Breach of Contract Against The Individual Defendants (excepting Pursel) and Tortious Interference With Contract Against L. Williams and 5 Star.**

To enforce the confidentiality provisions contained in the Employee Proprietary Information Agreements signed by L. Williams, Mastrofrancesco, Caruso, and C. Williams, CCC need only establish that it is seeking to protect information that it made an effort to keep confidential. *CUNA Mutual*, 1998 WL 409880, at *7.[1/] CCC need not establish that its confidential business information rises to the level of a trade secret to establish its breach of contract claims. *Id.* ("an employer seeking to enforce restrictions on the disclosure of confidential information need not establish that the information rises to the level of a trade secret"). As explained above with respect to its claim for violations of the ITSA, CCC plainly sought to protect its confidential information. Nonetheless, L. Williams and Mastrofrancesco exploited their access to CCC's computer systems by downloading electronic files which likely contain confidential information that is being used by them, Caruso, and C. Williams at 5 Star. L. Williams and Mastrofrancesco were also privy to a wealth of confidential information by

---

1/    To the extent that these agreements are governed by the law of the State of Connecticut, these agreements remain enforceable and do not require that CCC establish that the information rises to the level of a trade secret. *Newinno, Inc. v. Peregrim Devel., Inc.*, No. CV010390074S, 2002 WL 31875450, at *8 (Conn. Super. Ct. Dec. 3, 2002) ("Nondisclosure agreements may define proprietary or confidential information more broadly than [Uniform Trade Secrets Act] or common law and may contractually preclude employees from disclosing such information at least to the extent that the agreements are consensual, reasonable and supported by consideration.")

11

virtue of their high-level employment with CCC and involvement in integrating ICS's business and, therefore, have used or will inevitable use this information in performing their job duties for 5 Star. Moreover, Defendants L. Williams, Mastrofrancesco, Caruso, and C. Williams appear to be in possession of CCC materials that they have failed to return in further violation of the Employee Proprietary Information Agreements.

The evidence will also show 5 Star and L. Williams have tortiously interfered with the contractual obligations of Mastrofrancesco, Caruso, and C. Williams. CCC can show tortious interference with a contract by demonstrating (1) the existence of contracts between CCC and one of its former employees; (2) 5 Star and L. Williams knew of those contracts; (3) 5 Star and L. Williams intentionally and unjustifiably induced a breach of those contracts; (4) the former employees breached their contracts; and (5) CCC suffered damage as a result. *See Girsberger v. Kres*, 633 N.E. 2d 781, 789 (Ill. App. Ct. 1993).

CCC can easily meet these requirements. The Employee Proprietary Information Agreements are valid and binding contracts between Mastrofrancesco, Caruso, and C. Williams and the Company. 5 Star and its Manager, L. Williams, were at all times aware of these contracts. Despite this knowledge, 5 Star and L. Williams have intentionally and unjustifiably induced these employees to (1) breach their confidentiality obligations and (2) breach their obligations to return all property of CCC.

**D.     CCC Can Demonstrate Breach of Fiduciary Duty Against The Defendants.**

Employees breach their fiduciary duty when, while still affiliated with the company, "they solicit employees to join a rival business or orchestrate a mass exodus to follow shortly the officer's resignation from the company." *Veco Corp. v. Backcock*, 611 N.E.2d 1054, 1061 (Ill. App. Ct. 1993); *see also ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders*, 379 N.E.2d 1228, 1237 (Ill. App. Ct. 1993) ("While acting as an agent or employee of another, one owes the [fiduciary] duty of fidelity and loyalty"); *Unichem v. Gurtler*, 498 N.E.2d 724 (Ill. App. Ct. 1986) (officer breached fiduciary duty by encouraging employees to quit company to join competing company he intended to join). Employees likewise breach their fiduciary duties when they misappropriate their employer's confidential information, regardless of whether it rises to the level of a trade secret. *ABC*, 379 N.E.2d at 1237 (a fiduciary cannot "appropriate his employer's personal property"); *Charles Schwab & Co, Inc. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *5 (N.D. Ill. Sept. 27, 2005) (theft of customer information,

while still employed, constitutes a breach of fiduciary duties "even if that information does not constitute a full-blown trade secret"). Under Illinois law, a third party, such as 5 Star, who knowingly participates in or induces an employee to breach his fiduciary duties to his employer is liable to the employer if the third party benefits from the breach. *In re Salem Mills, Inc. v. Wisconsin Tool and Stamping Co.*, 881 F. Supp. 1109, 1116 (N.D. Ill. 1995).

As CCC's allegations demonstrate, L. Williams and Pursel, on behalf of 5 Star, breached their fiduciary duties to CCC. Before leaving CCC's employ, they informed the remaining Individual Defendants of their intention to form 5 Star and solicited them to leave CCC for positions at 5 Star. For their part, the other Individual Defendants, with full knowledge of the competitive activities of L. Williams and Pursel, failed to disclose this information to CCC and, rather, waited until 5 Star was close to becoming operational before tendering their immediate resignations and joining 5 Star. L. Williams, Pursel, and Mastrofrancesco further breached their fiduciary obligations by downloading CCC information from its computer systems for use at 5 Star. These wrongful actions unequivocally demonstrate a likelihood of success on the merits of CCC's claim for breach of fiduciary duties against the Defendants.

### E.   CCC Can Demonstrate Violation of the Consumer Fraud and Abuse Act ("CFAA").

CCC will likely prevail on the merits of its CFAA claim. As CCC's allegations demonstrate, prior to their resignation from CCC, L. Williams, Mastrofrancesco, and Pursel accessed CCC's work computers, a protected computer engaged in interstate commerce, without authorization or in excess of authorized access, intending to improperly convert documents developed by CCC and damage CCC's computers. As a result of their actions, CCC has lost the value of its misappropriated information and been forced to investigate the misuse of its computers. Moreover, L. Williams, Mastrofrancesco, Pursel, and 5 Star have obtained the value of CCC's misappropriated information. This constitutes a valid claim for violation of the CFAA under 18 U.S.C. Section 1030.

### F.   CCC Can Demonstrate Conversion Against the Defendants

To succeed on a claim for conversion, a plaintiff must demonstrate (1) the unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the

property; and (4) a demand for possession. *Trans Union LLC v. Credit Research Inc.*, No. 00 3885, 2001 WL 648953, at *5 (N.D. Ill. June 4, 2001). As the evidence clearly suggests that the Defendants unlawfully misappropriated CCC's confidential and trade secret information and have refused to return it despite CCC's demands, it is likely that CCC will succeed on its claim for conversion.

### G.     CCC Can Demonstrate Civil Conspiracy.

Given the totality of the circumstances, CCC will likely prevail on the merits of its civil conspiracy claim. To establish a cause of action for unlawful conspiracy to injury business, a plaintiff must demonstrate that defendants combined for the intentional and malicious purpose of injuring the plaintiff's business. *Nat'l Gas Appliance Corp. v. Manitowoc Co.*, 311 F.2d 896, 900 (7th Cir. 1962) (cause of action exists for unlawful conspiracy to injure plaintiff's business). The bad acts of the Defendants as described in detail above, establish that CCC also has a "better than negligible" chance of prevailing on this claim.

## IV.    The Balancing Of The Harms Weighs In Favor Of Issuing The Injunctive Relief Sought.

The balancing of harms is conducted on a sliding scale: "the greater the moving party's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor; conversely, the less likely it is that the moving party will succeed on the merits, the more the balance need weigh toward its side." *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994). As set forth above, there is a great chance that CCC will succeed on the merits of its claims. Even if this were not the case, however, the balance of harms tips decidedly in CCC's favor.

While the Defendants are free to pursue employment and business opportunities that do not infringe on CCC's rights, they may not engage in competition that is premised on CCC's confidential information and trade secrets or enjoy the fruits of their bad acts, including their breaches of fiduciary duty. Only immediate injunctive relief can prevent further irreparable harm to CCC, and preserve its good will, business reputation, and market share. As the harm to CCC, on balance, is far greater than any inconvenience to the Defendants, the preliminary injunctive relief should issue.

**IV.     Granting CCC The Requested Relief Is In The Public Interest**

Enjoining the Defendants from benefiting from or continuing their illegal acts will not injure the public at large.  In fact, the injunction requested merely requires the Defendants to do that which the law requires – refrain from disclosing or using its confidential and trade secret information or engaging in activities that will inevitably result in such disclosure or use. Moreover, the injunctive relief sought here furthers the goals of free and *fair* competition embodied in Illinois trade secret law and thus actually serves the public interest.

## CONCLUSION

For all of the reasons set forth above, this Court should exercise its power to preliminarily enjoin (a) all Defendants from using or disclosing CCC's confidential information or trade secrets; (b) 5 Star, L. Williams, Pursel, and Mastrofrancesco from engaging in activities in the foodservice supply industry for a period of one year; and (c) enjoining L. Williams, C. Williams, Caruso, and Mastrofrancesco from engaging in activities that would violate their Employee Proprietary Information Agreements.  This Court should further direct Defendants to return all property of CCC in their possession, custody, or control.

                      CONSOLIDATED COMMERCIAL CONTROLS,
                      INC., d/b/a ALLPOINTS FOODSERVICE PARTS
                      & SUPPLIES


                      By: /s/ Jeffrey L. Rudd_____
                                One of Its Attorneys


Bonita L. Stone
Jeffrey L. Rudd
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200 (telephone)
(312) 902-1061 (facsimile)
#60664560

## CERTIFICATE OF SERVICE

I, Jeffrey L. Rudd, an attorney, certify that on August 8, 2008, I served a copy of the foregoing ***Memorandum Of Law In Support Of Plaintiff's Motion For Preliminary Injunction***, by first class mail, proper postage prepared, in the U.S. Mail located at 525 West Monroe Street, Chicago, Illinois 60661 and by overnight delivery by Federal Express, upon the following:

>   Rowena A. Moffett
>   Brenner, Saltzman & Wallman LLP
>   271 Whitney Ave.
>   New Haven, CT 06511
>
>   5 Star Supply LLC
>   5 Star Management Group, LLC
>   Linda Williams
>   c/o Linda Williams
>   66 Hidden Hill Road
>   New Hartford, CT 06057
>
>   Clifford Williams
>   66 Hidden Hill Road
>   New Hartford, CT 06057
>
>   Philip Caruso
>   25 Cheryl Lane
>   Prospect, CT 06712
>
>   Stephen Pursel
>   494 Spielman Highway
>   New Hartford, CT 06013
>
>   Robert G. Mastrofrancesco
>   1076 Hamilton Avenue
>   New Hartford, CT 06057

  /s/ Jeffrey L. Rudd_____
                Jeffrey L. Rudd

60664560