**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CONSOLIDATED COMMERCIAL CONTROLS, INC. | ) | |
| | ) | CASE NO. 1:08-cv-04388 |
| Plaintiff, | ) | Honorable Virginia M. Kendall |
| | ) | |
| v. | ) | |
| | ) | |
| 5 STAR SUPPLY LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS DUE TO LACK OF JURISDICTION**

Defendants 5 Star Supply LLC, 5 Star Management Group, LLC, Linda A. Williams, Clifford G. Williams II, Stephen J. Pursel, Philip J. Caruso, and Robert G. Mastrofrancesco ("Defendants") submit the instant memorandum of law in support of their motion, filed concurrently herewith, seeking to dismiss the above-captioned action pursuant to Fed. R. Civ. P. 12(b)(2) on the ground that this Court lacks personal jurisdiction over Defendants.

**I.       FACTUAL BACKGROUND**

So as not to burden the Court with duplicative filings, Defendants incorporate by reference the facts of this action as set forth in the Factual Background section of Defendants' memorandum in support of their motion to dismiss due to improper venue, filed concurrently herewith.

**II.       PROCEDURAL BACKGROUND**

On or about July 18, 2008, the individual Defendants each received separate correspondence from legal counsel for Plaintiff making various demands of Defendants in connection with their new employment.  See Pl.'s Compl., Ex. E.  In the demand letter sent to Linda Williams, 5 Star Supply LLC and 5 Star Management Group, LLC, Plaintiff's counsel

asserted that Linda Williams was unlawfully competing with the Plaintiff, that Ms. Williams had misappropriated confidential information of the Plaintiff, and that "it is simply not possible for [Ms. Williams] to own and operate a directly competitive business without relying upon the [Plaintiff's] information". Plaintiff's counsel also demanded that Linda Williams permit Plaintiff to inspect the Defendants' computers and other electronic media. The letter further indicated that, unless Linda Williams responded to Plaintiff's demands within five (5) business days, Plaintiff would "pursue its legal rights, and seek a preliminary injunction to stop the continued misappropriation of its confidential and trade secret information and to bar 5 Star from engaging in any activities in the foodservice supply industry". The letters to Stephen Pursel and Robert Mastrofrancesco contained essentially identical claims of the inevitable disclosure of confidential information, demands of access to Defendants' computer devices and threats of impending litigation seeking preliminary injunctive relief. The letters to Clifford Williams and Philip Caruso demanded that they the return any documents and property related to the business of Plaintiff or ICS and that they immediately permit the inspection and deletion of any such information that may reside upon their computers or other electronic media.

Defendants are not utilizing Plaintiff's confidential or trade secret information in connection with their current business activities, indeed they have no need to do so, and they do not intend to do so at any time in the future. Not wishing to conduct business under the cloud of Plaintiff's spurious allegations and demands as set forth in the July 18, 2008 demand letters, Defendants, on July 24, 2008, filed an action in the United States District Court for the District of Connecticut (the "Connecticut Action"), seeking a declaratory judgment concerning the rights and remedies of the parties, and also alleging an affirmative claim of Plaintiff's violation of the Connecticut Wage Act, Conn. Gen. Stat. § 31-72, due to Plaintiff's failure and refusal to pay

Philip Caruso, Clifford Williams and Robert Mastrofrancesco the vacation pay and wages due them, for which violation said Defendants seek actual damages plus interest, costs and reasonable attorney's fees as provided pursuant to Connecticut General Statutes § 31-72. Via overnight mail sent on July 24, 2008, Defendants' counsel provided counsel for Plaintiff with a copy of the Connecticut Action, together with a transmittal cover letter.[1] A copy of the Complaint filed in the Connecticut Action and the accompanying cover letter are attached hereto as **Exhibit A** (these documents also are attached to Plaintiff's Complaint filed in the instant action, as Exhibit F). Plaintiff's agent for service was served with the Connecticut Action on August 6, 2008. See Marshal's Return of Service of Connecticut Action, attached hereto as **Exhibit B**. Counsel for Plaintiff filed an appearance in the Connecticut Action on August 19, 2008, and requested an extension of thirty (30) days in which to file a responsive pleading in the Connecticut Action, which request was granted. See **Exhibit C**.

On August 1, 2008, notwithstanding the pendency of the Connecticut Action, Plaintiff filed the instant action in the United States District Court for the Northern District of Illinois. Defendants were served on August 8, 2008.[2]

With respect to Plaintiff's unfounded allegations of wrongful conduct in this matter, Defendants' counsel made clear in the cover letter accompanying the Connecticut Action Complaint sent to Plaintiff's counsel on July 24, 2008 that "The 5 Star Parties vehemently deny CCC's allegations of wrongful conduct, more particularly but without limitation, the allegation that the 5 Star Parties are utilizing confidential and trade secret information of CCC in

---

[1] In her cover letter, in accordance with Fed. R. Civ. P. 4, Defendants' counsel requested that Plaintiff's counsel execute a Waiver of Service, to which request Plaintiff's counsel did not respond until well after Plaintiff had filed the instant action.

[2] Conversely, following receipt of a copy of the Complaint filed in this action on August 5, 2008, counsel for Defendants advised Plaintiff's counsel on August 8, 2008 that she agreed to waive service upon Defendants in accordance with Rule 4; but Plaintiff nevertheless undertook personal service upon each Defendant.

connection with the business of 5 Star Supply LLC."  Exhibit A.  Further, the Complaint filed in

the Connecticut Action expressly alleges: "Plaintiffs are not utilizing Defendant's confidential or

trade secret information in connection with their current business activities, indeed they have no

need to do so, and they do not intend to do so at any time in the future."  Exhibit A, ¶ 27.

Notwithstanding these clear and unequivocal denials of wrongful conduct in this regard, Plaintiff

represented to this Court in its *Verified* Complaint filed in this matter, as well as in its Motion for

Preliminary Injunction (at pp. 2-3) and Memorandum of Law in support thereof (at p. 7), that "in

neither document [meaning the Connecticut Action Complaint and the transmittal letter] did 5

Star or the Individual Defendants deny that they had taken information from CCC or were using

that information to compete with CCC."  Compl. ¶ 45.  Plaintiff's counsel's misrepresentations

to this Court are disappointing at the least, and may even violate Fed. R. Civ. P. 11(b).

At the initial motion conference with respect to Plaintiff's Renewed Motion for

Expedited Discovery held on August 21, 2008, counsel for Defendants indicated Defendants'

objection to Plaintiff's requests for preliminary injunctive relief and expedited discovery in this

District, and further indicated Defendants' intention to file the instant motions to dismiss this

action.  The Court directed that any such motions be filed by August 29, 2008.  The Court further

indicated that Plaintiff's requests for preliminary injunctive relief and expedited discovery would

be held in abeyance until the instant motion are decided.[3]

### III.   LEGAL STANDARD

When a party seeks dismissal based upon lack of personal jurisdiction and improper

venue, the Court must first determine whether the defendant is subject to personal jurisdiction

within the State; otherwise, consideration of alternative grounds for dismissal/transfer would be

---

[3] As indicated during the initial motion conference, Defendants object to Plaintiff's requests for injunctive relief and expedited discovery.  In the event that this matter is not dismissed or transferred, Defendants reserve their right to submit memoranda in opposition to such motions.

moot.  <u>Coalsales II, LLC v. Gulf Power Co.</u>, No. 06-cv-488-DRH, 2007 U.S. Dist. LEXIS 12593, at * 4-5 (S.D. Ill. Feb. 23, 2007) (attached hereto as **Exhibit D**).  Moreover, once a defendant moves to dismiss an action pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff has the burden of establishing the existence of personal jurisdiction over a defendant located out of state.  <u>Purdue Research Found. v. Sanofi-Synthelabo, S.A.</u>, 338 F.3d 773, 782 (7th Cir. 2003).  To meet this burden, the plaintiff must provide sufficient evidence to establish a prima facie case of personal jurisdiction.  <u>Turnock v. Cope</u>, 816 F.2d 332, 333 (7th Cir. 1987).[4]  In determining whether the plaintiff has met its burden of proving personal jurisdiction, the court may receive and consider affidavits from both parties.  <u>Glass v. Kemper Corp.</u>, 930 F. Supp. 332, 337 (N.D. Ill. 1996).  The court must resolve factual disputes in the pleadings and affidavits in favor of the plaintiff, but must take as true facts contained in the defendant's affidavit that the plaintiff does not dispute.  <u>Id.</u>

## IV.    ARGUMENT

Plaintiff inappropriately seeks to have its dispute adjudicated in this District, which lacks personal jurisdiction over Defendants.  For this reason, discussed below, this matter should be dismissed.

### A.    Dismissal Due to Lack of Personal Jurisdiction

In order to establish personal jurisdiction, a plaintiff must demonstrate that personal jurisdiction over Defendants complies with: (1) the Illinois long-arm statute, 735 ILCS 5/2-209; (2) Illinois constitutional law; and (3) federal constitutional law.  <u>RAR, Inc. v. Turner Diesel, Ltd.</u>, 107 F.3d 1272, 1276 (7th Cir. 1997).  Moreover, because the Illinois long-arm statute "'permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United

---

[4] In this regard, the Complaint is entirely devoid of any allegations supporting jurisdiction over the Defendants in Illinois.

States Constitutions,'" the analysis is in actuality a two-prong examination: (1) determining whether the applicable state long-arm statute is satisfied; and (2) whether exercise of jurisdiction is consistent with the constitutional requirements of due process. Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 714-715 (7th Cir. 2002) (quoting Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 940 (7th Cir. 2000)); Klump v. Duffus, 71 F.3d 1368, 1371 n.4 (7th Cir. 1995)); see also FMC Corp. v. Varonos, 892 F.2d 1308, 1310 n.5 (7th Cir. 1990) (indicating that the parameters of jurisdiction under the Illinois long-arm statute are contiguous with the requirements of due process under the United States and Illinois Constitutions).

In comporting with the constitutional requirements of due process, a court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts with the forum state "such that the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" Hyatt Int'l Corp., 302 F.3d at 713 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (additional citation omitted). This standard varies depending on whether the jurisdiction alleged is general or specific. RAR, Inc., 107 F.3d at 1277. General jurisdiction exists in cases where a defendant has "continuous and systematic" business contacts with the forum state. Hyatt Int'l Corp., 302 F.3d at 713. In contrast, in specific jurisdiction cases, the suit must "arise out of" or be "related to" the defendant's minimum contacts with the forum state. Id. at 716. Plaintiff can make neither showing in the instant matter.

### 1.    General Jurisdiction

To find general personal jurisdiction, the contacts must be "'so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely

different from those activities.'" Clearclad Coatings, Inc. v. Xontal Ltd., No. 98 C 7199, 1999 U.S. Dist. LEXIS 13173 (N.D. Ill. Aug. 20, 1999) (attached hereto as **Exhibit E**) (quoting Glass v. Kemper Corp., 930 F. Supp. 332, 338 (N.D. Ill. 1996)). In evaluating whether general jurisdiction exists, courts examine: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. Birnberg v. Milk St. Residential Assocs. Ltd. P'ship, Nos. 02 C 0978, 02 C 3436, 2003 U.S. Dist. LEXIS 806, at * 11 (N.D. Ill. Jan. 21, 2003) (attached hereto as **Exhibit F**).

Here, the company Defendants have *absolutely no contacts* with Illinois.  They have not made any product sales in Illinois, do not maintain an office within Illinois, do not send agents into Illinois to conduct business, do not advertise or solicit business in Illinois, or have a designated agent for service of process or members located in Illinois.  See Section I-D, supra. As such, there is no basis to find general jurisdiction over these Defendants.

Similarly, apart from the individual Defendants' alleged activities that form the basis of this suit (and which, therefore, do not establish general jurisdiction), the individual Defendants have had no dealings or contact with Illinois to justify this court's general personal jurisdiction. More specifically, the Defendants do not reside, own property or conduct business in Illinois; they do not maintain an office or employees with in Illinois; they do not send agents into Illinois to conduct business; they have not advertised or solicited business in Illinois; and they have not designated an agent for service of process in Illinois.  See Section I-D, supra.  As such, there can be no basis upon which to find general jurisdiction over Defendants in Illinois.

2.    Specific Jurisdiction

In determining whether specific personal jurisdiction exists, the court must first address whether the defendant has "'purposefully established minimum contacts with the forum State.'" Hyatt Int'l, Inc., 302 F.3d at 716 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)). In this regard, the court must determine whether the defendant "'should reasonably anticipate being haled into court [in the forum State].'" Id. (quoting Burger King Corp., 471 U.S. at 474 (citation omitted)). It is reasonable for a defendant to anticipate being haled into court in the forum state when it has "'purposefully availed itself of the privilege of conducting activities' there." Id. (quoting Burger King Corp., 471 U.S. at 475 (citation omitted)).

Second, the court must determine whether those contacts would make personal jurisdiction "reasonable and fair under the circumstances." RAR, Inc., 107 F.3d at 1277. After minimum contacts have been established, a defendant "can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [the forum] would violate traditional notions of fair play and substantial justice." Logan Prods., Inc. v. Optibase, Inc., 103 F.3d 49, 53 (7th Cir. 1996) (quoting Burger King Corp., 471 U.S. at 477). In assessing whether jurisdiction is consistent with fair play and substantial justice the court should consider: (1) the burden on the defendant in litigating in the forum; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interests of the interstate judicial system in obtaining an efficient resolution of the controversy; and (5) the interests of the several states in furthering fundamental substantive policies. Id.

In the instant matter, once again, because the company Defendants have not undertaken *any* activities in Illinois, there can be no basis upon which to find specific personal jurisdiction over these Defendants.  More particularly, the operations of Defendant 5 Star Supply LLC

cannot be found to have established minimum contacts with Illinois, as it has no operations or customers in Illinois at all, and it has no members in the State.[5] Id.  Defendant 5 Star Management Group, LLC, with no members in Illinois and no business operations at all, cannot be found to have the requisite contacts with Illinois.  Id.

Further, the individual Defendants cannot be said to have "purposefully availed [themselves] of the privilege of conducting activities" in Illinois.  Burger King Corp., 471 U.S. at 475.  Indeed, this action arises out of Defendants' decision to find alternate employment *precisely* because their employer was purchased by a company based in Illinois.  The individual Defendants did not want to work for, or be required to make trips to, a Chicago company. Defendants never entered into employment contracts with the new employer, and, prior to Plaintiff's purchase of ICS, Defendants Clifford Williams and Philip Caruso had never even visited Illinois.  Mr. Pursel and Mr. Mastrofrancesco's infrequent attendance at trade shows and Ms. Williams' single seminar attendance, all over four years ago, cannot justify jurisdiction in and of themselves.  The individual Defendants' limited trips to Illinois (a total of seven by Linda Williams, nine by Robert Mastrofrancesco (only one such visit within the last five years), four by Stephen Pursel (only one such visit within the last ten years), and only two by Clifford Williams and Philip Caruso), all at the behest of Plaintiff or Defendants' other former employers and before any of the alleged wrongful took place, are insufficient to establish specific jurisdiction over the individual Defendants  See Section I-D, supra.

Additionally, the considerations of fair play and substantial justice weigh against personal jurisdiction over Defendants.  The burden on Defendants, individuals and a small, start up company with limited capital, of litigating this matter in Illinois would be extreme.  Contrasted

---

[5] That Plaintiff alleges that Defendants' activities have harmed Plaintiff, an Illinois company, cannot be sufficient, without more, to establish personal jurisdiction over Defendants.  If such were the case, any party claiming to suffer harm could satisfy jurisdictional requirements, rendering the protections of due process meaningless.

with Plaintiff--"one of the leading suppliers . . . to the foodservice industry, Pl.'s Compl. ¶ 13—which has an office in Connecticut and substantially more resources than Defendants, the relative burdens of litigating in Illinois are enormously disparate.  Illinois has limited interest in this dispute, as the allegedly wrongful conduct took place in Connecticut and the company Defendants have no operations in Illinois.  Conversely, Connecticut has the much greater interest in this litigation, where the conduct allegedly took place and the witnesses and evidence more likely are located.  Plaintiff can just as readily obtain "convenient and effective relief" in Connecticut, where an action between the parties already is pending.  The interests of the interstate judicial system in obtaining an efficient resolution of this controversy and in furthering fundamental substantive policies favor dismissal of this action, so that dual litigation and the waste of resources that will entail, will not continue.  In this regard, Defendants note that if the company Defendants are dismissed from this action but the individual Defendants remain, Plaintiff would be required to litigate in two jurisdictions in order to seek relief against all parties, thereby wasting judicial resources litigating over identical issues in two courts and risking conflicting rulings.[6]

Thus, there can be no basis upon which to find specific jurisdiction over any of the Defendants in Illinois.

3.    The Fiduciary Shield Doctrine

Even assuming, arguendo, that the individual Defendants' conduct in connection with their employment with Plaintiff establishes sufficient minimum contacts with Illinois to satisfy federal due process, the fiduciary shield doctrine prevents the exercise of personal jurisdiction over the individual Defendants.  Based on the principles of fairness required by the Illinois

---

[6] Defendants also point out that they maintain affirmative claims for relief (statutory wage claims) against Plaintiff in the Connecticut Action, which claims will continue to be adjudicated by the Connecticut District Court regardless of the outcome of this matter.

Constitution, Illinois allows a nonresident defendant to raise a defense to personal jurisdiction known as the fiduciary shield doctrine. <u>Rice v. Nova Biomedical Corp.</u>, 38 F.3d 909, 912 (7th Cir. 1994). The fiduciary shield doctrine denies jurisdiction over an individual whose presence and activity in Illinois were solely on behalf of his employer or other principal. <u>Clark Prods., Inc. v. Rymal</u>, No. 02 C 6893, 2002 U.S. Dist. LEXIS 22333, at * 10-11 (N.D. Ill. Nov. 19, 2002) (attached hereto as **Exhibit G**) (citing <u>Rice</u>, 38 F.3d at 912). The Illinois Supreme Court has stated that where an individual defendant's conduct in Illinois is a product of -- and is motivated by -- his "employment situation and not his personal interests … it would be unfair to use this conduct to assert personal jurisdiction over him as an individual." <u>Rollins v. Ellwood</u>, 141 Ill. 2d 244, 565 N.E.2d 1302, 1314 (1990).

Here, the fiduciary shield doctrine prevents the exercise of personal jurisdiction over the individual Defendants based upon their contacts with Illinois through their employment by Plaintiff or its predecessor. As their Declarations make clear, the Individual Defendants' limited presence in Illinois was solely at the direction and on behalf of their employer. <u>See</u> Section I-D, <u>supra</u>. Therefore, these contacts cannot justify personal jurisdiction over the individual Defendants. <u>See, e.g.</u>, <u>Int'l Fin. Servs. Corp. v. Didde Corp.</u>, No. 00 C 6433, 2002 U.S. Dist. LEXIS 4177, at * 10-13 (N.D. Ill. Mar. 14, 2002) (attached hereto as **Exhibit H**) (concluding that fiduciary shield doctrine prevented exercise of personal jurisdiction over defendants whose contacts with Illinois were solely the result of acts performed in their capacity as officers or employees); <u>Plastic Film Corp. of Am., Inc. v. UNIPAC, Inc.</u>, 128 F. Supp. 2d 1143, 1146-47 (N.D. Ill. 2001) (determining that defendant was shielded from the court's exercise of personal jurisdiction over him because his only contacts with Illinois were in his capacity as an officer and director of defendant corporations); <u>Robinson v. Sabis Educ. Sys., Inc.</u>, No. 98 C 4251, 1999

U.S. Dist. LEXIS 9091, at * 9-10 (N.D. Ill. May 28, 1999) (attached hereto as **Exhibit I**) (applying fiduciary shield where defendants' only contacts with Illinois were as employees of another entity); <u>Rollins</u>, 565 N.E.2d at 1318 (applying fiduciary shield doctrine to non-resident whose activities in Illinois were pursuant to his employment, concluding that it would be unfair to use such conduct as basis to assert personal jurisdiction over the defendant as an individual, observing that the defendant "had little or no alternative besides unemployment when ordered to enter another State to carry out the wishes of his employer").[7]   In the absence of such contacts, there can be no basis for personal jurisdiction over the individual Defendants, as their current business activities have no contacts with Illinois.  <u>See</u> Section I-D, <u>supra</u>.

Thus, it would be inconsistent with the federal constitutional principles of due process to exercise personal jurisdiction over any of the Defendants in this case.[8]

## V.    CONCLUSION

For the reasons discussed above, Defendants respectfully submit that this matter should be dismissed.

---

[7] The shareholder exception to the fiduciary shield doctrine is inapplicable, as the individual Defendants were not shareholders of Plaintiff or ICS.  <u>See</u> <u>Plastic Film Corp. of Am., Inc.</u>, 128 F. Supp. 2d at 1147 (N.D. Ill. 2001) ("The determinative factor [to application of fiduciary shield] is the individual's status as a shareholder, not merely as an officer or director"); <u>Int'l Fin. Servs Corp.</u>, 2002 U.S. Dist. LEXIS 4177, at * 15 (**Exhibit H**) ("[J]ust because an individual is a member of management or holds controlling positions in a corporation does not nullify the protection of the fiduciary shield.").

[8] The Court should examine each Defendant's "minimum contacts" with Illinois separately.  At the very least, there is no basis upon which to assert personal jurisdiction over the company Defendants, which have no presence in or contact with Illinois.  This is particularly true with respect to Defendant 5 Star Management Group, LLC, which has no business operations whatsoever.

DEFENDANTS 5 STAR SUPPLY LLC, 5 STAR MANAGEMENT GROUP, LLC, LINDA A. WILLIAMS, CLIFFORD G. WILLIAMS, II STEPHEN J. PURSEL, PHILIP J. CARUSO, and ROBERT G. MASTROFRANCESCO,


By:   s/ Cary E. Donham

    Cary E. Donham
    Roger Joseph Kiley
    SHEFSKY & FROELICH LTD
    Their Attorneys
    111 East Wacker Drive
    Suite 2800
    Chicago, IL 60601
    (312) 527-4000
    Email: cdonham@shefskylaw.com
          rkiley@shefskylaw.com

1094924_1

# EXHIBIT A

# ■ Brenner, Saltzman & Wallman LLP

*ATTORNEYS AT LAW*

NEWTON D. BRENNER (1934-2006)
STEPHEN L. SALTZMAN, P.C.
MARC A. WALLMAN, P.C.
DAVID R. SCHAEFER, P.C.
DONALD W. ANDERSON, P.C.
SAMUEL M. HURWITZ, P.C.
WAYNE A. MARTINO, P.C.
MITCHELL S. JAFFE, P.C.
ALICE J. MICK, P.C.
KENNETH ROSENTHAL
CAROLYN W. KONE
BRIAN P. DANIELS
GEORGE BRENCHER IV, P.C.
JENNIFER DOWD DEAKIN, P.C.
ROWENA A. MOFFETT
JAMES E. ROSENBLUTH

SUZANNE H. ALDERMAN
SEAN M. FISHER
RONALD A. SOCCOLI, JR.

OF COUNSEL:
SHARON KOWAL FREILICH
HOLLY WINGER

Rowena A. Moffett
Email:  rmoffett@bswlaw.com

July 24, 2008

*VIA EMAIL and OVERNIGHT MAIL*
Bonita L. Stone, Esq.
KattenMuchinRosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693

Re:     *5 Star Supply LLC/Consolidated Commercial Controls, Inc.*

Dear Attorney Stone:

This office represents 5 Star Supply LLC, 5 Star Management Group, LLC, Linda Williams, Stephen Pursel, Clifford Williams, Philip Caruso and Robert Mastrofrancesco (the "5 Star Parties") in connection with the claims raised by Consolidated Commercial Controls, Inc. ("CCC") in your letters to my clients dated July 17, 2008.  The 5 Star Parties vehemently deny CCC's allegations of wrongful conduct, more particularly but without limitation, the allegation that the 5 Star Parties are utilizing confidential and trade secret information of CCC in connection with the business of 5 Star Supply LLC.

Enclosed please find a copy of a Complaint against CCC, Civil Cover Sheet and my Appearance, which were filed today in the United States District Court for the District of Connecticut seeking, <u>inter alia</u>, a declaratory judgment to resolve the parties' disputes in connection with this matter.  Also enclosed is a Notice of a Lawsuit and Request to Waive Service of a Summons.  Please advise whether CCC agrees to waive service of a Summons and Complaint in accordance with the enclosed Waiver.  I have enclosed two (2) copies of the Waiver, together with a self-addressed stamped envelope, for your convenience in returning the executed Waiver.

Bonita L. Stone, Esq.
July 24, 2008
Page 2

If you wish to discuss this matter further, feel free to contact me.

Sincerely,

Rowena A. Moffett

RAM/jr
Enclosures

ab4585.doc

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**FILED**

2008 JUL 24  P 3: 33

U.S. DISTRICT COURT
NEW HAVEN, CT

|  |  |  |
|---|---|---|
| 5 STAR SUPPLY LLC,<br>LINDA A. WILLIAMS, CLIFFORD G. WILLIAMS, II,<br>STEPHEN J. PURSEL, PHILIP J. CARUSO<br>and ROBERT G. MASTROFRANCESCO,<br>Plaintiffs, | : <br> : <br> : <br> : <br> : | CIVIL ACTION NO. |
| v. | : <br> : | |
| CONSOLIDATED COMMERCIAL<br>CONTROLS, INC.,<br>Defendant. | : <br> : <br> : <br> : | JULY 24, 2008 |

### COMPLAINT

Plaintiffs 5 Star Supply LLC, Linda A. Williams, Clifford G. Williams, II, Stephen J. Pursel, Philip J. Caruso, and Robert G. Mastrofrancesco bring this Complaint against Defendant Consolidated Commercial Controls, Inc. This is an action seeking a declaratory judgment and other relief arising from the Defendant's efforts to bar the Plaintiffs from engaging in business competitive with the Defendant, notwithstanding the absence of any contractual or other limitations on Plaintiffs' ability to do so.

**The Parties**

1.      Plaintiff 5 Star Supply LLC is a limited liability company organized under the laws of the State of Connecticut having its principal place of business in the State of Connecticut.

2.      Plaintiff Linda Williams is an individual who resides in and is a citizen of the State of Connecticut.

3.     Plaintiff Clifford Williams is an individual who resides in and is a citizen of the State of Connecticut.

4.     Plaintiff Stephen Pursel is an individual who resides in and is a citizen of the State of Connecticut.

5.     Plaintiff Philip Caruso is an individual who resides in and is a citizen of the State of Connecticut.

6.     Plaintiff Robert Mastrofrancesco is an individual who resides in and is a citizen of the State of Connecticut.

7.     Defendant Consolidated Commercial Controls, Inc. is a corporation organized under the laws of the State of Delaware having its principal place of business in the State of Illinois.

**Jurisdiction and Venue**

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 since the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

9.     Venue in this District is proper pursuant to 28 U.S.C. §1391

10.    This is an action seeking, inter alia, a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a question of actual controversy between the parties, as hereinafter more fully appears.

**Background**

11.    Defendant is a distributor of foodservice replacement parts and supplies.

12.    Plaintiff Linda Williams had been employed by Defendant and its predecessor in interest, International Commercial Supply Corporation ("ICS") for nine (9) years as CFO/COO prior to April 10, 2008.

13.    As CFO/COO of ICS, Linda Williams was responsible for overseeing all operational and financial functions of ICS.  After the acquisition of ICS by Defendant, Linda Williams' title changed to COO only, she reported to the President at Defendant's headquarters in Chicago, and her responsibilities were limited to the operational functions of Defendant's Connecticut and Nevada facilities.  Following the acquisition, Linda Williams was required to travel extensively to Defendant's headquarters in Chicago in order to carry out her job responsibilities.

14.    Plaintiff Clifford Williams had been employed by Defendant and its predecessor in interest, ICS, for twenty-two (22) years as Receiving/Inventory Control Manager prior to June 24, 2008.

15.    As Receiving/Inventory Control Manager for ICS, Clifford Williams was responsible for overseeing receipts of inventory and inventory control.  After Defendant's acquisition of ICS, Clifford Williams was demoted to a supervisory role within the warehouse, reporting to the warehouse manager.

16.    Plaintiff Stephen Pursel had been employed by Defendant and its predecessor in interest, ICS, for sixteen (16) years as Executive of Product Development prior to April 23, 2008.

17.    As Executive of Product Development of ICS, Stephen Pursel was responsible for creating and maintaining the annual catalog.  After Defendant's

acquisition of ICS, Stephen Pursel reported to Defendant's General Manager located in Chicago and he no longer had final decision making authority.

18.    Plaintiff Philip Caruso had been employed by Defendant and its predecessor in interest, ICS for twenty-five (25) years as Warehouse Manager prior to June 24, 2008.

19.    As Warehouse Manager for ICS, Philip Caruso was responsible for overseeing all warehouse functions. After Defendant's acquisition of ICS, Philip Caruso's title remained unchanged, but he lacked the hiring authority that he previously enjoyed at ICS. Following the acquisition, Philip Caruso also was informed that he would have to travel to Chicago regularly as part of his job duties.

20.    Plaintiff Robert Mastrofrancesco had been employed by Defendant and its predecessor in interest, ICS for twenty-seven (27) years as Export Sales and Customer Service Manager prior to June 24, 2008.

21.    As Export Sales and Customer Service Manager for ICS, Robert Mastrofrancesco was responsible for overseeing all sales and customer service reps for domestic and international sales. After Defendant's acquisition of ICS, Robert Mastrofrancesco was demoted to Customer Service Manager, reporting to a Manager in Chicago, and he was no longer responsible for export sales.

22.    Defendant purchased substantially all of the assets of ICS (previously a competitor of Defendant) in or about October 31, 2007, and thereafter became the employer of the individual Plaintiffs.

23.    Due to dissatisfaction with the operation of the Defendant company after it acquired ICS, each of the individual Plaintiffs determined to resign their employment

with Defendant. Linda Williams resigned her employment with Defendant, effective
April 10, 2008. Stephen Pursel resigned his employment with Defendant, effective April
23, 2008. Clifford Williams, Philip Caruso and Robert Mastrofrancesco resigned their
employment with Defendant, effective June 24, 2008.

24.    At no time were any of the individual Plaintiffs parties to an employment
agreement with either ICS or Defendant.

25.    After resigning from Defendant's employ, the individual Plaintiffs became
employed by Plaintiff 5 Star Supply LLC, which also is a distributor of foodservice
replacement parts and supplies.

26.    On or about July 18, 2008, the individual Plaintiffs each received separate
correspondence from legal counsel for Defendant making various demands of Plaintiffs
in connection with their new employment. In the demand letter sent to Linda Williams, 5
Star Supply LLC and an affiliated entity 5 Star Management Group, LLC, Defendant's
counsel asserted that Linda Williams was unlawfully competing with the Defendant, that
Linda Williams had misappropriated confidential information of the Defendants, and that
"it is simply not possible for [Ms. Williams] to own and operate a directly competitive
business without relying upon the [Defendant's] information". Defendant's counsel also
demanded that Linda Williams permit Defendant to inspect the Plaintiffs' computers and
other electronic media. The letter further indicated that, unless Linda Williams
responded to Defendant's demands within five (5) business days, Defendant would
"pursue its legal rights, and seek a preliminary injunction to stop the continued
misappropriation of its confidential and trade secret information and to bar 5 Star from
engaging in any activities in the foodservice supply industry". The letters to Stephen

Pursel and Robert Mastrofrancesco contained essentially identical claims of the inevitable disclosure of confidential information, demands of access to Plaintiffs' computer devices and threats of impending litigation seeking preliminary injunctive relief. The letters to Clifford Williams and Philip Caruso demanded that they the return any documents and property related to the business of Defendant or ICS and that they immediately permit the inspection and deletion of any such information that may reside upon their computers or other electronic media.

27.    Plaintiffs are not utilizing Defendant's confidential or trade secret information in connection with their current business activities, indeed they have no need to do so, and they do not intend to do so at any time in the future.

28.    The individual Plaintiffs intend to continue their employment with 5 Star Supply LLC and do not believe that such employment violates or will violate any contractual obligation to Defendant or any applicable provision of law with respect to confidential information or trade secrets, and that any contractual obligation which could be interpreted to bar such employment with 5 Star Supply LLC is invalid and unenforceable under Connecticut law.

## COUNT I – DECLARATORY JUDGMENT

29.    Plaintiffs repeat and allege Paragraphs 1 through 28 hereof as if fully set forth herein.

30.    There is an actual controversy between the parties as to whether Plaintiffs can continue to engage in business competitive with the Defendant.

## COUNT II – CLAIM PURSUANT TO CONNECTICUT GENERAL STATUTES § 31-72

31.    Plaintiffs repeat and allege Paragraphs 1 though 28 as if fully set forth herein.

32.    Although Defendant paid Linda Williams, Stephen Pursel and others for their unused vacation days following the termination of their respective employment with Defendant, Defendant failed to pay Philip Caruso for his unused vacation days following the termination of his employment with Defendant.

33.    Additionally, Defendant failed to pay Clifford Williams and Robert Mastrofrancesco the wages due them for the last two days of their employment.

34.    Defendant's failure to pay Philip Caruso, Clifford Williams and Robert Mastrofrancesco the vacation pay and wages due them was in bad faith, arbitrariness and unreasonableness.

35.    As a result thereof, under Connecticut General Statutes § 31-72, Plaintiffs Philip Caruso, Clifford Williams and Robert Mastrofrancesco are entitled to recover twice the amount of such wages/vacation pay not paid to said Plaintiffs in violation of Connecticut General Statutes §§ 31-71c and 31-76k, costs and reasonable attorneys' fees.

WHEREFORE, Plaintiffs 5 Star Supply LLC, Linda Williams, Clifford Williams, Stephen Pursel, Philip Caruso, and Robert Mastrofrancesco pray for relief as follows:

1.     With respect to Count I, that this Court render a declaratory judgment that the individual Plaintiffs' employment with 5 Star Supply LLC does not violate any contractual or legal obligations of the individual Plaintiffs to Defendant or any alleged doctrine of inevitable disclosure of confidential information or trade secrets.

2.     With respect to Count I, that this Court render a declaratory judgment that any contractual provision which could be interpreted to bar the individual Plaintiffs' employment with 5 Star Supply LLC is invalid and unenforceable under Connecticut law.

3.     With respect to Count II, actual damages plus interest, costs and reasonable attorney's fees as provided pursuant to Connecticut General Statutes § 31-72.

<div style="margin-left:40%">

PLAINTIFFS 5 STAR SUPPLY LLC, LINDA A.
WILLIAMS, CLIFFORD G. WILLIAMS, II
STEPHEN J. PURSEL, PHILIP J. CARUSO,
and ROBERT G. MASTROFRANCESCO,

By_____

Rowena A. Moffett, Esq. (ct 19811)
BRENNER SALTZMAN & WALLMAN, LLP
Their Attorney
271 Whitney Avenue
New Haven, CT 06511
Telephone: 203-772-2600
Fax: 203-562-2098
Email: rmoffett@bswlaw.com

</div>

# EXHIBIT B

**Moffett, Rowena A.**

| | |
|---|---|
| **From:** | CMECF@ctd.uscourts.gov |
| **Sent:** | Friday, August 15, 2008 12:46 PM |
| **To:** | CMECF@ctd.uscourts.gov |
| **Subject:** | Activity in Case 3:08-cv-01100-JBA 5 Star Supply LLC et al v. Consolidated Commercial Controls Inc Notice (Other) |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** **Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

<div align="center">

**U.S. District Court**

**United States District Court for the District of Connecticut**

</div>

**Notice of Electronic Filing**

The following transaction was entered by Moffett, Rowena on 8/15/2008 at 12:46 PM EDT and filed on 8/15/2008

| | |
|---|---|
| **Case Name:** | 5 Star Supply LLC et al v. Consolidated Commercial Controls Inc |
| **Case Number:** | 3:08-cv-1100 |
| **Filer:** | 5 Star Supply LLC |
| | Linda A. Williams |
| | Clifford G Williams |
| | Stephen J. Pursel |
| | Philip J. Caruso |
| | Robert G. Mastrofrancesco |

**Document Number:** 5

**Docket Text:**
**NOTICE by Robert G. Mastrofrancesco, 5 Star Supply LLC, Linda A. Williams, Clifford G Williams, Stephen J. Pursel, Philip J. Caruso** *of Filing Marshal's Return of Service* **(Moffett, Rowena)**

**3:08-cv-1100 Notice has been electronically mailed to:**

Rowena Amanda Moffett    rmoffett@bswlaw.com

**3:08-cv-1100 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1034868047 [Date=8/15/2008] [FileNumber=1700479-0
] [c7898ed650e630811788057127be92cc0d06ba7f61a1b8780199246bbf2740f06b3
f67aeda131b93361a52ed3bf1be9102bcbd92019ac7f9d724042f0f2b30e0]]

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| 5 STAR SUPPLY LLC,<br>LINDA A. WILLIAMS, CLIFFORD G. WILLIAMS, II,<br>STEPHEN J. PURSEL, PHILIP J. CARUSO<br>and ROBERT G. MASTROFRANCESCO,<br>Plaintiffs, | : <br> : <br> : <br> : <br> : | CASE NO. 08CV1100 (JBA) |
| | : | |
| v. | : <br> : | |
| CONSOLIDATED COMMERCIAL<br>CONTROLS, INC., | : <br> : <br> : | |
| Defendant. | : <br> : | AUGUST 15, 2008 |

### NOTICE OF FILING MARSHAL'S RETURN OF SERVICE

Attached hereto is the Marshal's Return of Service in the above-referenced case

evidencing service of process in the above-referenced matter upon the Defendant

Consolidated Commercial Controls, Inc. on August 6, 2008.


PLAINTIFFS 5 STAR SUPPLY LLC, LINDA A.
WILLIAMS, CLIFFORD G. WILLIAMS, II
STEPHEN J. PURSEL, PHILIP J. CARUSO,
and ROBERT G. MASTROFRANCESCO,


By___*s/Rowena A. Moffett*_____

Rowena A. Moffett, Esq. (ct 19811)
BRENNER SALTZMAN & WALLMAN, LLP
Their Attorney
271 Whitney Avenue
New Haven, CT 06511
Telephone: 203-772-2600
Fax: 203-562-2098
Email: rmoffett@bswlaw.com


AC1137.DOC

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2008, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].

_s/Rowena A. Moffett_

Rowena A. Moffett, Esq. (ct 19811)

AC1137.DOC

STATE OF CONNECTICUT:
                   : ss: HARTFORD          AUGUST 6, 2008
COUNTY OF HARTFORD   :
CIVIL ACTION NO. 8CN 1100 JBA

       Then and by virtue hereof, and by direction of the Plaintiff's Attorney, I left a
verified true and attested copy of the original SUMMONS IN A CIVIL ACTION, CIVIL
COVER SHEET, COMPLAINT, APPEARANCE, ORDER ON PRETRIAL
DEADLINES, ELECTRONIC FILING ORDER IN CIVIL CASES, NOTICE
REGARDING DESIGNATION OF CASE INTO ELECTRONIC FILING SYSTEMS
AND ELECTRONIC FILING OF PAPERS, NOTICE TO COUNSEL AND PRO SE
PARTIES, ORDER RE: DISCLOSURE STATEMENT AND TIPS FOR SUCCESSFUL
CM/ECF EFILING, with and in the hands of GARY SCAPPINI, MANAGER OF C T
CORPORATION SYSTEM, REGISTERED AGENT FOR SERVICE and duly
authorized to accept service for the within named defendant corporation
CONSOLIDATED COMMERICAL CONTROLS, INC., in the said town of
HARTFORD, County of Hartford.

       The within is the original SUMMONS IN A CIVIL ACTION, CIVIL
COVER SHEET, COMPLAINT, APPEARANCE, ORDER ON PRETRIAL
DEADLINES, ELECTRONIC FILING ORDER IN CIVIL CASES, NOTICE
REGARDING DESIGNATION OF CASE INTO ELECTRONIC FILING SYSTEMS
AND ELECTRONIC FILING OF PAPERS, NOTICE TO COUNSEL AND PRO SE
PARTIES, ORDER RE: DISCLOSURE STATEMENT AND TIPS FOR SUCCESSFUL
CM/ECF EFILING, with my doings thereon endorsed.

| | | |
|---|---|---|
| Copy | $17.00 | |
| Endorsements | 1.20 | |
| Service | 30.00 | |
| Travel | 18.00 | |
| | --------- | |
| Total | $66.20 | |

ATTEST:

JOSEPH ANTINERELLA
CT STATE MARSHAL
HARTFORD COUNTY

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------------------x
5 STAR SUPPLY LLC, ET AL,                    )
                              Plaintiffs,    )   NO.: 3:08-cv-01100(JBA)
                                             )
v.                                           )
                                             )
                                             )
CONSOLIDATED COMMERCIAL CONTROLS,)
INC.                                       x
                              Defendant.
-------------------------------------------------------------   AUGUST 19, 2008
```

## MOTION FOR ADDITIONAL TIME WITHIN WHICH TO ANSWER OR MOVE WITH RESPECT TO THE COMPLAINT

The defendant in the above entitled case, pursuant to the provisions of Local

Rule of Civil Procedure 7(b)(1), moves for an order granting it an additional thirty (30)

days within which to answer or otherwise move with respect to the Complaint herein.

In support of this motion, the defendant represents that counsel has attempted to

contact counsel for the plaintiffs in this matter to ascertain her position, but was unable

to contact counsel for the plaintiffs.  This is the first motion for an extension of time

that has been filed by the defendant.

Respectfully submitted,

By:   /s/ Harold James Pickerstein
Harold James Pickerstein (ct 05094)
Pepe & Hazard LLP
30 Jelliff Lane
Southport, CT 06890
(203) 319-4000
(203) 259-0251 fax
hpickerstein@pepehazard.com

HJP/1/10/90353v1
08/19/08-SPT/

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2008, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Rowena A. Moffett, Esq.
Brenner Saltzman & Wallman, LLP
271 Whitney Avenue
New Haven, CT 06511

_____ /s/ Harold James Pickerstein

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| 5 Star Supply, et al, <br>     *Plaintiffs,* <br><br>        *v.* <br><br> Consolidated Comm Controls, <br>     *Defendant.* | Civil No. 3:08cv1100 (JBA) |

## <u>ENDORSEMENT ORDER</u>

Motion for Additional Time [8] is GRANTED to and including 9/19/08.

IT IS SO ORDERED.

/s/_____
Joan Glazer Margolis, USMJ

_____

**Dated at New Haven, Connecticut:  <u>August 20, 2008</u>**

# EXHIBIT D

LEXSEE 2007 U.S. DIST. LEXIS 12593



Analysis
As of: Aug 29, 2008

**COALSALES II, LLC, a Delaware Limited Liability Company, Plaintiff, v. GULF POWER COMPANY, a Maine Corporation, Defendant.**

**Case No. 06-cv-488-DRH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**2007 U.S. Dist. LEXIS 12593**

**February 23, 2007, Decided**

**PRIOR HISTORY:** Coalsales II, LLC v. Gulf Power Co., 2006 U.S. Dist. LEXIS 77220 (S.D. Ill., Oct. 23, 2006)

**COUNSEL:** [*1] For COALSALE II LLC, a Delaware limited liability company, Plaintiff: Bruce A. Americus, Matthew F. Burger, LEAD ATTORNEYS, Buchanan Ingersoll - Pittsburgh, Pittsburgh, PA, US; Dayna L. Johnson, LEAD ATTORNEY, Greensfelder, Hemker et al. - Belleville, Generally Admitted, Belleville, IL; William A. Schmitt, LEAD ATTORNEY, Greensfelder, Hemker et al. - Swansea, Generally Admitted, Swansea, IL.

For Gulf Power Company, a Maine corporation, Defendant: Brian C. Wernsman, LEAD ATTORNEY, William P. Crain, Crain, Miller et al., Centralia, IL; Charles T. Wiggins, J. Nixon Daniel, III, Steven R. Griffin, Thomas F. Gonzalez, LEAD ATTORNEYS, Beggs & Lane, Pensacola, FL, US.

**JUDGES:** David R. Herndon, United States District Judge.

**OPINION BY:** David R. Herndon

**OPINION**

**MEMORANDUM & ORDER**

**HERNDON, District Judge:**

**I. INTRODUCTION**

Plaintiff Coalsales II, LLC (f/k/a Peabody COALSALES Company) filed its Complaint (Doc. 2), seeking declaratory relief concerning a contract it had entered into with defendant Gulf Power Company. Shortly after filing its Complaint, Plaintiff also filed a Motion to Establish its Right to Proceed in this Form and supporting memorandum (Docs. 4 & 5). In response, [*2] Defendant filed a Motion to Dismiss, or in the Alternative, to Transfer (Doc. 11), seeking to transfer this case to the United States District Court for the Northern District of Florida. Thereafter, Plaintiff filed its Response (Doc. 16), to which Defendant filed its Reply (Doc. 16). Thus, the Motions have been fully briefed and are now before the Court. Due to the similarities of the issues and relief sought raised by both Plaintiff's and Defendant's Motions (Docs. 4 & 11), a single Order will suffice. As more explicitly outlined within this Order, the applicable law favors a dismissal of this action.

**II. FACTUAL BACKGROUND**

The instant dispute stems from a Coal Supply Agreement ("CSA"), executed by Plaintiff and Defendant on July 1, 1994, whereby Plaintiff agreed to supply and sell coal to Defendant. Although the CSA identified several potential sources (coal mines), it appears that most of the coal was supplied by the Galatia Mine, located in Galatia, Saline County, Illinois. According to Plaintiff, it was notified on December 30, 2005 that the Galatia Mine was forced to permanently close its Millennium Portal Mine and to cease all further mining activities, due to severely [*3] adverse mine conditions.

Thus, Plaintiff notified Defendant via Defendant's agent, Southern Company, in a letter dated January 23, 2006, that the Galatia Millennium Portal Mine and cessation of mining constituted a *force majeure* event under Section 14 of the CSA. Further, Plaintiff stated it would no longer be able to supply coal to Defendant in accordance with the tonnage and quality specifications required under the CSA, but that its nonperformance was excused as a result of the *force majeure.*

The parties dispute whether the Galatia Mine was an exclusive source under the CSA, as Defendant believes the CSA imposes upon Plaintiff a continuing obligation to supply coal from other sources, regardless of the alleged *force majeure* at the Galatia Mine. Plaintiff and Defendant entered into negotiations to resolve the dispute, which were ultimately unsuccessful. On June 21, 2006, Plaintiff filed its Complaint seeking a declaratory judgment that events at the Galatia Mine constituted a *force majeure* under the CSA. The following day, Defendant filed a separate action against Plaintiff for breach of contract, in the U.S. District Court for the Northern District of Florida. [*4] The parties currently contest where this matter should be litigated. Plaintiff, obviously, rallies for the action to remain with this Court and also asserts that it is not subject to personal jurisdiction in Florida. In its Motion (Doc. 4), Plaintiff requests that the Court issue an order stating that Defendant is subject to personal jurisdiction in this forum, venue is proper and that the Court will hear Plaintiff's declaratory judgment action. Conversely, Defendant advocates that proper venue instead lies with the Northern District of Florida, and asserts it is not subject to personal jurisdiction in Illinois. Therefore, Defendant seeks for a dismissal of this action or in the alternative, for a transfer to the Northern District of Florida, pursuant to 28 U.S.C. § 1404, so that this action may be consolidated with its lawsuit. Presently, the lawsuit initiated by Defendant for breach of contract against Plaintiff, filed in the Northern District of Florida, has been stayed, pending resolution of the instant matter.

### III. ANALYSIS

Because the issue has been raised as the basis of Defendant's Motion to Dismiss, the Court must first determine whether [*5] Defendant is subject to personal jurisdiction in Illinois, otherwise, consideration of Plaintiff's Motion (Doc. 4) and Defendant's alternative request for a transfer of venue would be moot.

### A. EXISTENCE OF PERSONAL JURISDICTION OVER DEFENDANT

Once a defendant moves to dismiss pursuant to **Federal Rule of Civil Procedure 12(b)(2)**, a plaintiff has the burden of establishing the existence of personal ju-

risdiction over an out of state defendant. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.,* **338 F.3d 773, 782 (7th Cir. 2003) (internal citations omitted).** A plaintiff must provide sufficient evidence to establish at least a *prima facie* case of personal jurisdiction. *Turnock v. Cope,* **816 F.2d 332, 333 (7th Cir. 1987).**

Because this Court sits in the Southern District of Illinois, it will accordingly apply the Illinois statutory law along with federal circuit law to determine whether it has personal jurisdiction over either of Defendants in this case. In fact, Plaintiff must demonstrate that personal jurisdiction over both Defendants in this case complies with (1) the Illinois long-arm statute, (2) Illinois constitutional [*6] law, and (3) federal constitutional law. *RAR, Inc. v. Turner Diesel, Ltd,* **107 F.3d 1272, 1276 (7th Cir. 1997).** Moreover, because the Illinois long-arm statute "'permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions,'" [1] the analysis then becomes a two-prong examination: (1) determining whether the applicable state long-arm statute is satisfied; and (2) whether exercise of jurisdiction is consistent with the constitutional requirements of due process. *Hyatt Int'l Corp. v. Coco,* **302 F.3d 707, 715 (7th Cir. 2002) (citing *RAR,* 107 F.3d at 1276; *Klump v. Duffus,* 71 F.3d 1368, 1371 n.4 (7th Cir. 1995)); *see also FMC Corp. v. Varonos,* 892 F.2d 1308, 1311 n.5 (7th Cir. 1990).**

1    The Illinois long-arm statute, **735 ILL. COMP. STAT. 5/2-209(c)**, reads:

> A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.

[*7] In comporting with the constitutional requirements of due process, "a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum state." *World-Wide Volkswagen Corp. v. Woodson,* **444 U.S. 286, 291, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)).** As such, a defendant's contacts with the forum state must be such "that maintenance of the suit 'does not offend 'traditional notions of fair play and substantial justice.''" *Id.* at 292 (quoting *Int'l Shoe,* 326 U.S. at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940))). This standard is applied according to whether the forum state is attempting to assert "'general' or 'specific' jurisdiction over a defendant

in a suit 'arising out of or related to the defendant's contacts with the forum.'" *RAR, Inc.,* 107 F.3d at 1277 (quoting *Helicopteros Nacionales de Colombia, S. A. v. Hall,* 466 U.S. 408, 414 n.8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)). The minimum contacts analysis requires "a showing that the defendant 'should reasonably [*8] anticipate being haled into court [the forum state].'" *Hyatt,* 302 F.3d at 716 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)(quoting *World-Wide Volkswagen,* 444 U.S. at 297)).

The parties do not argue whether Defendant is subject to general jurisdiction in Illinois; they only discuss specific jurisdiction, or particularly, Defendant's contacts involving the CSA. Therefore, this analysis will be confined as to whether the exercise of specific jurisdiction over Defendant in Illinois is proper. Specific jurisdiction exists pursuant to the requirements of the Illinois long-arm statute when defendant commits any of the acts enumerated within subpart (a) of the statute or "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILL. COMP. STAT. 5/2-209(a)&(c). While the parties have extensively briefed the issue of whether Defendant took title to the coal in Illinois and thus, was subjected to personal jurisdiction, the Court finds personal jurisdiction on another basis, evident from the facts of the case. [2]

> 2   The Illinois Long-Arm Statute, 735 ILL. COMP. STAT. 5/2-209(a) finds specific jurisdiction for: (1) The transaction of any business within [Illinois] . . . . It is this particular subsection of the long-arm statute upon which the Court's performance of contract finding is based.

[*9] "Illinois courts have held that despite the lack of physical presence within Illinois, the long-arm statute and due process permit Illinois courts to gain jurisdiction over a person or corporation who enters a contract knowing that it will be performed in Illinois." *Biltmoor Moving and Storage Co. v. Shell Oil Co.,* 606 F.2d 202, 207 (7th Cir. 1979)(collecting Illinois cases). In determining whether a contractual relationship between the parties was sufficient to establish personal jurisdiction over Defendant, the Court may consider the following: (1) who initiated the transaction; (2) where the contract was negotiated; (3) where the contract was executed; and (4) where performance under the contract was to take place. *Viktron L.P. v. Program Data Inc.,* 326 Ill. App. 3d 111, 759 N.E.2d 186, 193, 259 Ill. Dec. 706 (Ill. App. Ct. 2001)(citing *Ideal Ins. Agency, Inc. v. Shipyard Marine, Inc.,* 213 Ill. App. 3d 675, 572 N.E.2d 353, 157 Ill. Dec. 284 (Ill. App. Ct. 1991)). Personal jurisdiction based on the performance of a contract in

Illinois does *not* also require that party to have been physically present in Illinois. *Biltmoor,* 606 F.2d at 207 (finding party was [*10] subject to personal jurisdiction in Illinois where contract was performed in Illinois through that party's agent).

In this case, the original CSA contemplated the Galatia Mine in Galatia, Illinois as a source of coal for Plaintiff to obtain in order to supply to Defendant (*see* Doc. 5, Ex. 2 - CSA, §§ 6.04 & 6.05). In later amendments to the CSA, the Galatia Mine was identified as the primary source or source of coal supply. [3] The majority of coal supplied to Defendant under the CSA was from the Galatia Mine for what appears to be a period spanning over more than ten years. The amendments to the CSA, reflected in several letters exchanged between the parties, make it evident that Defendant was aware that the performance of the contract (mining/supplying the coal) [4] was to be performed in Illinois, as the amendments clearly identify the source of coal supply as the Galatia Mine, located in Galatia, Illinois. This was not merely a unilateral act on Plaintiff's part -- selecting or changing a supply source without Defendant's knowledge or consent. In fact, the CSA required that any alternative coal supply source be subjected to test burns, in order to determine whether the coal [*11] met certain specifications set forth in the CSA. The facts show that these test burns were conducted at Defendant's generation plant in Florida. Clearly, Defendant was well aware of the situs of the contemplated and actual coal supply source.

> 3   The parties have identified three such instances of relevant amendments to the CSA: (1) January 15, 1998 Letter of Agreement between the parties (*see* Doc. 15, Ex. 3); (2) January 29, 2003 Letter of Agreement between the parties (*see* Doc. 15, Ex. 2, pp. 2-4); and (3) May 20, 2005 Letter of Agreement between the parties with incorporated "Term Sheet" (*see* Doc. 15, Ex. 4).
>
> 4   The Court realizes that the CSA, being a complex and lengthy corporate contract, called for other types of "performance" that may have occurred (or was contemplated to occur) in other locations besides Illinois. However, the overarching purpose of the CSA was to attain an amount of coal so that Plaintiff could supply it to Defendant. One of the primary coal supply sources contemplated under the original CSA was the Galatia Mine in Illinois. This contemplated source then became the actual source used to supply the majority of coal under the CSA -- it was even later reflected in the amendments to the CSA as the primary source. Therefore, the Court believes that when defining "performance" of a contract for

purposes of a specific jurisdiction analysis, the supplying of coal from the Galatia Mine is thereby properly construed as the "performance."

[*12] Given the fact that the CSA was performed in Illinois and also considering the sophistication of the parties, their bargaining power, the amount of coal supplied to Defendant, the duration of this contractual arrangement and the fact that Defendant was completely aware that the situs of the coal supply source was in Illinois, allows this Court to find that Defendant is subject to personal jurisdiction in Illinois for this action (for the majority of coal received under the CSA). *See Viktron, 759 N.E.2d at 195 (finding that substantial performance of a contract over a period of years contemplated in Illinois strongly favors a finding of specific jurisdiction under the Illinois long-arm statute).*

The Court also finds subjecting Defendant to personal jurisdiction does not offend the state or federal guarantees of due process. Through the parties' course of dealings under the CSA, Defendant had sufficient minimum contacts with Illinois whereby it could reasonably anticipate being haled into court here. As the Court has determined Defendant is subject to personal jurisdiction in Illinois regarding causes of action arising from the CSA, Defendant's Motion to Dismiss [*13] pursuant to Rule 12(b)(2) (lack of personal jurisdiction), must be denied. However, before contemplating Defendant's alternative request for a § 1404 transfer of this matter to the Northern District of Florida, the Court will first address Plaintiff's Motion (Doc. 4) to determine whether it should hear Plaintiff's action for declaratory judgment.

## B.    PLAINTIFF'S    COMPLAINT    FOR DECLARATORY RELIEF

On June 21, 2006, [5] Plaintiff filed its Complaint for Declaratory Relief (Doc. 2) against Defendant in this Court. Specifically, Plaintiff seeks a declaratory judgment in its favor declaring that "the closure of the Galatia's Millennium Portal Mine due to unexpected, adverse mining conditions constitutes conditions of a permanent *force majeure* event under Section 14 of the [CSA]," and further that Plaintiff is thereby excused and not liable to Defendant "for any damages allegedly resulting from delivery shortfalls occasioned by these *force majeure* conditions . . ." (Doc. 2, p. 9). The following morning, on June 22, 2006, Defendant then filed a Complaint for Breach of Contract (the CSA) against Plaintiff in the U.S. District Court for the Northern District of Florida ( [*14] *see* Doc. 11, Ex. D - Def.'s Compl.). Simply stated, Defendant believes that Plaintiff has a continuing obligation to supply coal under the terms of the CSA, regardless of the alleged *force majeure* event at the Galatia Mine.

5    A hard copy of the Complaint was filed-stamped as "Received" by the Benton office of the U.S. District Court of the Southern District of Illinois, however, the Complaint was not filed electronically on CM/ECF until June 23, 2006.

The Court acknowledges that it has discretion to decline to hear an action for declaratory judgment, regardless of whether proper jurisdiction exists. *Tempo Elec. Heater Corp. v. Omega Engineering, Inc., 819 F.2d 746, 747 (7th Cir. 1987) (collecting cases).* In this case, the current point of contention is whether Plaintiff's action should be allowed to remain with this Court, whether it should be dismissed, or whether it should be transferred pursuant to 28 U.S.C. § 1404 to the Northern District of Florida, [*15] so that it may be consolidated with Defendant's Complaint. Aside from the issue of personal jurisdiction, the parties have briefed the issue of the first to file doctrine. Plaintiff beat Defendant to the courthouse by a day and claims that for this reason, coupled with certain jurisdictional and convenience of venue reasons, its action should remain here. Defendant, however, argues that the first to file doctrine is not adhered to when the first filing was done in anticipation of a lawsuit, as is allegedly the case here. Yet, consideration of case filing chronology is but a sub-issue within the analysis framework for whether the Court should hear Plaintiff's Declaratory Judgment Complaint.

Under the Declaratory Judgment Act, federal courts may render judgment only where there is an "actual controversy." *28 U.S.C. § 2201; Trippe Mfg. Co. v. Am. Power Conversion Corp., 46 F.3d 624, 627 (7th Cir. 1995).* In other words, there must be action on the defendant's behalf which causes the plaintiff to reasonably apprehend being sued if the plaintiff continues the problematic conduct at issue. Further, a plaintiff's reasonable apprehension must [*16] exist at the time the declaratory action is filed. *Id.* (citing *Int'l Harvester, 623 F.2d 1207, 1210 (7th Cir. 1980)).* Thus, declaratory relief is sought for the purposes of "'clarify[ing] and settl[ing] the legal relations at issue' and to 'terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Tempco, 819 F.2d at 749 (quoting Borchard, Declaratory Judgments 299 (2d ed. 1941)).*

As *Tempco* illustrated, there are generally two scenarios of when a plaintiff should seek declaratory relief:

> (1) The controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e., a suit for damages or an injunction) but has not done so; and (2) Although the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or in-

efficient to require the parties to wait for a decision.

*Id.*

Nevertheless, even if the Court were to find that Plaintiff's Complaint meets the "actual controversy" requirement under the Act, it still "may properly refuse to grant declaratory relief for prudential reasons." [*17] *Trippe,* 46 F.3d at 627 (citing *Int'l Harvester,* 623 F.2d at 1217). A survey of case law in this regard largely involves disputes regarding intellectual property, but as the facts of many cases otherwise mirror the instant dispute, the Court finds the law of those cases analogous, with *Tempco* being a seminal case regarding the issue at hand.

In *Tempco,* the Seventh Circuit affirmed a district court's dismissal of a declaratory judgment action where the plaintiff sought a declaration that its use of the trademark, which used the greek letter omega, did not infringe upon the defendant's trademark. *Tempco,* 819 F.2d at 750. The defendant had actually filed an infringement suit in another federal district court four days after the plaintiff filed its declaratory judgment action. *Id.* at 747. The Seventh Circuit, reviewing *de novo,* found that plaintiff's suit for declaratory relief was of the first scenario (where the controversy has ripened to a point where one of the parties could invoke a coercive remedy), that is, until the defendant filed its infringement suit four days later. [*18] Finding that the defendant was not merely "continually accusing" the plaintiff, but instead, had promptly filed its infringement suit, the Seventh Circuit found "a declaratory judgment would serve no useful purpose and was properly denied." *Id.* at 749 (citing *Int'l Harvester,* 623 F.2d at 1218; *Cunningham Brothers v. Bail,* 407 F.2d 1165, 1169 (7th Cir.), *cert. denied,* 395 U.S. 959, 89 S. Ct. 2100, 23 L. Ed. 2d 745 (1969)).

Unavailing to the Seventh Circuit was the fact that the plaintiff had been first to file its declaratory judgment action, as such did not automatically award the "winner of the race to the courthouse" the ultimate "prize" of choosing the forum. *Id.* at 749-50 (acknowledging that the Seventh Circuit "has never adhered to a rigid 'first to file' rule") (internal citations omitted). *Tempco* found suits filed in anticipation of impending litigation improper, as these suits would only serve to misconstrue the "wholesome purpose" of the Declaratory Judgment Act. *Id.* (citing *Am. Auto. Ins. Co. v. Freundt,* 103 F.2d 613, 619 (7th Cir. 1939)).

Indeed, *Tempco* has been followed by many [*19] cases. *See, e.g., Trippe,* 46 F.3d at 629 (finding district court did not abuse its discretion when it dismissed a declaratory judgment count of the plaintiff's claim

when a similar trademark infringement action was later filed by the defendant); *Champion Lab., Inc. v. Burch,* No. 06-cv-4031-JPG, 2006 U.S. Dist. LEXIS 84892, 2006 WL 3370174 at *2 (S.D. Ill. Nov. 21, 2006)(Gilbert, J.)(first to file presumption overridden when the plaintiff's suit filed in anticipation of the defendant's mirror-image suit); *Barrington Group, Ltd. v. Genesys Software Sys, Inc.,* 239 F. Supp. 2d 870, 874 (E.D. Wis. 2003)(stating that "[p]ursuant to its inherent power, a court may dismiss the second-filed action to avoid duplicative litigation"); *Eli's Chicago Finest, Inc. v. The Cheesecake Factory, Inc.,* 23 F. Supp. 2d 906, 907-08 (N.D. Ill. 1998)(finding that the plaintiff's declaratory suit, filed five days before the defendant's nearly identical trademark infringement suit, was anticipatory and therefore would not warrant the first to file rule and thereby dismissed the plaintiff's suit); *Successories, Inc. v. Arnold Palmer Enterprises, Inc.,* 990 F. Supp. 1044, 1046 (N.D. Ill. 1998) [*20] (finding that the defendant's subsequently-filed infringement action obviated the need for plaintiff's declaratory judgment action and therefore dismissal was warranted); *Associated Mills, Inc. v. Regina Co., Inc.,* 675 F. Supp. 446, 448 (N.D. Ill. 1987)(finding that the plaintiff's anticipatory filing of a declaratory judgment action "amounted to a preemptive strike," thereby "distort[ing] the purpose of a declaratory judgment by using it as a vehicle to secure a forum of its own choosing"). The instant dispute, though not involving the issue of trademark infringement, is akin to the facts of *Tempco.* Further, courts have since found *Tempco* "'applies to declaratory judgment actions designed to pre-empt not only infringement suits, but other lawsuits as well.'" *Budget Rent a Car Corp. v. Miljack, Inc.,* 760 F. Supp. 135, 137 (N.D. Ill. 1991)(citing *Natural Gas Pipeline v. Union Pacific Resources,* 750 F. Supp. 311, 314 (N.D. Ill. 1990); *CNA Financial Corp. v. Home Indemnity Co.,* 703 F. Supp. 759 (N.D. Ill. 1989)).

Plaintiff, in this case, notified Defendant of the *force majeure* event [*21] at the Galatia Mine via a letter dated January 23, 2006. Thereafter, the parties entered into discussions to attempt a resolution of the dispute: Plaintiff believes it has no further obligation under the CSA to supply Defendant with coal due to the *force majeure,* whereas Defendant believes Plaintiff remains obligated to provide coal from alternate sources. From the parties' briefs, these settlement discussions lasted through early summer of 2006. In early June, Defendant claims it became apparent the parties would not reach an agreeable settlement, but negotiations continued (Doc. 11, pp. 2-3). While the parties were still in negotiations, according to Defendant, Plaintiff filed its Complaint. Plaintiff contests Defendant's assertion that it intentionally deceived Defendant. Instead, Plaintiff states that the parties'

2007 U.S. Dist. LEXIS 12593, *

settlement discussions had "broken down" long prior to the filing of its suit (Doc. 15, p. 11). Rather than being anticipatory in nature, Plaintiff believes its filing was made in good faith. [6]

6  The parties further dispute the fact of whether Defendant received notice of Plaintiff's suit before filing its breach of contract suit the following morning. The Court finds that neither party is completely blameless. While Plaintiff may have filed its suit during the time Defendant believed the parties were still negotiating, Defendant admittedly acted in similar fashion, as Defendant fails to note that this "assumption" of ongoing negotiations somehow ceased prior to when Defendant filed its breach of contract suit the very next morning. Therefore, either Plaintiff first broke the litigation armistice by shooting its declaratory judgment action over the bow, whereby Defendant knew and retaliated by filing its own suit the next morning **or** Defendant intended to be one to breach the parties' "negotiations tryst," unaware Plaintiff had already beat it to the punch. So the Court believes the playing field is leveled in this instance, as far as good faith filings are concerned.

[*22]  Regardless of the existence of good faith, the Court finds that Plaintiff's declaratory judgment suit was anticipatory in nature, as it was clear the parties were disputing the issue of whether Plaintiff had breached the CSA, negotiations were not going well and future litigation initiated by Defendant was therefore looming. Defendant's suit for breach of the CSA will involve the same parties and issues as the instant litigation. Moreover, Defendant's suit pending in the Northern District of Florida obviates Plaintiff's need for declaratory relief. Plaintiff's claims of *force majeure* to excuse performance and liability under the CSA will likely serve as affirmative defenses to Defendant's suit. Plaintiff, likewise, can contend the exercise of personal jurisdiction in Florida by filing the appropriate motion in Defendant's suit.

Regardless of the fact that this Court deems it has personal jurisdiction over Defendant in this matter, because federal courts must act with prudence to preserve judicial economy, this Court, in its discretion, hereby dismisses Plaintiff's Complaint for declaratory relief, finding Defendant's suit obviates the need for the declaratory judgment Plaintiff [*23] seeks. *See Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)("As between federal district courts . . . the general principle is to avoid duplicative litigation"). With this Order, the Court does *not* make a finding regarding whether Plaintiff is subject to personal jurisdiction in Florida or where proper venue lies.

## IV. CONCLUSION

As the Court finds that personal jurisdiction over Defendant in this forum exists with respect Plaintiff's action, Defendant's Motion to Dismiss Based on Lack of Personal Jurisdiction, pursuant to Rule 12(b)(2) (Doc. 11), is hereby **DENIED.** Defendant's alternative request for a Transfer of Plaintiff's suit, pursuant to § 1404, to the U.S. District Court for the Northern District of Florida to be consolidated with Defendant's pending suit, is also **DENIED.** Instead, the Court addresses its ruling in regard to Plaintiff's Motion to Establish Its Right to Proceed in this Forum (Doc. 4), which requests the Court to hear its suit for declaratory judgment. As the Court, aligning itself with the legal precedence established by *Tempco,* finds that Plaintiff's declaratory judgment [*24] action is obviated by Defendant's suit for breach of contract and therefore declines to hear Plaintiff's action, it hereby **DENIES** Plaintiff's Motion (Doc. 4). Accordingly, Plaintiff's Complaint (Doc. 2) is **DISMISSED.**

**IT IS SO ORDERED.**

Signed this 23<rd> day of February, 2007.

/s/ David RHerndon

**United States District Judge**

# EXHIBIT E

# 1 OF 2

LEXSEE 1999 U.S. DIST. LEXIS 13173



Caution
As of: Aug 29, 2008

**CLEARCLAD COATINGS, INC., an Illinois corporation, f/k/a HAWKING
INTERNATIONAL, INC., Plaintiff, v. XONTAL LTD., a Maryland corporation,
RALPH COXON, TIM COXON, HAWKING INTERNATIONAL, LLC, a Mary-
land limited liability corporation, HAWKING INTERNATIONAL, LTD., a United
Kingdom Corporation, LEONARD GEOFFREY HAWKES, and PETER
CHARLES RYDER, Defendants.**

**No. 98 C 7199**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**1999 U.S. Dist. LEXIS 13173**

**August 19, 1999, Decided
August 20, 1999, Docketed**

**DISPOSITION:**    [*1] Motions to transfer as to all Defendants denied; motions to dismiss for lack of personal jurisdiction as to all Defendants denied; motions to dismiss Counts II, III and IV from Plaintiff's case denied in part and granted in part.

**COUNSEL:** For CLEARCLAD COATINGS, INC., plaintiff: Michael Patrick Mullen, Frank T. Foster, John Patrick Nyhan, Mullen & Foster, Chicago, IL.

For XONTAL, LTD., RALPH COXON, defendants: Joel T. Pelz, Jenner & Block, Chicago, IL.

For XONTAL, LTD., RALPH COXON, defendants: Anthony P Palaigos, Louis J Kozlakowski, Jr, Blum Yumkas Mailman Gutman & Denick PA, Baltimore, MD.

For TIM COXON, HAWKING INTERNATIONAL, LLC, HAWKING INTERNATIONAL LTD., GEOFFREY LEONARD HAWKES, PETER CHARLES RYDER, defendants: Richard C. Robin, Anthony Joseph Ashley, Vedder, Price, Kaufman & Kammholz, Chicago, IL.

For TIM COXON, HAWKING INTERNATIONAL, LLC, defendants: Charles R. Bacharach, Gordon, Fein-

blatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD.

For XONTAL, LTD., counter-claimant: Joel T. Pelz, Jenner & Block, Chicago, IL.

For XONTAL, LTD., counter-claimant: Anthony P Palaigos, Louis J Kozlakowski, Jr, Blum Yumkas Mailman Gutman & Denick PA, Baltimore, [*2] MD.

For CLEARCLAD COATINGS, INC., counter-defendant: Michael Patrick Mullen, Frank T. Foster, John Patrick Nyhan, Mullen & Foster, Chicago, IL.

**JUDGES:** REBECCA R. PALLMEYER, United States District Judge.

**OPINION BY:** REBECCA R. PALLMEYER

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Clearclad Coatings, Inc., an Illinois-based distributor of industrial coatings, claims that several of its former suppliers are now competing unfairly. On November 10, 1998, Plaintiff Clearclad f/k/a Hawking International, Inc. filed this lawsuit against the following

Defendants: Xontal Ltd.; Ralph Coxon, Xontal's president; Hawking International, LLC ("Hawking LLC"); Tim Coxon, Ralph Coxon's son, a former officer of Xontal, and now Hawking LLC's president; Hawking International, Ltd. ("Hawking Ltd."); and Leonard Geoffrey Hawkes and Peter Charles Ryder, two officers of Hawking Ltd. In its six-count Complaint, Plaintiff alleges violations of the Lanham Act, 15 U.S.C. § 1125 (Count I), a breach of contractual covenant not to compete (Count II), breach of fiduciary duties (Count III), fraud (Count IV), conspiracy (Count V), and violation of the Illinois Trade Secrets Act, 754 ILCS [*3] 10651 (Count VI). The six counts are brought against all seven Defendants.

Defendants move to dismiss or transfer the claims against them. Four related motions are before the court: (1) Defendant Xontal's motion to transfer the case to the District of Maryland or to dismiss Counts II, III, and IV for failure to state a claim; (2) Defendant Ralph Coxon's motion to dismiss for lack of personal jurisdiction, to transfer, or to dismiss Counts II, III, and IV for failure to state a claim; (3) Defendants Timothy Coxon and Hawking International, LLC's motion to dismiss for lack of personal jurisdiction, to transfer, or to dismiss Counts II, III, and IV for failure to state a claim; and (4) Defendants Hawking International, Ltd., Leonard Geoffrey Hawkes, and Peter Charles Ryder's motion to dismiss for lack of personal jurisdiction or to dismiss Count IV. For the reasons discussed below, the court denies the motions to transfer as to all Defendants; denies the motions to dismiss for lack of personal jurisdiction as to all Defendants; denies in part and grants in part the motions to dismiss Counts II, III, and IV from Plaintiff's case.

## FACTUAL BACKGROUND

The parties dispute each [*4] other's version of the facts. At this juncture of the case, however, the court accepts all well-pleaded allegations as true except that with respect to the transfer motion, the court is free to consider unrebutted facts set forth in the parties' affidavits. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). Any conflicts in the affidavits are resolved in favor of Plaintiff. *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988).

The parties have not made the court's job easy-besides the multiple motions and the numerous claims, the involved parties have adopted company names similar to the point of confusion, as will be seen in a moment. In addition, the companies' relationships are clearly interrelated, but the parties vigorously dispute the extent of that enmeshed web. The jumbled facts are further distorted by the constant cross-referencing within the parties' briefs to additional arguments and facts laid out in the other motions and briefs. With those difficulties in mind, the court attempts to detail the facts relevant to the motions at hand.

## I. The Relevant Parties

### A. Plaintiff Clearclad Coatings, Inc. f/k/a Hawking International, [*5] Inc.

Plaintiff Clearclad Coatings, Inc. ("Clearclad"), formerly known as Hawking International, Inc. ("Hawking Inc."), is an Illinois corporation with its principal place of business in Harvey, Illinois. (Compl. P 1.) Plaintiff is in the business of manufacturing, importing, distributing, and selling industrial coatings throughout North America. (*Id.*) In the early 1990s, Hawking Inc. distributed urethane products called "Clearclad" and manufactured in England by LVH Coatings, Inc. ("LVH"). (R. Coxon Aff., Ex. A to Defendant Ralph Coxon's Motion to Dismiss for Lack of Personal Jurisdiction, to Transfer, or to Dismiss Count II, III and IV for Failure to State a Claim Upon which Relief can be Granted (hereinafter "R. Coxon's Motion") P 4; L. Hawkes Aff., Ex. 1 to Memorandum of Defendants Hawking International, Ltd., Leonard Geoffrey Hawkes and Peter Ryder in Support of Motion to Dismiss for Lack of Personal Jurisdiction P 4.) Hawking Inc. obtained Clearclad products from Hawking International Ltd. ("Hawking Ltd."), a British company, which in turn obtained the products from LVH. (R. Coxon Aff. P 4.) Although the precise parameters of their relationship are not known, the two companies [*6] were related in that Hawking Ltd. owned shares in Hawking Inc. (L. Hawkes Aff. P 5.) On or about December 31, 1996, Hawking Inc. merged with Clearclad [1] to form what is now known as Clearclad Coatings, Inc. (Compl. P 2.)

> 1    The record does not indicate the nature of the original "Clearclad" entity or the nature of its business prior to the merger with Hawking Inc.

### B. Defendant Xontal, Ltd.

Defendant Xontal, Ltd. ("Xontal") is a Maryland corporation with its principal place of business in White Hall, Maryland. (*Id.* P 3.) Xontal is involved in the business of selling and distributing chemicals, including, at one point, some of Plaintiff's products. (*Id.*) In a contract executed on July 22, 1993, Xontal agreed to serve as Hawking Inc.'s east coast exclusive distributor. (R. Coxon Aff. P 5.) Xontal's distribution territory covered Massachusetts, Connecticut, Rhode Island, New York, Pennsylvania, Maryland, Delaware, Virginia, North Carolina, South Carolina, Georgia, Alabama, Tennessee, Florida, Mississippi, [*7] West Virginia, and Vermont. (Compl. P 3.) Notably, Illinois was not part of the territories to be served by Xontal, and Xontal has never made

sales of Plaintiff's urethane product in Illinois. (R. Coxon Aff. P 5.)

According to Plaintiff, the terms of the exclusive distribution agreement between Xontal and Plaintiff ("Distribution Agreement"), as well as the custom and practices of the parties, imposed fiduciary duties on Xontal, its officers, employees, and agents "of the utmost loyalty, honesty, good faith and fair dealings." (Compl. P 18.) Notably, nothing in the Distribution Agreement explicitly makes Xontal a fiduciary of Hawking Inc. Several additional provisions of the Distribution Agreement are worth noting. First is a non-compete clause, stating:

> Not during the continuance of this Agreement [shall Xontal] be concerned or interested either directly or indirectly in the manufacture or supply of goods in the Territories which are substantially similar to or are competitive with the Products nor for a period of one year after the termination of this Agreement to distribute or deal in the Territories with any products substantially similar to or competitive with the products [*8] upon suitable compensation by Principal.

(Distribution Agreement, Ex. A to Compl. P 5.2.) The agreement also includes the following clause:

> The distributor [Xontal] shall not without the express written consent of the Principal use any Confidential Information other than for the promotion and sales of the Products or disclose any Confidential Information to any third party.

(Id. P 7.1.) Finally, the agreement includes what Plaintiff calls a forum selection clause:

> This Agreement shall be governed by the laws of the State of Illinois in every particular and the parties submit to the non-exclusive jurisdiction of the State of Illinois courts.

(Id. P 12.)

The Distribution Agreement between Xontal and Clearclad covered a five-year term, ending July 22, 1998. (R. Coxon Aff. P7.) According to Ralph Coxon, president of Xontal, in 1997, Clearclad proposed a new agreement in which Xontal would receive only a non-exclusive distributorship. (Id.) This, he describes, was completely unacceptable, and he ultimately terminated

their working relationship. [2] (Id.) Clearclad "directly disputes" Ralph Coxon's version of what occurred. (Response [*9] to Defendants Timothy Coxon and Hawking International, LLC's Motion to Dismiss or Transfer or, Alternatively, to Dismiss Counts II, III and IV for Failure to State a Claim Upon Which Relief can be Granted ("Pl. Response to R. Coxon's Motion"), at 6.) Edward Kittridge, President of Clearclad, instead contends that Coxon did not say that he would "*absolutely*" not extend a Distribution Agreement on a non-exclusive basis." (Kittridge Aff., Ex. 1 to Pl. Response to R. Coxon's P 38 [3] (emphasis in original).) Apparently in an effort to support that assertion, Kittridge notes that he was engaged in intensive negotiations with Coxon through July 22 1998, at which point Coxon concluded that he would not extend the Distribution Agreement. [4] (Id.)

> 2   The record does not disclose whether Plaintiff itself distributed the urethane products on the east coast following the end of its relationship with Xontal.
> 3   The court observes that Clearclad's citations to paragraphs in Kittridge's affidavit differ from the actual numbering of paragraphs in the affidavit itself. This is consistent throughout, raising a question of whether Clearclad was working from a different version of the affidavit than the one before the court.

[*10]

> 4   The basis of Clearclad's objection to Coxon's description of events is not entirely clear to the court. Certainly, Coxon could have told Kittridge in 1997 that he would absolutely not accept a non-exclusive Distribution Agreement, but continued negotiations in the hopes that another agreement would result. And if Clearclad's dispute has to do only with the use of the word "absolutely" (i.e., whether Coxon's position was subject to compromise), the court finds little merit to Clearclad's objection.

## C. Defendant Ralph Coxon

Defendant Ralph Coxon is a resident of Maryland, a permanent resident alien of the United States, and a citizen of the United Kingdom. (Compl. P 5.) Plaintiff alleges that Ralph Coxon possesses a financial ownership interest in Defendant Hawking International, LLC ("Hawking LLC"), a Maryland domestic limited liability company that was formed on June 12, 1998. (Id. PP 4-5.) The use of the name "Hawking International" by Hawking LLC was apparently authorized by Ralph Coxon (Compl. P 7), from which Plaintiff infers that "surely . . . some financial relationship [exists] [*11] between Ralph Coxon, Hawking Ltd., LLC, and Timothy Coxon." (Pl. Response to R. Coxon's Motion, at 5.) Ralph Coxon,

however, claims that Xontal has no financial interest in Hawking LLC. (R. Coxon Aff. P 9.)

### D. Defendant Hawking International, LLC

Defendant Hawking LLC, like Plaintiff, sells urethane products in the eastern and southeastern United States. (T. Coxon Aff., Ex. 1 to Memorandum in Support of Motion to Dismiss or Transfer or, Alternatively, to Dismiss Counts II, III and IV for Failure to State a Claim Upon Which Relief can be Granted (hereinafter "T. Coxon Motion") P 2.) Hawking LLC has its principal place of business in White Hall, Maryland, at the same street address as Xontal. (Compl. P 4.) Consistent with the company and family name common to this case, Hawking LLC is owned solely by Timothy Coxon, who is the son of Ralph Coxon. (T. Coxon Aff. PP 2, 5.)

### E. Defendant Timothy Coxon

Defendant Timothy Coxon is a resident of Georgia since approximately 1993 and a permanent resident alien of the United States and citizen of the United Kingdom. (Compl. P 6; T. Coxon Aff. P 3.) From approximately 1992 to May 1998, he worked as a salesman for Xontal, primarily [*12] on the sale of products distributed by Clearclad. [5] (T. Coxon Aff. P 4.) When Timothy Coxon learned from his father that Xontal's Distribution Agreement with Clearclad was not going to be renewed, he realized that there would be no work for him at Xontal, and on May 14, 1998, he resigned from Xontal and pursued plans to start his own company. (Id. PP 5, 7.) As discussed below, Timothy Coxon eventually became a distributor for a urethane product produced by Hawking Ltd. (Id. P 8.)

> 5    Plaintiff asserts that he was not a salesman, but Vice-President and an officer at Xontal, but does not offer any substantiating documentation or explain the significance of the purported distinction. To the extent that the different positions are relevant in discussing the fiduciary shield issue, the court discusses that below. See infra Part II.C.1.b.

### F. Defendant Hawking International, Ltd.

Defendant Hawking International, Ltd. ("Hawking Ltd.") is a corporation formed under the laws of the United Kingdom with [*13] its principal place of business in Gloucestershire, England. (Compl. P 8.) Hawking Ltd. is involved in the manufacture, import, export, distribution, and sale of chemical products internationally. (Id.) In April 1987, Hawking Ltd. was appointed by LVH to be a distributor of LVH's urethane products in Asia, Australia, Ireland, and the Middle East. (L. Hawkes Aff. P 4.) The Distribution Agreement was extended to cover Canada and the United States in or about 1991. (Id.)

As described above, in 1992, Hawking Ltd. entered into a Distribution Agreement with Plaintiff to distribute the LVH urethane products in the United States. (Id. P 5.) At the time, Hawking Ltd. owned an undisclosed number of shares in Hawking Inc. (Id.) On or about April 25, 1994, LVH ended its relationship with Hawking Ltd. and negotiated the Distribution Agreement for Clearclad urethane products with Hawking Inc. directly. (Id. P 6.) Since approximately March 1994, Hawking Ltd. has not sold any products to Hawking Inc. or its successor, Clearclad. (Id.) In January 1995, as part of a settlement with Hawking Inc. (the nature of the dispute being settled is not explained), Hawking Ltd. sold all [*14] of its interest in Hawking Inc., presumably to Hawking Inc. (Id.)

On February 15, 1995, Hawking Ltd. and Hawking Inc. entered into an agreement to "sell, assign, convey and transfer a perpetual license to Hawking International, Inc. to use all existing trade names, trade marks and assumed names of Hawking International, Ltd. held, used or asserted, and relating directly or indirectly to products now being marketed by Hawking International Inc." (Compl. PP 11-12; see Settlement Agreement, Ex. A to Compl.) Defendants Hawkes and Ryder, officers of Hawking Ltd., were also parties to that agreement. (See Compl. P 12; Settlement Agreement.) The three Defendants were paid $ 58,560 for the license. (Id.) Illinois law applies in construing the agreement. (Compl. P 13; Settlement Agreement.)

In May 1998, Timothy Coxon contacted Hawking Ltd. about the possibility of Coxon distributing a new urethane product for Hawking Ltd. in the United States. (T. Coxon Aff. P 8.) The agreement was finalized in June 1998 for Coxon's new company, Hawking LLC, to become a distributor of Hawking Ltd.'s new product, known as Techniclad, in the United States. (L. Hawkes Aff. P 7.)

### G. Defendants [*15] Hawkes and Ryder

As the name may imply, Defendant Leonard Geoffrey Hawkes has been affiliated with at least two of the "Hawking" companies. He is the Managing Director and Chairman of the Board of Hawking Ltd. (L. Hawkes Aff. P 3.) He is a resident and citizen of the United Kingdom. (Id. P 2; Compl. P 9.) During the period of Hawking Inc. and Hawking Ltd.'s association, Hawkes served as a director of Hawking Inc. (L. Hawkes Aff. P 5.) On or about April 25, 1994, however, Edward Kittridge, President of Hawking Inc., called for a special meeting of the shareholders of Hawking Inc. for the purpose of removing Hawkes as a director, and the Board voted him out.

(*Id.*) The record does not reveal Kittridge's motivation for removing Hawkes.

Defendant Peter Charles Ryder, also a citizen and resident of the United Kingdom, is the Technical Director and Deputy Chairman of the Board of Directors of Hawking Ltd. (P. Ryder Aff., Ex. 2 to Memorandum of Defendants Hawking International, Ltd., Leonard Geoffrey Hawkes and Peter Ryder in Support of Motion to Dismiss for Lack of Personal Jurisdiction PP 2-3.) Like Hawkes, Ryder was removed as a director at the specially-summoned April 25, 1994 shareholders' [*16] meeting. (L. Hawkes Aff. P 5.)

## II. The Allegations

The claims, like the parties, are numerous and closely interlinked. At bottom, Plaintiff alleges that during the existence of the Distribution Agreement between Clearclad and Xontal, Defendants Xontal, Ralph and Timothy Coxon, Hawking LLC, Hawking Ltd., Hawkes, and Ryder were actually secretly competing with Clearclad and diverting sales inquiries and sales to themselves. (Pl. Response to R. Coxon's Motion, at 2.) Plaintiff charges that Defendants Xontal, Hawking LLC, and Ralph and Tim Coxon have manufactured and distributed goods substantially similar to and competitive with those distributed by Plaintiff Clearclad and have disclosed trade secrets in violation of the non-compete clause in the Distribution Agreement. (Compl. PP 22; 52.) Plaintiff further alleges that Defendants Hawking Ltd., Hawkes, and Ryder have assisted, aided, abetted, and conspired with the other Defendants to manufacture and distribute such products. (*Id.* P 23.) Finally, Plaintiff claims that all Defendants have wrongfully claimed ownership of the name "Hawking International" in violation of Plaintiff's settlement February 1995 agreement with [*17] Hawking Ltd. (*Id.* PP 29-30.)

Plaintiff takes issue with nearly all of the facts presented in support of Defendants' motions. For example, Ralph Coxon maintains that since the Distribution Agreement expired on July 22, 1998, Xontal has not sold or distributed any urethane coating products. (R. Coxon Aff. P 10.) Clearclad disputes that statement and goes so far as to call it "such a distorted rendition of facts as to almost amount to a misrepresentation." (Pl. Response to R. Coxon's Motion, at 3.) Kittridge proffers a sales brochure, indicating that Xontal and Ralph Coxon would be selling Techniclad products (a urethane coating product) at a June 1999 SUR/FIN [6] trade show. (Kittridge Aff. P 45; *see* SUR/FIN Brochure, Ex. C to Pl. Response to R. Coxon's Motion.) The brochure reads: "Exhibit: Xontal will feature E-coat materials by Hawking International LLC; Fannon Products' infrared lamps and ovens; and Pro Quip automatic plating machines." (SUR/FIN Brochure.) Based on this, Clearclad concludes that Xontal's

assertion that it and Hawking LLC are not selling competitive products is a "gross misrepresentation." (Pl. Response to R. Coxon's Motion, at 3.)

6    The parties do not explain the acronym.

[*18]    Instead, Plaintiff alleges that since early 1998, Defendants have on numerous occasions secretly competed with Clearclad and diverted sales inquiries and sales to themselves. In April 1998, Plaintiff claims that Hawkes and Timothy Coxon "called on a Clearclad customer" (not identified by name) and attempted to sell the customer products competitive with Clearclad products. (Kittridge Aff. P 19.) At the SUR/FIN trade show in June 1998, Alfred M. Gabriele, [7] one of Xontal's salesmen, allegedly diverted inquiries of Kwikset Lock Company ("Kwikset"), a potential Clearclad customer, and offered competing products by Hawking LLC and Hawking Ltd. (Compl. PP 36-37; *id.* P 20.) Jack Lofstrom, Vice-President of Sales at Clearclad, was present at the trade show and has submitted an affidavit stating that under the Distribution Agreement, Xontal was expected to offer and attempt to sell Clearclad products at the show. (Lofstrom Aff., Ex E to Pl. Response to R. Coxon's Motion P 3.) Lofstrom also states that he observed Gabriele talking with Kwikset at the show. (*Id.* P 5.) Gabriele later sent Kwikset a letter on behalf of Hawking LLC, confirming an association between Hawking Ltd. and Hawking [*19] LLC, and offering to sell Techniclad products to Kwikset. (Compl. P 38; *see* Gabriele Letter, Ex A to Kittridge Aff.)

> 7    Gabriele was a salesman at Xontal who serviced Clearclad customer accounts. (Compl. P 35.) He resigned from Xontal effective June 25, 1998 and is now working for Hawking LLC. (*Id.*) Gabriele is not a defendant in this lawsuit.

On August 12, 1998, Clariant Corp. ("Clariant"), another potential Clearclad customer that had made significant steps toward signing a contract with Clearclad, decided instead to do business with Xontal, which was putting in a "trial system" (the term is not explained) costing less than Clearclad's system. (*Id.* P 48; Kittridge Aff. P 29.) Clearclad alleges that Xontal had provided Clariant with false information and that Defendants sold Clariant a competing product based on trade secrets and confidential information taken from Plaintiff. [8] (*Id.*)

> 8    Although Clariant's ultimate decision came after the end of the Distribution Agreement, Plaintiff claims that negotiations between Xontal and Clariant began in March of 1998, while the Distribution Agreement was still in effect. (*See* Kittridge Aff. P 28.)

[*20] According to Plaintiff, Defendants have also managed to steal away existing Clearclad customers by relying on confidential information and making misrepresentations. On October 5, 1998, Wilshire Lighting, a Clearclad customer serviced by Xontal and Gabriele, informed Clearclad that it had chosen Hawking LLC to supply chemical coatings for its products. (Compl. P 40; Kittridge Aff. P 22.) The diversion of the sale, Plaintiff charges, was the result of illegal use of confidential information and trade secrets and misrepresentations about Hawking LLC's products being the same as those by Clearclad (apparently, Plaintiff contends they are not). (Id.) On October 7, 1998, Hager and Sons Hinge and Manufacturing Company, Inc. ("Hager"), another customer of Clearclad serviced by Xontal, switched to Hawking LLC for its coating products, allegedly based on the same misconduct by Defendants. (Compl. P 41; Kittridge Aff. P 23.)

Plaintiff also alleges that Defendants wrongfully used one of Clearclad's trade names/trademarks (grouped together by Plaintiff). Specifically, Clearclad claims that "Hawking International" was one of the trade names and trademarks licensed to Clearclad under the settlement [*21] agreement with Hawking Ltd. (Compl. P 29.) At least two acts by Defendants allegedly infringed Plaintiff's rights. First, on or before January 1998, Ralph Coxon registered an internet domain registration to use "Hawking International" and registered the name "www.hawkinginternational.com." (Id. P 27). Second, Ralph Coxon filed a letter with the State Department of Assessments and Taxation in Maryland dated June 5, 1998 that stated "Please be advised that as the owner of the name 'Hawking International', I hereby authorize for you to accept for filing and recording among you [sic] records the Articles of Organization for Hawking International, LLC., signed Ralph Coxon." (Id. P 31.) Defendants do not dispute those facts, but challenge Plaintiff's notion that its license was exclusive.

This alleged conduct is the basis of the complaint for unfair competition, breach of covenant not to compete, breach of fiduciary duties, fraud, conspiracy, and violation of Illinois' trade secrets law. All Defendants move to dismiss or transfer the case to the District of Maryland in four separate motions. The court addresses each motion in turn.

## DISCUSSION

[*22]

### A. Personal Jurisdiction

"In deciding a motion to dismiss for lack of personal jurisdiction, the court may receive and consider affidavits from both parties." *Glass v. Kemper Corp.*, 930 F.

Supp. 332, 337 (N.D. Ill. 1996). All factual disputes in the pleadings and affidavits are resolved in favor of the plaintiff, but facts contained in the defendants' affidavits that remain unrefuted by the plaintiff are deemed true. *Id.* (citations omitted). The burden of establishing a prima facie case for personal jurisdiction is on the plaintiff. *See Steel Warehouse of Wisc. Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998).

### B. Motion to Transfer Venue

In deciding a motion to transfer, the court must weigh the public interest and the private interests of the parties to the litigation. *Sanders v. Franklin*, 25 F. Supp. 2d 855, 857 (N.D. Ill. 1998) (citation omitted). The moving party bears the burden of demonstrating that the transferee forum is "clearly more convenient." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986) (citations omitted). It is not sufficient if the transfer will merely [*23] shift the burden from one party to the other. *Sky Valley Ltd Partnership v. ATX Sky Valley, Ltd.*, 776 F. Supp. 1271, 1276 (N.D. Ill. 1991) (citations omitted). "The determination of whether a case should be transferred pursuant to § 1404(a) is committed to the sound discretion of the trial court." *Law Bulletin Publ'g Co. v. LRP Publications, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998) (citing *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989); other citation omitted).

### C. Motion to Dismiss

A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Kennedy v. National Juvenile Detention Ass'n*, 187 F.3d 690, 1999 U.S. App. LEXIS 18407, 1999 WL 595483, at *2 (7th Cir. 1999) (quoting *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). The court regards all well-pleaded facts as true and looks at them in the light most favorable to the plaintiff. *Id.* (citations omitted).

## II. The Four Motions

### A. Xontal's Motion to Transfer [*24]  or to Dismiss Counts II, III, and IV for Failure to State a Claim

Defendant Xontal moves to transfer this action to the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1404(a). Specifically, Xontal argues that transfer is appropriate because: (1) a substantial part of the events in this lawsuit occurred in Maryland; (2) the majority of witnesses are located in Maryland or elsewhere outside Illinois; and (3) transfer will serve the interest of justice. Alternatively, it asks that Counts II, III, and IV be dismissed pursuant to FED. R.

CIV. P. 12(b)(6). [9] Plaintiff urges the court to deny the motion because transfer is not convenient for the parties, does not benefit a majority of the witnesses, and does not advance the interests of justice. Plaintiff also contends that it has pled sufficient facts to withstand a motion to dismiss as to Counts II, III, and IV. The court looks at the issues separately below.

> 9 Defendant Xontal has waived its right to file a reply brief on this motion. Presumably, it incorporates the arguments made by its co-Defendants' motions. Unfortunately, not all issues are analyzed in the same way for all Defendants (e.g., the individual Defendants' alleged wrongful act). This problem is exacerbated by the fact that Xontal's initial brief on this issue was exactly that-preliminary and brief (only one page long). Had Xontal filed a more extensive initial memorandum or filed its own reply brief, the court would not have to extrapolate from the other Defendants' briefs for pertinent facts and arguments. The court notes the Seventh Circuit's recent admonition that "[a] brief must make all arguments accessible . . . rather than ask [the judge] to play archaeologist with the record," DeSilva v. DiLeonardi, 181 F.3d 865, 1999 WL 430176, at *2 (7th Cir. 1999), but has in this case made every effort to glean factual information from the full record.

[*25] **1. Motion to Transfer Venue**

"A district court may transfer a civil action for the convenience of the parties and witnesses [and] in the interests of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The court has discretion to transfer the case pursuant to § 1404(a) if: (1) venue was proper in the transferor court; (2) venue and jurisdiction would be proper in the transferee district; and (3) the transfer will serve the convenience of the parties and the witnesses as well as the interests of justice. Sanders, 25 F. Supp. at 857 (citation omitted).

The final element in the § 1404(a) analysis involves a balancing of private and public interests. Private interest factors include: (1) the plaintiff's choice of forum, (2) the situs of material events, (3) the relative ease of access to sources of proof, (4) convenience of the witnesses, and (5) convenience to the parties. Law Bulletin, 992 F. Supp. at 1017 (citations omitted). Public interest factors focus on whether a change in venue will promote the nebulous "interests of justice" and include: (1) the relation [*26] of the community to the issues in the litigation and the desirability of resolving controversies in their locale, (2) the court's familiarity with applicable law, and (3) congestion of the respective dockets and the

prospects of earlier trial. Sanders, 25 F. Supp. 2d at 857 (citation omitted).

Neither party has argued that the first two elements of § 1404(a) are not satisfied. The court therefore focuses its analysis on the final consideration, the convenience of parties and witnesses and the interest of justice factors.

**a. Private Interest Factors: Convenience of Parties and Witnesses**

**(1) Plaintiff's Choice of Forum**

The plaintiff's choice of forum is entitled to substantial weight, especially if it is the plaintiff's home forum. United Air Lines, Inc. v. Mesa Airlines, Inc., 8 F. Supp. 2d 796, 798 (N.D. Ill. 1998) (citation omitted). The balance must weigh strongly in the defendant's favor before a plaintiff's choice of forum is disturbed. Id. (citation omitted). Plaintiff Clearclad is an Illinois corporation with its principal place of business in Harvey, Illinois. That Clearclad has brought this action in its home forum thus weighs [*27] heavily against transfer.

Besides a bald assertion that a substantial part of the events in this action occurred in Maryland, Xontal does not respond to this issue at all. Defendants Timothy Coxon and Hawking LLC, however, argue that "where the plaintiff's chosen forum is not the situs of material events, plaintiff's chosen forum is entitled to less deference." Law Bulletin, 992 F. Supp. at 1017 (citation omitted). Defendants argue that Maryland, rather than Illinois, is the situs of the majority of the events alleged in the complaint. The court considers this argument in connection with Xontal's motion below.

**(2) Situs of Material Events**

Although the court can imagine arguments that favor Xontal, Xontal itself has not met its burden of showing that Maryland was the situs of material events. In the court's view, the primary allegation against Xontal centers on alleged violations of provisions in the Distribution Agreement between Xontal and Hawking Inc. through unfair competition. According to Plaintiff, the agreement was negotiated and entered into in Illinois. (Response to Defendant Xontal's Motion to Transfer or, Alternatively, to Dismiss Counts II, III [*28] and IV for Failure to State a Claim Upon Which Relief can be Granted (hereinafter "Pl. Response to Xontal's Motion"), at 6.) Defendants themselves assert that Hawking Inc. drafted the agreement (see R. Coxon Aff. P 5), suggesting that the negotiations and drafting took place in Illinois, where Hawking Inc. was located. In addition, the other contract at issue (the settlement agreement between Hawking Inc. and Hawking Ltd.) was also negotiated and entered into in Illinois. (Pl. Response to Xontal's Motion, at 6.)

Nor is it apparent that the alleged diversion of sales inquiries and sales took place in Maryland. Xontal's market appears to have covered much of the eastern and southeastern portions of the United States, not just Maryland. (*See* Compl. P 3.) And the incident at the SUR/FIN show in 1998 occurred in Minneapolis, Minnesota. (*See id.* P 37.) Lastly, the court notes that the alleged diversion of sales transpired with customers outside Maryland: Kwikset is in Oklahoma, Wilshire Lighting is in Massachusetts, Hager is in Alabama, and Clariant is in North Carolina. (*See* Lofstram Aff. P 7.) The court therefore finds that Plaintiff Clearclad's choice of Illinois as the [*29] forum is entitled to substantial deference.

### (3) Relative Ease of Access to Sources of Proof

Xontal has not addressed this issue directly. Based on the record, however, the court concludes that consideration of this factor neither weighs in favor of nor against transfer. Plaintiff's documents are located in Illinois. (Kittridge Aff. P 49.) Defendants Xontal and Ralph Coxon keep records exclusively in Maryland. (R. Coxon Aff. P 11.) Defendant Timothy Coxon keeps his personal records in Georgia, while the records for Hawking LLC are spread among Georgia, Maryland, and New Jersey. (T. Coxon Aff. P 13.) Records for Defendants Hawking Ltd., Hawkes, and Ryder are all located in the United Kingdom. (Hawkes Aff. P 13.)

Transfer to the District of Maryland would only shift the burden from one party to the other, an insufficient basis for transfer. *See Sky Valley*, 776 F. Supp. at 1276. The majority of the Defendants themselves do not keep all of their records in Maryland. Finally, moving documents (even by the boxful) is not such an unreasonable burden in litigation as to warrant transfer. In light of modern technological advances and wide availability of computers, modems, [*30] facsimile machines, etc., moving information from one place to another does not create the onerous burden it once may have. *See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218, 863 F. Supp. 186 (D. Del. 1993). Therefore, this element does not influence the court's decision.

### (4) Convenience of the Witnesses

Convenience of witnesses is often the controlling factor for § 1404(a) purposes. *Brandon Apparel Group, Inc. v. Quitman Mfg. Co.*, 42 F. Supp. 2d 821, 834 (N.D. Ill. 1999); *Law Bulletin*, 992 F. Supp. at 1018; *Riviera Finance v. Trucking Servs., Inc.*, 904 F. Supp. 837, 839 (N.D. Ill. 1995). The "party seeking transfer under § 1404(a) should specify the key witnesses it intends to call and make a general statement of their expected testimony." *College Craft Cos., Ltd. v. Perry*, 889 F. Supp. 1052, 1055 (N.D. Ill. 1995) (citing *Heller Fin.*, 883 F.2d at 1293; other citations omitted). Further, a court should focus on the convenience of potential *non-party* wit-

nesses on the assumption that witnesses within the control of the party calling them (i.e., employees) will appear [*31] voluntarily. *Id.* (citation omitted).

Xontal has not provided the names of expected, or even potential, witnesses. It has only averred that the majority of witnesses are located in Maryland and elsewhere outside Illinois. Defendants Timothy Coxon and Hawking LLC state that they believe the parties themselves will be the primary witnesses. Plaintiff notes that of Defendants' potential witnesses, then, only Ralph Coxon resides in Maryland. For example, Timothy Coxon resides in Georgia, while Leonard Hawkes and Peter Ryder both reside in the United Kingdom.

Plaintiff, on the other hand, plans to call a number of witnesses who reside in Illinois, including: Edward Kittridge (President of Clearclad); Jack Lofstram (Vice-President of Sales at Clearclad); and four other witnesses whose roles in the dispute are at this point unidentified: Patrick Kittridge, Matthew Kittridge, Maurice Brady, and William Heuring. Other potential witnesses for Plaintiff include representatives of the companies that were once Clearclad customers, whose residences are all outside Maryland and Illinois. As Plaintiff puts it, "No matter where this litigation is resolved, these witnesses from the customer companies [*32] will need to travel outside the district where they reside." (Pl. Response to Xontal's Motion, at 5.) The court agrees with Plaintiff that the convenience of one party witness (Ralph Coxon) at the expense of at least six other witnesses does not justify changing the venue to Maryland.

### (5) Convenience of the Parties

The court also considers the convenience of the litigants, specifically their respective residences and their ability to bear the expenses of litigating in a particular forum. *Brandon Apparel*, 42 F. Supp. 2d at 834. It is axiomatic that litigating outside of one's home forum is always more burdensome than litigating at home.

Xontal does not address the issue, and Plaintiff concedes that this factor is, at best, a tie. (*See* Pl. Response to Xontal's Motion, at 5.) A majority of the parties reside outside of Illinois and Maryland, making neither forum clearly more convenient. Additionally, none of the parties appears to be in a better position to bear the expenses of litigating in a foreign forum. The court thus finds that this factor neither supports nor argues against transfer.

### b. Public Interest Factors: Interests of Justice

Whether transfer [*33] is in the interests of justice involves analysis of three factors: (1) relation of the locale to the controversy, (2) court's familiarity with applicable law, and (3) speed of litigation. None of the factors favor transfer here.

Since neither party addresses the first issue, the court simply finds that consideration of this factor is neutral and does not tilt the scale in favor of one party. As for familiarity with the law, Defendants Timothy Coxon and Hawking LLC contend that Maryland courts are just as equipped as this court to apply Illinois law on the breach of contract and conspiracy claims and note that Maryland itself has a trade secrets act. Defendants nevertheless admit that this element neither weighs in favor of nor against transfer. For purposes of evaluating the final factor, the court turns to reports from the Federal Court Management Statistics for the period ending September 30, 1998. ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, 1998 FEDERAL COURT MANAGEMENT STATISTICS. The two most relevant statistics to the court's current analysis are: (1) the median months from filing to disposition, and (2) the median months from filing to trial. *Brandon Apparel*, 42 F. Supp. 2d at 835 [*34] (citations omitted). The median months from filing to disposition was 6 months in both the Northern District of Illinois and the District of Maryland. The median months from filing to trial was 25 months in the Northern District of Illinois compared to only 18 months in the District of Maryland. This case would arguably proceed to trial 7 months earlier in the District of Maryland, but "the use of statistics must be examined in light of the other considerations in the interests of justice." *United*, 8 F. Supp. 2d at 800. In weighing the above factors, the interests of justice do not clearly require transfer. *See id.*

### c. Resolution

A balance of the above considerations weighs against transfer to the District of Maryland. Xontal has failed to show that the District of Maryland is clearly the more convenient forum, and the interests of justice do not clearly favor that forum. Clearclad brought this action in its home forum, and none of the other factors favor transfer. Xontal's motion for transfer of venue is denied.

### 2. Motion to Dismiss Count II: Breach of Covenant not to Compete in Agreement

Defendant Xontal briefly argues that Count II must be dismissed [*35] because the covenant not to compete was conditioned "upon suitable compensation by Principal," (Distribution Agreement P 5.2), and Ralph Coxon states that no suitable compensation was ever received, (*See* R. Coxon Aff. P 15.)

Under the Federal Rule's system of notice pleading, however, a plaintiff is not required to plead all that it must prove nor required to plead specific facts. *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995). A plaintiff may even plead conclusions so long as they pro-

vide the defendant with at least minimal notice of the claim. *Id.* at 154. In addition, Plaintiff asserts in its argument that suitable compensation was provided to Xontal in the form of "mutual promises and mutual benefits which flowed between Plaintiff and Defendants," (Pl. Response to Xontal's Motion, at 11), and by providing training, marketing materials, and furnished booths and space at trade shows, (Kittridge Aff. P 42.)

Plaintiff has alleged enough to meet the low threshold on a motion to dismiss. The allegations of the complaint, though bare of specific facts, notify Defendants of the nature of this claim for breach of the covenant not to compete. [*36] The court adheres to the common wisdom that it should not inquire into the adequacy of the consideration to support a promise, only its existence. *See Wagner v. Nutrasweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996) (citations omitted). Furthermore, whether the alleged suitable compensation described by Plaintiff was intended to support the non-compete clause is not a question for the court to determine at this juncture. The question of fact created by the parties' affidavits precludes dismissing this claim. The motion to dismiss Count II is denied.

### 3. Motion to Dismiss Count III: Breach of Fiduciary Duties

Xontal urges dismissal of Count III because Plaintiff does not allege what fiduciary duty is owed nor how it arose. Moreover, Xontal points out that the Distribution Agreement explicitly provides that no special relationship existed between Clearclad and Xontal. In pertinent part, the Distribution Agreement provides:

> Nothing contained in this Agreement shall create the relationship of Principal and Agent nor that of Partnership between the Principal and the Distributor nor shall the Distributor have any right or authority to enter into any agreement or [*37] to assume or create any obligation expressed or implied on behalf of the principal without prior written consent of the Principal.

(Distribution Agreement P 15.)

Plaintiff does not dispute that the Distribution Agreement included such a provision, but contends that a fiduciary duty nonetheless arose based on custom and practice of the parties. Plaintiff's only supposed support for this proposition is Kittridge's affidavit, stating that Xontal, its officers, and employees were authorized to make representations, warranties, and agreements on behalf of Clearclad with existing and potential customers and that these arrangements were honored by Clearclad.

EXHIBIT E

2 OF 2

(See Kittridge Aff. P 44.) In Plaintiff's view, this some-
how creates an "ongoing agency relationship with its
attendant fiduciary duties of good faith, fair dealing,
honestly [sic] and loyalty." (Pl. Response to Xontal's
Motion, at 15.)

"It is well established under Illinois law that parties
to a contract . . . do not owe a fiduciary duty to one an-
other." *Bixby's Food Systs., Inc. v. McKay*, 985 F. Supp.
802, 808 (N.D. Ill. 1997); *see also Oil Express Nat'l, Inc.
v. Burgstone*, 958 F. Supp. 366, 370 (N.D. Ill. 1997)
[*38] (citing *Original Great Am. Chocolate Chip Cookie
Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th
Cir. 1992); other citation omitted). The explicit dis-
claimer of an agency relationship in the Distribution
Agreement further indicates that Xontal and Clearclad
were not in a fiduciary relationship.

Plaintiff's responses to this argument are unpersua-
sive. Citing to *Schlunk v. Volkswagenwerk Aktiengesell-
schaft*, 145 Ill. App. 3d 594, 602, 503 N.E.2d 1045,
1050, 105 Ill. Dec. 39 (1st Dist. 1986), Plaintiff argues
that written disclaimers of an agency relationship are not
controlling. Although the *Schlunk* court did not explain
its rationale, the decision does suggest that the exercise
of control is more important in finding an agency rela-
tionship. *See id.* Indeed, focusing on the issue of control
is consistent with the common law view of fiduciary
duty, which is imposed

> when the disparity between the parties
> in knowledge or power relevant to the
> performance of an undertaking is so vast
> that it is a reasonable inference that had
> the parties in advance negotiated ex-
> pressly over the issue they would have
> agreed that the agent owed the principal
> the high duty [*39] . . . because otherwise
> the principal would be placing himself at
> the agent's mercy.

*Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992).
This is not the type of situation described or even alleged
by Plaintiff, however. There is no allegation that Clear-
clad reposed trust and confidence in Xontal, who thereby
gained influence and superiority over Clearclad. *See id.*
Moreover, both parties are commercial businesses, pre-
sumably headed by equally capable and business-minded
officers.

That leaves Plaintiff with its assertion that the cus-
tom and practice of the parties created an ongoing
agency relationship and corresponding fiduciary duties.
The only evidence that Plaintiff proffers is Kittridge's
affidavit, which baldly asserts, "Based on the custom and
practices of the parties, Xontal, its officers, employees

and agents were fiduciaries of Hawking International
Inc. and Clearclad." (Kittridge Aff. P 44.) This is not a
factual assertion, but a legal conclusion that contradicts
the terms of the parties' agreement, which this court need
not accept. *See Scott v. O'Grady*, 975 F.2d 366, 368 (7th
Cir. 1992), *cert. denied*, 508 U.S. 942, 124 L. Ed. 2d
643, 113 S. Ct. 2421 (1993) [*40] (court is not bound by
the plaintiff's legal characterizations of the facts). Noth-
ing else in the record suggests that the custom and prac-
tice in the industry generally or these parties particularly
was to create an agency relationship. Indeed, nothing
about an arms-length business relationship between two
corporations based on a written contract is characteristic
of a fiduciary relationship. *See Pro Football Weekly, Inc.
v. Gannett Co.*, 988 F.2d 723, 727 (7th Cir. 1993) (find-
ing that such a situation does not support allegations of a
fiduciary duty); *see also McKay*, 985 F. Supp. at 808
("the allegation that 'one businessman simply trusted
another to fulfill his contractual obligations' is insuffi-
cient to state a fiduciary duty"). Neither has Plaintiff
cited to any authority imposing an agency relationship
based on custom and practice despite an express written
agreement otherwise. Finding no basis for a fiduciary
duty, the court grants the motion to dismiss Count III
against all Defendants for breach of fiduciary duties.

**4. Motion to Dismiss Count IV: Fraud**

Xontal's only argument with respect to the fraud
claim is that it fails to meet the [*41] standards for
pleading fraud as required by Rule 9(b) of the Federal
Rules. Plaintiff responds that it has, to the best of its abil-
ity and based on the knowledge within its control, al-
leged specific fraudulent statements, identified who
made such statements, alleged when and where the
statements were made, and alleged how they were
fraudulent-all to the satisfaction of Rule 9(b).

The basic elements of common law fraud are: (1) a
false representation of material facts; (2) by a party who
knows or believes it to be false; (3) with the intent to
induce an act; (4) action in reliance on the statement; and
(5) injury to the plaintiff as a consequence of that reli-
ance. *McKay*, 985 F. Supp. at 808 (citation omitted).
Fraud may also consist of the omission or concealment
of a material fact if accompanied by the intent to deceive
under circumstances that create the opportunity and duty
to speak. *Id.* (citation omitted). Allegations of fraud are
subject to a heightened pleading standard under FED. R.
CIV. P. 9(b), which requires a plaintiff to plead "all
averments of fraud . . . with particularity." *Goren v. New
Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) [*42]
(citations omitted). A plaintiff must plead the "who,
what, when, and where" of the alleged fraud. *Uni* Qual-
ity, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.
1992). The more stringent pleading standard recognizes

that accusations of fraud can do serious damage to the goodwill of a business or professional person, and persons ought not toss such accusations into complaints to induce advantageous settlements or for other ulterior purposes. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992).

Nonetheless, Rule 9(b) is to be read in the context of our liberal notice pleading system. *Barr v. Barr*, 207 B.R. 168, 172 (N.D. Ill. 1997) (citations omitted). "Thus, it is not necessary that a plaintiff plead each fraudulent detail, so long as the circumstances constituting fraud have adequately been set forth." *Id.* (citing *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)). Additionally, a plaintiff need not plead facts which it may lack prior to discovery. *Id.* (citing *Katz v. Household Int'l., Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996)). Lastly, where a plaintiff alleges [*43] fraud against a third party, less detail may be required under Rule 9(b) because the plaintiff may not have access to all the facts necessary to detail the claim. *Uni* Quality*, 974 F.2d at 923 (citations omitted).

Xontal mistakenly looks to only one paragraph in the complaint to argue that it is insufficient to meet Rule 9(b). The paragraph alleges, "Defendants have made false representations, false promises and omissions regarding material matters as alleged herein including that they would act in an honest, trustworthy and loyal manner, not divulge or misuse confidential materials and trade secrets, and not engage in unlawful, competitive acts." (Compl. P76.) Were this the only paragraph supporting the fraud allegation, the court might well agree with Xontal's conclusion. Clearclad's complaint, however, is replete with instances of alleged fraud. For instance, Plaintiff alleges that Xontal told Hager, a Clearclad customer, that Clearclad had "messed up a $ 3 million job" in Italy, which was untrue. (Compl. P 42.) Plaintiff also alleges that during negotiations with Clariant, a potential Clearclad customer, Defendants misrepresented to Clariant that Clearclad would [*44] not provide a free "trial system." (*Id.* P 48.) Without comment on the merits of the fraud claim, the court simply concludes that Plaintiff has alleged enough to meet Rule 9(b)'s pleading requirements. The motion to dismiss Count IV is denied.

## B. Defendant Ralph Coxon's Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer or to Dismiss Counts II, III, and IV for Failure to State a Claim

Defendant Ralph Coxon moves to dismiss this action for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2) or for change of venue to the District of Maryland pursuant to 28 U.S.C. § 1404(a). Alternatively, he moves to dismiss Counts II, III, and IV for failure to

state a claim pursuant to FED. R. CIV. P. 12(b)(6). Plaintiff counters that this court does have personal jurisdiction over Ralph Coxon based on his tortious conduct, which affected Clearclad's business in Illinois. Plaintiff again maintains that Counts II, III, and IV withstand a motion to dismiss. The court looks at the issues separately below.

### 1. Motion to Dismiss for Lack of Personal Jurisdiction

As indicated above, Plaintiff charges all Defendants with federal unfair [*45] competition, in violation of the Lanham Act, 15 U.S.C. § 1125. The Lanham Act does not specifically authorize this court's exercise of jurisdiction. This court therefore has personal jurisdiction over Defendants only if an Illinois court does. *See Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1201 (7th Cir. 1997). Deciding whether an Illinois state court would have jurisdiction entails a three-part inquiry: (1) state statutory law, (2) state constitutional law, and (3) federal constitutional law. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Because the Illinois long-arm statute authorizes jurisdiction to the constitutional limits, however, the Seventh Circuit has held that the three-part inquiry collapses into two constitutional inquiries--one state and one federal. *Id.* If jurisdiction is improper under either the United States or Illinois Constitution, the court cannot exercise jurisdiction over the nonresident party. *Brandon Apparel Group, Inc. v. Quitman Mfg. Co.*, 42 F. Supp. 2d 821, 828 (N.D. Ill. 1999) (citation omitted). Following the doctrine that "federal courts should avoid addressing [*46] federal constitutional issues when it is possible to dispose of a case on pendent state grounds," *Triple G. Landfills, Inc. v. Board of Comm'rs of Fountain County, Ind.*, 977 F.2d 287, 291 (7th Cir. 1992), the court addresses the state constitutional issue first. *See RAR*, 107 F.3d at 1276.

#### a. State Due Process

The Illinois Constitution contains a guarantee of due process that is separate and independent from the federal due process clause. *Brandon*, 42 F. Supp. 2d at 828 (citing *Rollins v. Ellwood*, 141 Ill. 2d 244, 152 Ill. Dec. 384, 565 N.E.2d 1302, 1316 (Ill. 1990)). To subject a nonresident defendant to personal jurisdiction in Illinois, the party's connection with Illinois should enable it "to predict that it might be subject to the jurisdiction of this state"; a "random, fortuitous, or attenuated" connection does not suffice. *Berndorf Belt Systs, Inc. v. Ascona Food Group (Canada) Ltd.*, 1998 U.S. Dist. LEXIS 19141, No. 98 C 1055, 1998 WL 851496, at *5 (N.D. Ill. Dec. 3, 1998) (quoting *Autotech Controls Corp. v. K.J. Electric Corp.*, 256 Ill. App. 3d 721, 628 N.E.2d 990, 995-96, 195 Ill. Dec. 526 (1st Dist. 1993)).

Unfortunately, [*47] two problems preclude this court from fully addressing this issue. First, although the "Illinois Supreme Court has made clear that the Illinois due process guarantee is not necessarily co-extensive with federal due process protections[,]" it has "given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." *RAR*, 107 F.3d at 1276. In other words, there is scant case law to guide this court. Second, the parties have not briefed the state constitutional issue as such; in fact, Defendant Ralph Coxon offers no analysis under the Illinois Constitution. Under the circumstances, the court finds no reason in this case to distinguish Illinois' due process guarantee from federal due process protections. *See Lawson v. Tax Lien Resources Group, LLC*, 1998 U.S. Dist. LEXIS 21533, No. 98 C 245, 1998 WL 957331, at *3 (N.D. Ill. Dec. 15, 1998). Hence, if federal due process requirements are satisfied, the court finds jurisdiction over Ralph Coxon appropriate.

**b. Federal Due Process**

The Due Process Clause of the Fourteenth Amendment limits the circumstances in which a state may assert personal jurisdiction over nonresident [*48] individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733, 24 L. Ed. 565 (1878). Under the traditional rubric, a defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945) (citation omitted). Courts have typically considered the due process analysis as a two-part inquiry: (1) the court must determine whether "minimum contacts" exist and, if so, (2) the court must determine whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Tingstol Co. v. Rainbow Sales, Inc.*, 8 F. Supp. 2d 1113, 1115 (N.D. Ill. 1998).

**(1) Minimum Contacts**

Minimum contacts with the forum state are established when a defendant purposefully avails itself of the rights and privileges of conducting activities in the state such that it invokes the benefits and protections of that state's law. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). In other words, the defendant's activities must be [*49] of such a quality and nature that it would reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). Such a defendant has enjoyed the benefits and protections of that state's laws, and jurisdiction over it satisfies due process. *Hanson v.*

*Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958).

Subject to the limits of due process, a court may exercise two types of personal jurisdiction over an out-of-state defendant: general and specific. General jurisdiction arises when the nonresident defendant has "continuous and systematic general business contacts" with the forum state. *Glass v. Kemper Corp.*, 930 F. Supp. 332, 338 (N.D. Ill. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984)). The contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." *Id.* (citing *International Shoe*, 326 U.S. at 318). Plaintiff does not really try to fit Ralph Coxon under general jurisdiction, and it is clear that he would [*50] not fall under this court's general jurisdiction over his person: he does not live and has never lived in Illinois; does not own or maintain a residence in Illinois; does not maintain an office or bank account in Illinois; does not maintain a telephone number in Illinois; has not voted or been liable for taxes in Illinois; and has come to Illinois only on matters at the basis of Plaintiff's specific claims. (*See* R. Coxon Aff. P 14.)

Specific jurisdiction, on the other hand, arises when the defendant's contacts with the forum are related to the controversy underlying the litigation. *Glass*, 930 F. Supp. at 338 (citations omitted). If a relationship between the litigation and forum exists, the plaintiff need only show that the defendant's contacts with the forum reach a "minimum" threshold. *Id.* (citation omitted). Defendant denies even these contacts, maintaining that all allegations against Coxon arise out of a relationship with other Defendants, who are all nonresident defendants.

What Defendant Coxon fails to recognize, however, is that "the state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if [*51] events were put in train outside its borders." *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997). In *Janmark*, the plaintiff, a seller of mini shopping carts, brought action against a competitor and its operator, seeking declaratory judgment and asserting a claim of tortious interference with prospective economic damage. *Id.* at 1201. Finding that a single phone call from defendant in California to a customer in New Jersey could not be a tort "within" Illinois, the district court dismissed the defendant for lack of personal jurisdiction. *Id.* Reversing, the Seventh Circuit reasoned that since without an injury there is no tort and that a wrong does not become a tort until an injury has occurred, the location of the injury is vital to understanding where the tort occurred. *Id.* at 1202. Because the injury took place in Illinois, the tort occurred in Illinois and was thus actionable in Illinois. *Id.*

In this case, the injuries from the alleged torts (bad financial consequences) were felt in Illinois, the home forum for Plaintiff. That Ralph Coxon's alleged wrong-doings may have taken place outside the state do not affect [*52] that result. Plaintiff has, nonetheless, presented sufficient evidence to show that Ralph Coxon entered Illinois on numerous occasions to conduct Xontal's business. Ralph Coxon himself states, in his affidavit, that he made business trips to Illinois (the record does not indicate how many), including a trip in September 1997 when he was negotiating the new Distribution Agreement with Clearclad. (R. Coxon Aff. P 12.) Kittridge adds that Ralph Coxon "engaged in hundreds of telephone calls, faxes and correspondence into the State of Illinois" regarding business matters. (Kittridge Aff. P 37.) Ralph Coxon benefitted from his activities in Illinois, and he could have reasonably foreseen that he might be haled into an Illinois court. At a minimum, the court can exercise specific jurisdiction over Defendant Ralph Coxon in this lawsuit, which related to the relationship arising from Coxon's contacts.

**(2) Fair Play and Substantial Justice**

Having determined that Ralph Coxon has minimum contacts with Illinois, the court next considers whether the assertion of jurisdiction comports with fair play and substantial justice. The court's inquiry considers the burden on the defendant, the interests [*53] of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of disputes, and the shared interest of the several states in furthering fundamental social policy. *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996). Once minimum contacts have been established, the defendant can escape jurisdiction only by making a "compelling case" that forcing it to litigate in the forum state would be unreasonable. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).

Neither party discusses this matter. Given the heavy burden placed on defendant at this stage to overcome jurisdiction, the court cannot conclude that Coxon has met that burden. Moreover, the court finds that the exercise of jurisdiction over Coxon is not unfair. Illinois has a legitimate interest in holding him answerable on a claim related to the contacts he arguably established in Illinois, namely with Clearclad. *See Burger King*, 471 U.S. at 482-83.

**c. Fiduciary Shield Doctrine**

As another basis for his argument that the court lacks personal jurisdiction over him, Ralph Coxon [*54] contends that he benefits from the fiduciary shield doctrine. Under the doctrine, "a court cannot exercise jurisdiction over a nonresident defendant who has performed acts in Illinois solely as a representative of his employer, and not for his personal benefit." *Glass*, 930 F. Supp. at 340 (quoting *Rollins v. Ellwood*, 141 Ill. 2d 244, 275, 565 N.E.2d 1302, 1316, 152 Ill. Dec. 384 (1990)). The shield is withdrawn if the agent was acting also or instead on his own behalf, *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994), *cert. denied*, 514 U.S. 1111, 131 L. Ed. 2d 855, 115 S. Ct. 1964 (1995), and does not apply when the employee has the power to decide what is to be done and chooses to commit the acts that subject him to long-arm jurisdiction, *see Brujis v. Shaw*, 876 F. Supp. 975, 978 (N.D. Ill. 1995) (citations omitted). Though recognized by courts in Illinois, the Seventh Circuit has observed that the doctrine has been criticized and rejected by many jurisdictions. *Id.* (citations omitted). Lastly, the doctrine is not absolute, but discretionary or "equitable." *Id.* (citations omitted).

This is not the type of case for application of the [*55] doctrine. The Illinois Supreme Court first recognized and applied the doctrine to a Maryland policeman who had been sent into Illinois to serve an arrest warrant and was later sued in Illinois for false arrest based on that entry. *See Rollins*, 141 Ill. 2d 244, 576 N.E.2d 1302 at 1307, 1314-15, 152 Ill. Dec. 384. The court concluded that it was unfair and unreasonable to assert personal jurisdiction over an individual who sought the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal. 576 N.E.2d at 1318.

Without making any findings about whether Ralph Coxon was the alter ego of Xontal or whether the corporate veil should be pierced, the court concludes that equity does not require application of the doctrine to Ralph Coxon. He was ostensibly in Illinois to serve the interests of his employer, Xontal, but that essentially coincides with his personal interest. He was not following the orders of any supervisor, but acted with discretion regarding all matters. Ralph Coxon's "fiduciary shield" objection is overruled.

**d. Resolution**

Finding minimum contacts with Illinois and the exercise of personal jurisdiction over Ralph Coxon to be fair, [*56] the court concludes that Illinois may exercise personal jurisdiction over him. Defendant Ralph Coxon's motion to dismiss for lack of personal jurisdiction is denied.

**2. Motion to Transfer Venue**

Defendant Ralph Coxon moves to transfer this case to the District of Maryland for the same reasons advanced by Defendant Xontal, namely that: (1) a substantial part of the events of this action occurred in Maryland; (2) the majority of witnesses are located in Mary-

1999 U.S. Dist. LEXIS 13173, *

land or elsewhere outside Illinois; and (3) transfer will serve the interest of justice. The analysis of the transfer issue for Defendant Coxon is identical to the analysis of this issue for Defendant Xontal. As such, for the reasons outlined above, the court denies the motion to transfer venue.

### 3. Motion to Dismiss Counts II, III, and IV

Defendant Ralph Coxon makes the same arguments with respect to these claims as did Defendant Xontal. For the reasons discussed above, the court denies the motion to dismiss Count II and IV and grants the motion to dismiss Count III.

### C. Defendants Timothy Coxon and Hawking LLC's Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer or to Dismiss Counts II, III, and [*57] IV for Failure to State a Claim

In now familiar fashion, Defendants Timothy Coxon and Hawking LLC move to dismiss for lack of personal jurisdiction, to transfer venue, or to dismiss Counts II, III, and IV for failure to state a claim. Plaintiff responds that the court has personal jurisdiction over both Defendants and that Counts II, III, and IV state a claim for relief. The court turns to the issues in turn.

### 1. Motion to Dismiss for Lack of Personal Jurisdiction

As discussed above, this court has personal jurisdiction over Defendants if Illinois and federal due process requirements are met. *See supra* Part II.B.1. Plaintiff does not attempt to demonstrate general jurisdiction, and given Timothy Coxon's limited contacts with Illinois (*see* T. Coxon Aff. PP 10-11), the court would find general jurisdiction lacking. Specific jurisdiction, however, requires a much lesser showing of contacts with the forum state. Just how much is debated vigorously by the parties here. [10] The parties present a difficult question about the propriety of basing specific jurisdiction wholly on "injury" from a business tort that is felt in the forum state. Specifically, Defendants argue that [*58] specific jurisdiction exists over Timothy Coxon and Hawking LLC only if they "entered" Illinois; injury in Illinois based on acts outside of Illinois is an insufficient basis. Plaintiff, on the other hand, cites to the Seventh Circuit's opinion in *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997) as evidence that injury in Illinois, even as a result of extra-jurisdictional acts, is enough to confer jurisdiction to Illinois courts. Because understanding of the *Janmark* case is essential to this discussion, the court reviews the analysis in that case.

10   It is true that Defendants Xontal and Ralph Coxon incorporated by reference all arguments made by the other Defendants, which would presumably include this particular issue on specific jurisdiction. Nevertheless, for convenience, the court discusses the issue as presented by these particular Defendants' briefs (i.e., with the specific details of Timothy Coxon and Hawking LLC).

### a. Specific Jurisdiction Based on Injury in the Forum State

[*59]   In *Janmark*, as detailed above, the Seventh Circuit held that injury in the forum state was sufficient to confer jurisdiction over an extra-jurisdictional business tortfeasor. In providing additional reasoning, the court cited to the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984), which held that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor. In *Calder*, the entertainer Shirley Jones sued the author and editor of a *National Enquirer* article for libel. *Id.* at 785. Jones sued the Florida resident in California, and the defendant moved to dismiss for lack of personal jurisdiction. *Id.* at 784-85. The Court found exercise of personal jurisdiction proper because the allegedly libelous story concerned the California activities of a California resident, impugned her reputation in California, was drawn from California sources, and was most widely distributed in California. *Id.* at 788-89. Ultimately, California was the "focal point both of the story and of the harm suffered." *Id.* at 789.

Courts have read *Calder* [*60] as providing an "effects test," which has been interpreted to mean that "a court may exercise personal jurisdiction over a nonresident defendant who commits an intentional tort by certain acts outside the forum which have a particular type of effect upon the plaintiff within the forum." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 261 (3d Cir. 1998). The Seventh Circuit discussed *Calder* in *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 411-12 (7th Cir. 1994), a case also cited by the court in *Janmark*. In *Indianapolis Colts*, the Indiana plaintiff sued the Maryland defendant for trademark infringement based on the name of a football team, the "Colts." *Id.* at 411. Finding the injury of an impaired trademark to be felt mainly in Indiana and the state in which the injury occurs to be the state in which the tort occurs, the court relied on *Calder* to suggest that someone who commits a tort in Indiana should be amenable to suit there. *Id.* at 411-12. The court called that conception of personal jurisdiction "austere" and ultimately determined that it could rely [*61] on the fact that the defendant had also "entered the state in some fashion" to impose jurisdiction over the defendant. *Id.* at 412. In other words, the court did not resolve whether injury in the forum state is sufficient to confer

1999 U.S. Dist. LEXIS 13173, *

jurisdiction. Neither did it rule that a defendant must always "enter" the forum state, consistent with the court's conclusion in *Janmark*. Resting on *Janmark*'s holding, Plaintiff here notes that it was injured in Illinois and contends that it need not make an additional showing of "entry" into Illinois.

Defendants do not argue that *Janmark* is bad law (it is not) or inapposite (it is not), but follow a different strategy--they basically argue that other courts in this district are not strictly following *Janmark* because they are, in fact, requiring "entry" into Illinois to establish personal jurisdiction. In *Clipp Designs, Inc. v. Tea Bags, Inc.*, 996 F. Supp. 766, 767 (N.D. Ill. 1998), the Illinois plaintiff sued the Minnesota defendants for trade dress infringement in violation of the Lanham Act. The court cited *Janmark* for the proposition that the state in which the injury occurs may require the wrongdoer [*62] to answer for its deeds even if the wrongdoing occurred outside of that state. *Id.* at 768 (quoting *Janmark*). Having determined that the alleged injury occurred in Illinois, the court then stated that the "critical issue" is whether defendants "entered" Illinois in some fashion. *Id.* Although not cited or discussed by Defendants, the court has found another case from this district, which similarly included the "entering" prong as part of its analysis. *See Brown v. Citicorp*, 1998 U.S. Dist. LEXIS 9273, No. 97 CV 6337, 1998 WL 341610, at *5 (N.D. Ill. June 22, 1998) (citing *Janmark*, but still finding "important" the fact that the defendant had "entered" the state).

Defendants further call Clearclad's position "absurd" as a policy matter. In Defendants' view, under *Janmark*, a "plaintiff would obviate the need for any jurisdictional inquiry whenever a trademark, copyright or unfair competition case is brought by an Illinois plaintiff, because the plaintiff's alleged injury will always be felt in Illinois." (Reply to Plaintiff's Response to Timothy Coxon's and Hawking International LLC's Motion to Dismiss or Transfer, or, Alternatively, to Dismiss Counts II, III and [*63] IV for Failure to State a Claim Upon Which Relief can be Granted (hereinafter "T. Coxon's Reply"), at 5.) Arguing that Plaintiff's position would trump congressional intent and due process, Defendants urge rejection of Plaintiff's argument.

The court recognizes the difficulty of the issue, considering the Seventh Circuit's pronouncement and the decisions by courts in this district that seemingly add more to the analysis. Nonetheless, this court considers *Janmark* authoritative and finds the situation at hand factually indistinguishable from the one in *Janmark*. Both the plaintiff here and in *Janmark* are Illinois residents that suffered injury in Illinois in the form of bad financial consequences as a result of an alleged business tort that occurred outside the state. Thus, under *Janmark*,

the court need not make findings about whether the Defendants "entered" Illinois. Yet it is worth noting that Timothy Coxon's multiple business trips to Illinois appear to be enough to meet the low threshold showing of "entry" into the forum state. He clearly came into the state to conduct business with an Illinois-based company and hoped to profit from the relationship. Plaintiff also [*64] alleges that Timothy Coxon made hundreds of phone calls and faxes to the state during the alleged wrongdoing. This may be fairly construed as "entering" Illinois in "some fashion." The court therefore concludes that specific jurisdiction over the Defendants is proper in Illinois because the injury to Clearclad occurred in Illinois. [11]

> 11    The court has delved into the issue a bit further by examining how the issue has been treated in other circuits. The result is an interesting one: every other circuit to decide the issue has reached a conclusion at odds with *Janmark* and held that injury from a business tort in the forum state by itself does not meet due process requirements. *See, e.g., IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998); *Noonan v. Winston Co.*, 135 F.3d 85 (1st Cir. 1998); *ESAB Group, Inc. v. Centricut*, 126 F.3d 617 (4th Cir. 1997), *cert. denied*, 523 U.S. 1048, 118 S. Ct. 1364, 140 L. Ed. 2d 513 (1998); *Far West Capital, Inc. v. Towne*, 46 F.3d 1071 (10th Cir. 1995); *General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993); *Southmark Corp. v. Life Investors Inc.*, 851 F.2d 763 (5th Cir. 1988).

> The circuit to consider the issue most recently was the Third Circuit in *IMO*, which explicitly rejected the reasoning of the Seventh Circuit in *Janmark*. Believing the Seventh Circuit read *Calder* too broadly, the court in *IMO* concluded that such a broad sweep "fails to accommodate *Calder*'s emphasis on the fact that the forum must be the focal point of the harm and that the defendant must expressly aim the tortious activity at the forum." 155 F.3d at 264. The court further opined that *Calder* "did not change the fact that even in intentional tort cases the jurisdictional inquiry 'focuses on the relations among the defendant, the forum, and the litigation.'" *Id.* at 265 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984)).

> The Third Circuit then held that a court may exercise personal jurisdiction over a nonresident defendant if: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said

to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. 155 F.3d at 265-66. The third requirement means that the "plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Id.* at 266.

In light of the overwhelming number of circuits reaching the opposite conclusion of *Janmark*, the court concedes that the landscape in this area may change in the future. Nonetheless, at this juncture, the court is not inclined to depart from clear Seventh Circuit precedent.

[*65] Defendants submit that all of Timothy Coxon's contacts with Illinois occurred before Hawking LLC was created and before any of the alleged wrongs took place. Plaintiff calls that factual assertion inaccurate and instead alleges that he had numerous contacts with Illinois by mail, facsimile, and telephone, and had access to Clearclad's confidential information *while* he was engaging in wrongdoing. At this stage of the case, the court construes the facts in favor of Plaintiff and, as such, agrees that Plaintiff has sufficiently alleged that Timothy Coxon's contacts with Illinois took place during the alleged wrongdoing.

**b. Fiduciary Shield Doctrine**

As did Ralph Coxon, Timothy Coxon also argues that the fiduciary shield doctrine should apply and relieve him of personal liability. Because he made all of his contacts with Illinois solely as a representative of Xontal, he argues that it would not be fair, just, and reasonable for this court to assert jurisdiction over him based on those contacts. Plaintiff counters that Timothy Coxon's acts in Illinois were discretionary and intentional acts that directly caused tortious injury in Illinois. This militates against applying the [*66] doctrine to him, argues Plaintiff.

Timothy Coxon's case, as a salesperson or officer at Xontal, is in the court's opinion a closer call than that of his father, who was the president and obviously had the discretion to serve his own personal interest. Nonetheless, part of Plaintiff's Complaint charges Timothy Coxon with wrongdoing in his capacity as the President of Hawking LLC. Neither does the court find that equity requires application of the doctrine here. Hence, the fiduciary shield doctrine does not apply.

**2. Motion to Transfer**

Defendants Timothy Coxon and Hawking LLC advance the same arguments for why this action should be transferred to the District of Maryland pursuant to § 1404(a). For the reasons fully outlined above, the court denies the motion to transfer.

**3. Motion to Dismiss Count II: Breach of Covenant not to Compete in Agreement**

It is undisputed that Defendants Timothy Coxon and Hawking LLC are not parties to the Distribution Agreement between Xontal and Clearclad that is at the basis of Count III. Defendants therefore urge dismissal under the general rule in Illinois that an agent may not be held personally liable for a breach of contract by his [*67] principal when the agent has disclosed that he is acting on behalf of the principal. *See Strzelecki v. Schwarz Paper Co.*, 824 F. Supp. 821, 829 (N.D. Ill. 1993) (citations omitted). Plaintiff contends that third parties may nonetheless be held liable for misuse of trade secrets if the third person knows of the breach of a confidential relationship when he acquired the trade secret. *See Colony Corp. v. Crown Glass Corp.*, 102 Ill. App. 3d 647, 650, 430 N.E.2d 225, 228, 58 Ill. Dec. 283, 286 (1st Dist. 1981) (citations omitted).

Defendants correctly note that *Colony Corporation* is inapposite for the claim that a third party can be sued for breach of contract; the case only addresses liability for misuse of a trade secret. Notably, however, Defendants fail to look closely (or possibly intentionally ignore) the full rule outlined in *Strzelecki*, Defendants' own authority. The court there recognized an exception to the general rule of no liability when the agent takes some active part in violating some duty the principal owes to a third person. *Strzelecki*, 824 F. Supp. at 829 (citation omitted). This exception arguably applies to [*68] the present situation, in which Clearclad alleges that Defendants Timothy Coxon and Hawking LLC were directly involved in competing against Clearclad in violation of the non-compete clause. The court therefore denies the motion to dismiss Count II.

**4. Motion to Dismiss Count III: Breach of Fiduciary Duties**

Defendants contend that no cause of action exists in Illinois for breach of fiduciary duty in this situation. For reasons discussed fully above, the court grants the motion to dismiss Count III.

**5. Motion to Dismiss Count IV: Fraud**

Defendants make the exact same argument made by Defendants Xontal and Ralph Coxon with respect to Count IV, namely that it fails to meet Rule 9(b)'s plead-

ing requirements. For reasons already indicated, the court denies the motion to dismiss Count IV.

### D. Defendants Hawking Ltd., Leonard Hawkes, and Peter Ryder's Motion to Dismiss for Lack of Personal Jurisdiction or to Dismiss Count IV

Defendants Hawking Ltd., Leonard Hawkes, and Peter Ryder (collectively "the English Defendants") initially moved to dismiss for lack of personal jurisdiction or alternatively to dismiss Count IV. In their reply brief, however, they also move to transfer [*69] this action to the District of Maryland by fully incorporating Defendant Timothy Coxon's and Hawking LLC's arguments. They also move to dismiss Counts II and III, which they initially understood to not include them as Defendants. Plaintiff, not surprisingly, argue that this court has personal jurisdiction over the English Defendants and that Counts II, III, and IV state a claim for relief. The court looks to the issues in turn.

### 1. Motion to Dismiss for Lack of Personal Jurisdiction

The court has already detailed the requirements of finding personal jurisdiction over the English Defendants, whose nomenclature identifies them as nonresident defendants. *See supra* Part II.B.1. They argue that general jurisdiction is lacking because all of their contacts with Illinois arose out of their former business relationship and Hawking Inc., one of Clearclad's predecessor corporations. Since 1994, the English Defendants claim that they have had no direct contact with Illinois. Specific jurisdiction, they contend, is also unwarranted because none of the alleged wrongdoing occurred in Illinois. Lastly, they maintain that jurisdiction is inappropriate because they did not "enter" Illinois, [*70] as supposedly required by the courts in this district.

#### a. General Jurisdiction

It is uncontroverted that the English Defendants are all citizens of the United Kingdom. Neither Hawkes nor Ryder have ever lived or maintained a residence in Illinois; owned real property in Illinois; maintained offices of bank accounts in Illinois; maintained a telephone number in Illinois; voted or been liable for income taxes in Illinois; or held a job in which either one was based in Illinois. (Hawkes Aff. P 9; Ryder Aff. P 5.) Similarly, Hawking Ltd. has never been licensed or registered to do business in Illinois; owned real property in Illinois; or been liable for payroll or other taxes in Illinois. (Hawkes Aff. P 10.) Plaintiff does not address whether the English Defendants' pre-1994 activities could provide a basis for general jurisdiction. Contacts before the time of the alleged wrongdoing are not, however, ordinarily part of the court's consideration in establishing general jurisdiction.

*See Sara Lee Corp. v. Interstate Warehousing, Inc.*, 1997 U.S. Dist. LEXIS 5154, No. 96 C 5375, 1997 WL 189308, at *2 (N.D. Ill. Apr. 15, 1997) (because the defendant had ceased all Illinois activities before injury [*71] to the plaintiff, no general jurisdiction); *cf. Scherr v. Abrahams*, 1998 U.S. Dist. LEXIS 8531, No. 97 C 5453, 1998 WL 299678, at *5 (N.D. Ill. May 29, 1998) (contacts before the allegedly infringing journal was created are not basis for special jurisdiction because the suit could not have arisen from those contacts). Additionally, Plaintiff's claim that the English Defendants have been "present in Illinois on many occasions" is not sufficient to meet the high standard of showing the continuous and systematic business contacts needed for general jurisdiction.

#### b. Specific Jurisdiction

According to the English Defendants, absent allegations that the party took action in Illinois to advance the alleged wrongs, this court cannot exercise specific jurisdiction over them. Plaintiff submits that the "facts amply establish personal jurisdiction over the Hawking Ltd. parties for unfair competition and other tortious conduct," (Response to Motion to Dismiss for Lack of Personal Jurisdiction of Defendants Hawking International, Ltd., Leonard Geoffrey Hawkes and Peter Ryder and Alternative Motion to Dismiss Count IV (hereinafter "Pl. Response to English Def. Motion"), at 3), and then details their [*72] alleged wrongdoing. Plaintiff's response misses the mark-jurisdiction is not an issue of whether the facts establish the basis for the claims, but whether these defendants held minimum contacts with Illinois such that exercising personal jurisdiction over them comports with due process.

Plaintiff proposes an alternative means of imposing jurisdiction, namely a "national contacts" analysis, which it urges the court to follow. Under the theory of "national contacts" or "aggregate contacts," to impose jurisdiction over a foreign defendant being sued on a federal cause of action, the court may consider its contacts with the United States as a whole as opposed to its contacts only with the forum state. *Handley v. Indiana & Michigan Elec. Co.*, 732 F.2d 1265, 1268 (6th Cir. 1984) (citation omitted); *see also United Rope Distributors Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 534 (7th Cir. 1991). Courts will not make such an inquiry, however, in the absence of statutory authority for nationwide or worldwide service of process. *See e.g., Wells Fargo & Co. v. Wells Fargo Exp. Co.* 556 F.2d 406, 418 (9th Cir. 1977); *Miller Pipeline Corp. v. British Gas plc*, 901 F. Supp. 1416, 1421 (S.D. Ind. 1995); [*73] *DeJames v. Magnificence Carriers, Inc.*, 491 F. Supp. 1276, 1282 (D.N.J. 1980). Because the Lanham Act, the federal question in this case, does not grant nationwide service of process, *see Wells Fargo*, 556 F.2d at 419, the court

will not apply the "national contacts" analysis to establish personal jurisdiction.

In any event, this court has already determined that under *Janmark*, injury in the forum state, even if resulting from tortious acts outside the state, may support a finding of specific jurisdiction. *See supra* Part II.C.1.a. Plaintiff here alleges injury in Illinois resulting from, among other torts, alleged diversions of sales and misuse of trade secrets by the English Defendants. Even absent *Janmark*, the court notes that several facts regarding the English Defendants support a finding of personal jurisdiction. First, all three were parties to a settlement agreement with Plaintiff that is at the heart of some of the claims, an agreement explicitly governed by Illinois law. Defendants Hawkes and Ryder were one time members of the corporate board of Plaintiff's predecessor, an Illinois corporation. Hawking Ltd. was also a party with [*74] Plaintiff to a distribution agreement and at one time owned shares in Plaintiff. The court therefore finds that personal jurisdiction over the English Defendants is proper. [12]

> 12   Although not raised by the parties, the court notes that another basis for specific jurisdiction may exist in this case. Counts II, III, and IV are based on an alleged conspiracy, and thus what is referred to as the "conspiracy theory of jurisdiction" is applicable. Under this theory, "a court may assert jurisdiction over all of the co-conspirators, both resident and non-resident, based on their involvement in a conspiracy which occurred within the forum." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 43 F. Supp. 2d 904, 912 (N.D. Ill. 1999) (citation omitted). To meet the standard, the plaintiff must: (1) make a prima facie factual showing of conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in the forum. *Id.* (citing *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995); other citation omitted). If all three requirements are met, even a foreign defendant with no real contact with the forum state and no direct business relations tied to the forum state would be subject to the court's jurisdiction. *Id.* On the other hand, a mere assertion that a corporate defendant participated in a conspiracy and that another member of the conspiracy committed a tort in the forum state is insufficient to impose jurisdiction on the absent co-conspirator. *Id.* (citation omitted). As the issue was not discussed by the parties here, the court will not address the matter further.

[*75]   **c. Fiduciary Shield Doctrine**

The individual English Defendants contend that jurisdiction over them is precluded by the fiduciary shield doctrine. As noted above, this is an equitable and discretionary doctrine. And in the court's view, Defendants Hawkes and Ryder are not entitled to its protection. They were both officers of Hawking Ltd. with discretion to act, and there is no indication that they were told to conduct business in a certain way (i.e., to negotiate a business relationship with Hawking LLC). Hence, the court declines to apply the fiduciary shield doctrine.

**2. Motion to Transfer Venue**

The English Defendants simply incorporate the arguments made by Defendants Timothy Coxon and Hawking LLC for transfer of this case to the District of Maryland. For reasons already discussed, the court denies the motion to transfer.

**3. Motion to Dismiss Count II: Breach of Covenant not to Compete in Agreement**

The English Defendants incorporate the arguments made by Defendants Timothy Coxon and Hawking LLC and offer no additional reasons why the motion should be dismissed. Therefore, as with the other Defendants, the court denies the motion to dismiss Count II.

[*76]   **4. Motion to Dismiss Count III: Breach of Fiduciary Duties**

The court has already determined that no cause of action exists for a breach of fiduciary duties under these circumstances. The motion to dismiss Count III is granted.

**5. Motion to Dismiss Count IV: Fraud**

The English Defendants urge dismissal of count IV for failing to plead fraud with the particularity required by Rule 9(b). They contend that Plaintiff fails to identify even a single statement made by them to plaintiff or on which plaintiff relied to its detriment. Plaintiff responds that it has made such allegations.

The only allegation tangentially related to the English Defendants is Plaintiff's claim that in April 1998, Timothy Coxon called on a Clearclad customer with Geoffrey Hawkes and attempted to sell it products that were competitive with Clearclad products. (*See* Compl. P 43.) One instance of alleged fraud is sufficient to meet the pleading requirements, but this single allegation fails to identify what the alleged misrepresentation was. If the encounter was an attempt to divert sales from Clearclad, that may be a basis for claims for unfair competition or breach of the non-compete clause. It is [*77] not, how-

ever, a basis for fraud. The court therefore grants the English Defendants' motion to dismiss Count IV.

## CONCLUSION

For reasons discussed above, the court denies the motions to dismiss for lack of personal jurisdiction as to all Defendants; denies the motions to transfer venue as to all Defendants; denies the motion to dismiss Count II as to all Defendants; grants the motion to dismiss Count III as to all Defendants; and grants the motion to dismiss Count IV as to the English Defendants and denies it as to the other Defendants.

ENTER:

Dated: August 19, 1999

REBECCA R. PALLMEYER

United States District Judge

# EXHIBIT F

LEXSEE 2003 U.S. DIST. LEXIS 806



Caution
As of: Aug 29, 2008

**CARL BIRNBERG and JACOB MOSKOVIC, on behalf of themselves and all others similarly situated, Plaintiffs, v. MILK STREET RESIDENTIAL ASSOCIATES LIMITED PARTNERSHIP, LEND LEASE REAL ESTATE INVESTMENTS, INC., BOSTON FINANCIAL TECHNOLOGY GROUP INC., LAKE MICHIGAN ASSOCIATES, LLC, LMA GP LLC, CLARK ENTERPRISES, INC. AND CLARK ONTERIE, L.L.C., Defendants. CARL BIRNBERG and JACOB MOSKOVIC, on behalf of themselves and all others similarly situated, Plaintiffs, v. BOSTON FINANCIAL GROUP, LIMITED PARTNERSHIP, AND BOSTON FINANCIAL GROUP, INC., Defendants.**

**02 C 0978, 02 C 3436 (Consolidated Proceedings)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2003 U.S. Dist. LEXIS 806**

**January 17, 2003, Decided
January 21, 2003, Docketed**

**SUBSEQUENT HISTORY:** Magistrate's recommendation at Birnberg v. Milk St. Residential Assocs., 2003 U.S. Dist. LEXIS 9097 (N.D. Ill., May 28, 2003)

**PRIOR HISTORY:** Birnberg v. Milk St. Assocs., Ltd. P'ship, 2002 U.S. Dist. LEXIS 9321 (N.D. Ill., May 22, 2002)

**DISPOSITION:**    [*1] Defendants' motions to dismiss granted in part and denied in part.

**COUNSEL:** For CARL BIRNBERG, JACOB MOSKOVIC, plaintiffs: Lawrence P Kolker, Wolf, Haldenstein, etal, New York, NY.

For CARL BIRNBERG, JACOB MOSKOVIC, plaintiffs: Adam J. Levitt, Wolf, Haldenstein, Adler, Freeman & Herz LLC, Chicago, IL.

For CARL BIRNBERG, JACOB MOSKOVIC, plaintiffs: Scott J Farrell, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY.

For MILK STREET RESIDENTIAL ASSOCIATES LIMITED PARTNERSHIP, LEND LEASE REAL ESTATE INVESTMENTS, INC., BOSTON FINANCIAL TECHNOLOGY GROUP, INC., LAKE MICHIGAN ASSOCIATES LLC, LMA GP LLC, CLARK ENTERPRISES, INC., CLARK ONTERIE, L.L.C., defendants: Jeffrey L. Willian, Wendy [*2] Lynn Bloom, Nathanael M. Cousins, Kellye L Fabian, Kirkland & Ellis, Chicago, IL.

**JUDGES:** BLANCHE M. MANNING, U.S. DISTRICT COURT JUDGE.

**OPINION BY:** BLANCHE M. MANNING

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiffs Carl Birnberg and Jacob Moskovic brought the instant diversity actions, on behalf of themselves and a proposed class, for breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, intentional

2003 U.S. Dist. LEXIS 806, *

interference with contractual relations, fraud, and negligent misrepresentation against: (1) Milk Street Residential Associates Limited Partnership ("Milk Street"), a Massachusetts limited partnership; (2) Lend Lease Real Estate Investments, Inc. ("Lend Lease"), a Delaware corporation; (3) Boston Financial Technology Group, Inc. ("BFTGI"), a Massachusetts corporation; (4) Lake Michigan Associates LLC ("Lake Michigan"), a Delaware limited liability company; (5) LMA GP LLC ("LMA"), a Delaware limited liability company, (6) Clark Enterprises, Inc. ("Clark Enterprises"), a Maryland corporation; (7) Clark Onterie, LLC ("Clark Onterie"), a Maryland corporation; (8) Boston Financial [*3] Group, Limited Partnership ("BFGLP"), a Massachusetts limited partnership; and (9) Boston Financial Group, Inc. ("BFGI"), a Massachusetts corporation.

The instant matter comes before the Court on Defendants BFGI, BFTGI, Clark Enterprises, and Clark Onterie's Motions to Dismiss Under Rule 12(b)(2) For Lack of Jurisdiction [36-1 and 9-1] and Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, LMA, Clark Enterprises, and Clark Onterie's Motions to Dismiss Under Rule 12(b)(6) For Failure to State a Claim [37-1, 36-1, 9-1, and 7-1]. [1]

> 1    Milk Street has not filed or joined in any of the motions to dismiss.

For the reasons that follow, the Rule 12(b)(2) motion is GRANTED as to BFTGI and DENIED with regard to BFGI, Clark Enterprises, and Clark Onterie, while the Rule 12(b)(6) motion is GRANTED in part and DENIED in part.

## BACKGROUND

[2]

> 2    The facts in the Background section are taken from Plaintiffs' Complaints.

[*4] This matter stems from a partnership dispute arising out of the Franklin Building Associates Limited Partnership ("the Franklin Partnership"). Plaintiffs, two of the limited partners, who reside in Illinois and Minnesota, brought this action against the general partners and several companies allegedly affiliated with the general partners.

The Franklin Partnership was formed by BFTGI in 1984 to own units in Onterie Associates, an Illinois limited partnership, which was created to own and operate the Onterie Center, a 60 story residential and commercial building in Chicago, Illinois. Plaintiffs were among 174 limited partners who bought an interest in the Franklin Partnership. Defendant Milk Street was the general part-

ner of the Franklin Partnership from 1984 until December of 1999.

Unfortunately, the Onterie Center, and thus the Franklin Partnership, was not a financial success, and as a result, the Onterie Center defaulted on two of its loans and the limited partners did not receive any return on their investments.

As a result of the poor financial condition of the Onterie Center, Plaintiffs allege that Defendants created a scheme to unlawfully enrich themselves at the expense [*5] of the limited partners. On February 23, 1999, defendants mailed the limited partners a memorandum outlining a plan to acquire the limited partners' interests and substitute LMA for Milk Street as the general partner. Plaintiffs alleged that this memorandum was "false and misleading" in that it: (1) misrepresented Onterie's value in order to induce the Limited Partners to grant their consents; (2) failed to disclose pervasive conflicts of interest which were part of the buy-out scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose.

As a result of the February 23rd memorandum and other actions by Defendants, Plaintiffs allege that Defendants were able to purchase the limited partners' interests in the Franklin Partnership. Plaintiffs allege that Defendants breached their fiduciary duty to the limited partners, breached the Franklin Partnership agreement, breached the implied covenant of good faith and fair dealing, violated the Illinois Consumer Fraud and Deceptive Business Practices Act, intentionally interfered with the limited partners' contractual relations, defrauded the limited partners, and made several negligent misrepresentations [*6] in offering to buy the limited partners' interests.

After taking limited discovery on jurisdictional issues, Defendants moved to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), and for failure to state a claim, under Rule 12(b)(6). The Court will discuss each of these motions in turn.

## ANALYSIS

### I. Motion to Dismiss for Lack of Personal Jurisdiction

In ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court may consider matters outside the pleadings, such as affidavits and other materials submitted by the parties. *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir. 1971). The plaintiffs bear the burden of establishing personal jurisdiction by a preponderance of the evidence. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). The court must resolve any factual disputes in the plaintiffs' favor, and accept the allegations in the plaintiffs' complaints as true

only to the extent that they are not controverted by other evidence in the record. *Id.* The court must also accept uncontested jurisdictional facts presented by the defendants as true. *Connolly v. Samuelson*, 613 F. Supp. 109, 111 (N.D. Ill. 1985). [*7]

A federal court sitting in diversity has personal jurisdiction over nonresident defendants only if jurisdiction would be proper in the state in which the federal court sits. *Michael J. Neuman & Assocs., Ltd. v. Florabelle Flowers, Inc.*, 15 F.3d 721, 724 (7th Cir. 1994). The Illinois long-arm statute contains a "catch-all" provision that allows Illinois courts to assert personal jurisdiction to the maximum extent permitted by the Illinois and United States Constitutions. 735 ILCS 5/2-209(c). [3] Thus, jurisdiction is coextensive with federal due process requirements. *See RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). Therefore, to determine whether personal jurisdiction is proper, the court must examine whether personal jurisdiction comports with Illinois and federal due process guarantees. *Id.*

> 3 The Illinois long-arm statute also gives Illinois courts jurisdiction over nonresident defendants "doing business" in Illinois, if the claims arise from their "transactions" in Illinois, if the defendants committed a "tortious act" within Illinois, or if they own real property in Illinois. 735 ILCS 5/2-209(a) & (b).

[*8] Unfortunately, Illinois courts "have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." *Id.* As a general rule, "'jurisdiction [under the Illinois constitution] is to be asserted only when it is fair, just, and reasonable . . . considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois.'" *Id.* (*quoting Rollins v. Ellwood*, 141 Ill. 2d 244, 565 N.E.2d 1302, 1316, 152 Ill. Dec. 384 (Ill. 1990)). Without specific guidance from Illinois courts, federal courts sitting in diversity in Illinois focus on federal due process in determining if Illinois due process guarantees are satisfied. *See Mors v. Williams*, 791 F. Supp. 739, 743 (N.D. Ill. 1992). Consequently, absent a clear indication that exercise of jurisdiction here violates the Illinois Constitution, this Court will rely on its federal analysis of jurisdiction to determine if personal jurisdiction comports with Illinois due process.

To assert personal jurisdiction consistent with federal due process, the defendants must have: (A) "certain [*9] minimum contacts with the forum state" such that (B) the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

The court's assessment of minimum contacts depends on whether "general" or "specific" jurisdiction is at issue. *RAR*, 107 F.3d at 1277. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Id.* The court may exercise specific jurisdiction over defendants if they "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances." *Id.* In examining a defendant's contacts with a particular state, the court must determine whether the defendant "purposefully availed itself of the privilege of conducting activities" in the forum state so that it "should reasonably anticipate being haled into court there." *Id.* In other words, the focus of the court's inquiry must be on the "relationship among the defendant, the forum, and the litigation. [*10] " *Heritage House Rests., Inc. v. Cont'l Funding Group, Inc.*, 906 F.2d 276, 283 (7th Cir. 1990). The main factor in specific jurisdiction analysis is foreseeability -- was it reasonably forseeable to the defendant that its action could result in litigation in the state in question. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). Contacts that are "random, fortuitous, or attenuated" are not sufficient to establish that a state's exercise of personal jurisdiction over the defendant was foreseeable. *Heritage House*, 906 F.2d at 283. Moreover, in examining the contacts in a specific jurisdiction analysis, the court cannot "simply aggregate all of the defendant's contacts with the state -- no matter how similar in terms of geography, time, or substance." *RAR*, 107 F.3d 1277.

In contrast to specific jurisdiction, general jurisdiction is applicable when the lawsuit neither arose nor was related to the defendant's contacts with forum state. *Id.* Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. [*11] *Id.* The general jurisdiction standard is "a fairly high standard requiring a great amount of contacts." *Jamik, Inc. v. Days Inn of Mount Laurel*, 74 F. Supp. 2d 818, 822 (N.D. Ill. 1999). Factors courts examine in determining whether general jurisdiction exist include: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984).

If the court finds that it has either specific or general jurisdiction, the court must still ensure that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. Under this determination, the court examines: (1) the interest of the state in providing a forum [*12] to the plaintiff; (2) the interest of the state in regulating the activity involved; (3) the burden of defense in the forum on the defendant; (4) the relative burden of prosecution elsewhere on the plaintiff; (5) the extent to which the claim is related to the defendant's local activities; and (6) the avoidance of a multiplicity of suits on conflicting adjudications. *See Asahi Metal Inds. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987); *Burger King*, 471 U.S. at 472-73, 476-77. Because no one factor is dispositive, this Court must balance all of the factors. *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000). However, the most important factors to consider are the interests of the forum and the relative convenience of the defendant in litigating in that forum. *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002). It is well-settled, however, that a party that has directed its activities at the forum state bears the burden of presenting a "compelling case" that these other considerations make jurisdiction in the forum [*13] unreasonable. *Burger King*, 471 U.S. at 477.

Here, BFTGI, BFGI, Clark Enterprises, and Clark Onterie contend that Plaintiffs "cannot demonstrate that personal jurisdiction is satisfied under either the general jurisdiction or specific jurisdiction standard." The Court will thus examine whether it has jurisdiction over each of these Defendants.

**A. Boston Financial Technology Group, Inc.**

BFTGI has presented evidence showing that on March 31, 1986, it changed its name to BFGI and ceased to exist as a business entity. *See* Gladstone Decl. at 2 (Def. BFGI's Mot. to Dismiss, Ex. A); Articles of Amendment (*Id.*, Ex. B) (certificate stating name change). Because Plaintiffs have not contested this assertion, the Court accepts this fact as true for the purposes of this motion. *Connolly*, 613 F. Supp. at 111. Therefore, because the relevant time period regarding the dispute over the Franklin Partnership stems from January 1, 1997 to December 21, 2001, *see Birnberg v. Milk Street*, 2002 U.S. Dist. LEXIS 9321, 2002 WL 1162848, at *6 (N.D. Ill. May 24, 2002), this Court finds that BFTGI did not have minimum contacts with Illinois during the relevant time period, [*14] and therefore, the Court GRANTS BFTGI's Motion to Dismiss Under Rule 12(b)(2) for Lack of Jurisdiction.

**B. Boston Financial Group, Inc.**

Plaintiffs contend that a number of mailings by BFGI to the limited partners, many of whom lived in Illinois, are sufficient contacts to enable this Court to assert jurisdiction over BFGI. Before discussing these mailings, however, the Court will examine whether documents mailed to residents of Illinois satisfy the minimum contacts requirement.

Generally, mail from a foreign defendant to individuals within the forum state is insufficient by itself to provide a basis for the exercise or personal jurisdiction. *Greenberg v. Miami Children's Hosp. Research Inst., Inc.*, 208 F. Supp. 2d 918, 926 (N.D. Ill. 2002). Where, however, the communication constitutes a "tortious act," it is sufficient to establish minimum contacts. *See Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 282 (7th Cir. 1990). The Illinois long-arm statute provides in relevant part that:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts [*15] hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts: (2) The commission of a tortious act within this State.

735 ILCS 5/2-209(a)(2). Under section 2-209(a)(2), "a single tortious act occurring in Illinois will establish jurisdiction in Illinois, even though the defendant has no other contact in Illinois and has never been to Illinois." *Mergenthaler Linotype Co. v. Leonard Storch Enter. Inc.*, 66 Ill. App. 3d 789, 383 N.E.2d 1379, 1384, 23 Ill. Dec. 352 (Ill. App. Ct. 1978). Courts have broadly construed the term "tortious act" to include acts beyond those which "create common law liability" to include "any act that constitutes a breach of duty to another imposed by law." *Vlasak v. Rapid Collection Sys., Inc.*, 962 F. Supp. 1096, 1100 (N.D. Ill. 1997). *See also Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 429 F. Supp. 139, 140 (N.D. Ill. 1977) ("the word 'tortious' . . . is not restricted to the technical definition of a tort, but also includes any act committed within the state which involves a breach of duty to [*16] another and makes the actor liable for damages").

Applying the above principles, courts have held that mailings by non-resident defendants which constitute a tort and are sent to Illinois residents and affect interests in Illinois are sufficient to confer jurisdiction over the non-resident defendant under section 2-209. *See Cross v. Simons*, 729 F. Supp. 588, 592 (N.D. Ill. 1989); *McClub Serv., Inc. v. Stovall*, 714 F. Supp. 370, 373

(N.D. Ill. 1989). In *McClub*, 714 F. Supp. at 371, in a diversity action against a Texas defendant for breach of contract, fraud, and fraudulent inducement, the defendants moved to dismiss for lack of personal jurisdiction based on the grounds that its only contact with Illinois was a few telephone calls and mailings to the plaintiff, an Illinois resident. Applying Illinois law, the court held that "the mailing of . . . messages into Illinois that constitutes part of the tortious conduct, coupled with an intent to affect Illinois interests, satisfies the requirements of [section 2-209(a)(2)]." *Id.* Denying the motion, the court found that the plaintiff met requirements of section 2-209(a)(2) by alleging [*17] that the tortious conduct consisted of mailing the fraudulent statements into Illinois, which were intended to and did result in economic injury to Illinois residents. *Id.*

With these factors in mind, the Court now examines the mailings which Plaintiffs contend establish personal jurisdiction in Illinois under section 2-209. On February 23, 1999, the limited partners received a memorandum in the mail ("the February Memorandum") which proposed a buy-out of the Franklin Partnership whereby LMA would replace Milk Street as the Franklin Partnership's general partner, acquire the limited partners' interests, and ultimately acquire the Onterie Center. The memorandum sought the limited partners' written consent for the proposed acquisition. Enclosed with the memorandum were a consent, proxy, special power of attorney, a certificate of non-foreign status, and a release for LMA and Milk Street (which would be signed only if the above transactions were completed).

The February Memorandum listed BFGI as an attorney for the Franklin Partnership and included a power of attorney which stated that the signee

> irrevocably constitutes and appoints each of the Attorneys, in each case with [*18] full power of substitution, the true and lawful attorney-in-fact of the Principal, in his name, place, and stead, to make, execute, consent to, swear to, acknowledge, publish, record and file: All such instruments as the Attorneys or any of them may deem necessary or desirable to carry out the provisions of the sale, as discussed in the Memorandum, in accordance with its terms.

In support of its contention that BFGI was one of the entities which mailed the February Memorandum, Plaintiffs point to the Cooperation Agreement of May 25, 1999, which was signed by Milk Street, BFGI, BFTGI, and LMA. (Pls.' Mem. in Opp'n, Ex. F.) The Cooperation Agreement states that "BFGI, as successor to [BFTGI], has certain rights pursuant to the Second Amended and Restated Agreement and Certificate of Limited Partnership of Onterie." Paragraph five states that:

> BFGI hereby represents that it sent the [February] Memorandum to all Investor Limited Partners in Franklin of record as of the dates of the three documents constituting the [February] Memorandum and received the document entitled Consent, Power of Attorney and Proxy from Investor Limited Partners in Franklin holding more than sixty-eight [*19] percent of the Investor Limited Partner interests in Franklin.

Based on this document, it would appear that BFGI sent out the allegedly deceptive and fraudulent February Memorandum and that it received the documents enclosed therein from the limited partners. [4]

> 4    Additionally, Plaintiffs cite to a number of other correspondences which were sent to the limited partners which purport to be updates on the purposed purchase of the limited partners' interests in the Franklin Partnership, (*See* Pls' Mem. in Opp'n, Exs. C, D, E and F.) Each of these correspondences state that they are from "Boston Financial."

To rebut the contention that BFGI mailed the February Memorandum to the limited partners, BFGI relies on the deposition testimony of Michael Gladstone, former vice-president of BFGI and a limited partner of BFGLP. (*See* Defs' Reply, Ex. D.) According to Gladstone, by 1992, BFGI "pretty much ceased to operate as an operating company" because "virtually" all of its assets, rights, and responsibilities [*20] were transferred to BFGLP for tax purposes. (*Id.* at 15, 20-21.) After 1992, BFGLP "became our operating entity" and BFGI's "primary purpose was to serve as general partner of a couple of real estate limited partnerships." (*Id.* at 16-17.) Because BFGI "was not all operating entity at the time," Gladstone testified that it was not involved in the buy-out of the limited partners in 1998. (*Id.* at 57.) Gladstone stated that the reference to BFGI in the Cooperation Agreement was "careless on our part in preparing the document . . . . When this document was being drafted, we were probably not all that focused on what entity was referred to in Paragraph 5. We were merely trying to make the representation that the investor memos had been sent to all limited partners, and we were not focused on the abbreviation BFGI." (*Id.* at 88.) Gladstone further asserted that the reference to "Boston Financial" in the various other

correspondences mailed to the Limited Partners actually referred to BFGLP not BFGI. (*Id.* at 60, 63, 65.) Consequently, relying on Gladstone's deposition testimony, BFGI contends that "though this Court may have jurisdiction over [BFGLP] due process simply [*21] does not permit jurisdiction over [BFGI]."

Despite Mr. Gladstone's testimony, this Court finds that whether BFGI sent the February Memorandum is a factual dispute which this Court must resolve in Plaintiffs' favor. *Turnock*, 816 F.2d at 333. This finding is supported not only by the plain language of the February Memorandum and the Cooperation Agreement, but by the fact that Mr. Gladstone signed the Cooperation Agreement on behalf of BFGI. Mr. Gladstone testified that BFGI "pretty much" ceased to operate after 1992. If, however, BFGI, was not an operating entity after 1992, then it is unclear why Mr. Gladstone would have signed the Cooperation Agreement on its behalf on May 25, 1999. Therefore, for purposes of determining only whether this Court can assert jurisdiction over BFGI at this time, this Court finds that the February Memorandum was mailed by BFGI.

Even though Plaintiffs have established that BFGI mailed the February Memorandum to Illinois, to establish jurisdiction under section 2-209(a)(2), Plaintiff must still show that the mailing of the February Memorandum constituted a tort which was intended to and did cause injury to an Illinois resident. Plaintiffs [*22] allege that Defendants devised a plan to fraudulently buy-out the limited partners. As part of this plan, BFGI allegedly sent the February Memorandum which was "false and misleading" in that it: (1) "misrepresented Onterie's value in order to induce the Limited Partners to grant their consents"; (2) failed to disclose "pervasive conflicts of interest" which were part of the buy-out scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose. As a result of the misrepresentations in the February Memorandum, Plaintiff allege that Defendants improperly acquired the limited partners' interests "for far less than their true value" and caused the limited partners to unnecessarily incur "huge tax liabilities."

Consequently, for the purposes of this motion, the Court finds that the Complaint sufficiently alleges that the February Memorandum was mailed as to Illinois residents, constituted a "tortious act," and caused injuries to Illinois residents. The Court thus holds that it has jurisdiction over BFGI under 735 ILCS 5/2-209(a)(2).

Although this Court has jurisdiction over BFGI under the Illinois long-arm statute, federal due process also requires [*23] that the exercise of personal jurisdiction over a nonresident defendant be reasonable. *Int'l Shoe*, 326 U.S. at 316. Illinois has a strong interest in adjudi-

cating injuries that occur within its borders. *Coolsav-ings.com. Inc. v. IQ.Commerce Corp.*, 53 F. Supp. 2d 1000, 1005 (N.D. Ill. 1999). This interest is especially strong in cases involving torts within Illinois' borders. *M/H Group v. Macsoft, Inc.*, 1987 U.S. Dist. LEXIS 1821, No. 86 C 8163, 1987 WL 7823, at *3 (N.D. Ill. March 9, 1987) (states have a special interest in exercising jurisdiction over those who commit torts within its jurisdiction). An individual injured in Illinois need not go to another state to seek redress from persons who, though remaining in that other state, knowingly committed a tort causing an injury in Illinois. *See Calder v. Jones*, 465 U.S. 783, 790, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984).

Moreover, it would not be unduly burdensome for BFGI to litigate in Illinois. *Euromarket Designs, Inc. v. Crate & Barrel, Ltd.*, 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000)(unless the inconvenience of having to litigate in the forum is so great as to deprive the defendant [*24] of due process, it will not overcome clear justifications for the exercise of jurisdiction). Traveling from Massachusetts, where BFGI is incorporated and has its principal place of business, to Illinois is not oppressive. *See id.* (modern advances in transportation and communication make it more reasonable to litigate in a foreign forum). Therefore, this Court holds that it would not be unreasonable to exercise personal jurisdiction over BFGI.

Accordingly, because BFGI has minimum contacts with Illinois and it is not unreasonable to exercise jurisdiction over it, this Court holds that it has personal jurisdiction over BFGI.

## C. Clark Enterprises and Clark Onterie

Plaintiffs also contend that the following contacts enable this Court to assert specific jurisdiction over Clark Enterprises and Clark Onterie: (1) travel to Illinois by their representatives; and (2) ownership of the Onterie Center. [5] The Court will discuss each of these contacts in turn.

> 5 Plaintiffs also contend that this Court has general jurisdiction over Clark Enterprises and Clark Onterie. Because this Court finds that it has specific jurisdiction, it will not discuss the general jurisdiction contention.

### [*25] 1. Travel to Illinois

To establish specific jurisdiction based on the defendant's travel to the forum state, the travel must have been significantly related to the dispute at issue. *See Wis. Elec. Mfg. Co. v. Pennant Prods., Inc.*, 619 F.2d 676, 678 (7th Cir. 1980) (holding that two trips to Illinois which "were significant in the formation of the contract and [the defendant's] efforts to have it satisfactorily per-

formed" were sufficient contacts to create specific juris-diction). *See also RAR*, 107 F.3d at 1278 ("unless their contacts are continuous and systematic enough to rise to the level of general jurisdiction, individuals and corpora-tions must be able to conduct interstate business confi-dent that transactions in one context will not come back to haunt them unexpectedly in another"); *LaSalle Nat'l Bank v. Vitro, Sociedad Anonima*, 85 F. Supp. 2d 857, 861 (N.D. Ill. 2000) ("the claims in the complaint must relate to, or arise out of, the contacts with the forum").

Here, Plaintiffs assert that representatives of Clark Enterprises traveled to Illinois several times within the past few years. These trips include: (a) a trip [*26] by Lawrence Nussdorf to confer with potential attorneys for litigation involving Chandra Jha, one of the general part-ners in Onterie Associates; (b) a trip by Nussdorf and A.J. Clark to view the Onterie project and meet with the building engineer and Jha; (c) a trip by Nussdorf to meet with Northwestern Memorial Hospital in connection with its lease at the Onterie Center; (d) a trip by Rebecca Owen to meet with three Chicago-based law firms to interview legal counsel for the Jha litigation; and (e) a trip by Robert Flanagan to meet with individuals in-volved in business matters with an affiliate of Clark En-terprises.

Plaintiffs, however, have failed to explain how Clark Enterprises' contacts regarding the Jha litigation are re-lated to the instant litigation. Similarly, Plaintiffs have not showed how Mr. Flanagan's meeting with Clark En-terprises' affiliate for "business matters" was connected with the instant suit. Plaintiffs have also failed to show that the trips that Clark Enterprise executives took to Chicago regarding the Onterie Center are related to this litigation -- *e.g.*, the misrepresentations made to the lim-ited partners and the purchase of the limited partners' interests [*27] in the Franklin Partnership. The fact that Clark Enterprise executives took trips to Chicago regard-ing the general business of the Onterie Center is not suf-ficient minimum contact for this Court to assert specific jurisdiction over Clark Enterprises.

Plaintiffs also contend that representatives of Clark Onterie's manager, Clark Realty Capital, L.L.C. ("Clark Realty"), traveled to Chicago regarding Clark Onterie's investment in Lake Michigan. This contention is based on Clark Onterie's responses to interrogatories. In re-sponse to this admission, Margery Silberstein, assistant general counsel of Clark Enterprises and Defendants' Rule 30(b)(6) deponent on jurisdictional issues, testified that Clark Onterie's response to this interrogatory was "not 100% accurate" because Clark Really took these trips on behalf of Lake Michigan not Clark Onterie. This statement, however, was contradicted by other testimony given by Ms. Silberstein. For example, she testified that one of Clark Realty's managers traveled to Chicago in connection with the Onterie Center to sign the closing statement on behalf of Clark Onterie. Additionally, sev-eral other managers of Clark Realty traveled to Chicago for which [*28] Clark Onterie was billed for the travel. Consequently, because there is conflicting evidence on this point, this Court must resolve any factual disputes in the plaintiffs' favor. *Turnock*, 816 F.2d at 333. There-fore, for jurisdictional purposes, this Court will assume that these trips were made on behalf of Clark Onterie. [6]

> 6  As explained below, the Court finds that the actions of Clark Realty can be attributed to Clark Onterie for jurisdictional purposes

## 2. Ownership of the Onterie Center

Plaintiffs further contend that this Court has jurisdic-tion because Clark Enterprises and Clark Onterie own real property in Illinois (the Onterie Center). Plaintiffs are correct that they can establish jurisdiction by show-ing that Clark Enterprises and Clark Onterie own real estate in Illinois. *See* 735 ILCS 5/2-209(a)(3) ("any per-son, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts enumerated, thereby submits such person . . . to the ju-risdiction [*29] of the courts of this State as to any cause of action arising from the doing of any of such acts: . . . (3) The ownership, use, or possession of any real estate situated in this State").

There is, however, a problem with this contention. As Defendants correctly point out, Clark Enterprises and Clark Onterie do not directly own real estate in Illinois. Instead, they own the Onterie Center indirectly through their ownership in affiliated companies.

Generally, jurisdiction over a subsidiary is insuffi-cient to confer jurisdiction over a nonresident parent. *LaSalle Nat'l Bank*, 85 F. Supp. 2d at 864. However, "if the parent sufficiently controls the subsidiary, then courts will impute the acts of the subsidiary to the parent." *Id.* The general rule assumes that there will be some control in a normal parent-subsidiary relationship. *Id.* Illinois courts have recognized two methods for establishing jurisdiction over a foreign corporation based on the ac-tivities of its subsidiary. *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 866 (N.D. Ill. 1998). Under the first method, the plaintiff must provide evidence that justifies piercing the corporate [*30] veil of the parent company. *Id.* Under the second method, the plaintiff must show that the parent substantially controls the ac-tivities of a subsidiary doing business in Illinois. *Id.*

Under Illinois law, a corporation's veil may be pierced if there is: (1) such unity of interest and owner-ship that the separate personalities of the corporation and the subsidiary would no longer exist; and (2) adherence

to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Id.* To determine if there is a sufficient "unity of interest and ownership" between two corporations, Illinois courts look to four factors: (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another as its own. *Id.*

Under the second approach, which is "more flexible," the court must determine "whether the parent has substantially controlled the subsidiary." *LaSalle Nat'l Bank*, 85 F. Supp. 2d at 864-65. Precisely how much control the parent must have is "hard to state with precision," in part because there will [*31] always "be some control in the normal parent/subsidiary relationship." *Id. See aslo Gruca*, 19 F. Supp. 2d at 868 ("it is an economic fact of life that subsidiaries are subject to the overall direction of the parent, with a unity of interest and common objective").

The court in *Gruca* identified several factors to consider in determining if a parent is so closely linked to its subsidiary that jurisdiction over the subsidiary creates jurisdiction over the parent: (1) whether the parent arranges financing for and capitalization of the subsidiary; (2) whether separate books, tax returns, and financial statements are kept; (3) whether officers or directors are the same; (4) whether the parent holds its subsidiary out as an agent; (5) the method of payment made to the parent by the subsidiary; (6) and how much control is exerted by the parent over the daily affairs of its subsidiary. *Gruca*, 19 F. Supp. 2d at 867.

Here, after examining the deposition testimony of Ms. Silberstein, Defendants' responses to interrogatories, and the organizational/ownership chart of the Onterie Center, LP, this Court makes the following findings of fact for the purposes [*32] of the instant motion to dismiss for lack of personal jurisdiction.

Dissecting the corporate structure of the entities and indivduals who actually own the Onterie Center is no easy task. Although Clark Enterprises indirectly owns the Onterie Center, its ownership interest is four tiers away from the Onterie Center. Clark Enterprises owns a 35% interest in Clark LMA, LLC, who in turn owns a 75% interest in LMA, LLC, who in turn has a 100% interest in LMAGP, LLC, who in turn is a 98.5% owner of Onterie Center, LP, which actually owns the Onterie Center. Likewise, Clark Onterie owns an interest in the Onterie Center through its ownership interest in LMA, LLC.

Simply looking at the wed of ownership, however, does not tell the whole story. A close examination of the corporate structure of the Clark entities -- Clark Enter-

prises, Clark LMA, and Clark Onterie -- reveals that they are joined at the hip. Many of Clark Enterprises' directors and officers are also managers of Clark Realty, which manages Clark Onterie, the LMA entities, and Clark LMA. The operating agreement of each of these entities specifically state that they cannot take any action on their own, only through Clark Realty. [*33] Moreover, the same executives and directors of Clark Enterprises, who also manage Clark Realty, also own interests in Clark Onterie and Clark LMA. In fact, overall, including the interests of its executives and directors in Clark LMA, Clark Enterprises has over a 60% interest in Clark LMA.

Based on this incestuous corporate structure, it is not surprising that Ms. Silberstien testified that Clark LMA, the LMA entities, and Clark Onterie "exist solely for the purpose of owning an interest in the Onterie Center," and that they do not have any employees, directors, or officers. (Silberstien Dep. at 49.)

In response, Clark Enterprises and Clark Onterie contend that Plaintiffs have not proffered any evidence relating to many of the factors discussed above such as whether Clark LMA, LLC and the LMA entities keep their own books, tax returns and financial statements. The reason for this lack of evidence, however, is due to Ms. Silberstien's lack of knowledge on these issues. Ms. Silberstien was designated by Clark Enterprises as its Rule 30(b)(6) deponent for a deposition on jurisdictional discovery, and therefore, she should have had knowledge of these issues. *Smithkline Beecham Corp. v. Apotex Corp.*, 2000 U.S. Dist. LEXIS 667, 2000 WL 116082, at *8-9 (N.D. Ill. Jan. 24, 2000) [*34] . At her deposition, however, Ms. Silberstien lacked knowledge to answer questions on these issues. Therefore, this Court finds that these issues are questions of fact, which for the purposes of this motion are to be decided in Plaintiffs' favor, *See* Fed. R. Civ. Pro. 37(b)(2)(A).

Therefore, based on this evidence, this Court finds that Clark LMA, LLC and the LMA entities were simply shells created so that Clark Enterprises and Clark Onterie would have an ownership interest in the Onterie Center, which is located in Illinois.

This decision is supported by the holding in *Wesleyan Pension Fund, Inc. v. First Albany Corp.*, 964 F. Supp. 1255 (S.D. Ind. 1997), which is factually similar to the present case. The plaintiff in *Wesleyan*, a pension fund, brought an action for fraud to recover losses it suffered after investing in several real estate limited partnerships with the non-resident defendants, *Id.* at 1257. The defendants, who consisted of three individuals, nine closely held corporations, and three limited partnerships, brought a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). [*35] *Id.*

In denying the Rule 12(b)(2) motion, the court rejected the defendants' contention that the plaintiff must demonstrate that each defendant had minimum contacts with the forum. *Id.* at 1261. Instead, the court held that, for purposes of determining jurisdiction, it would treat the defendants as a "single entity." *Id.* The court noted that the presumption that a subsidiary is independent from its parent may be overcome by evidence that "the parent has greater control over the subsidiary, than normally associated with common ownership and directorship or where the subsidiary is merely an empty shell." *Id.* at 1262. *See also APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (applying Illinois law, the court held that a plaintiff may pierce the corporate veil by "showing that one corporation is really a dummy or sham for another"); *YKK USA, Inc. v. Baron*, 976 F. Supp. 743, 747 (N.D Ill. 1997) (plaintiff may pierce the corporate veil by "by alleging that the corporation was a mere shell utilized by the individual defendant for his own personal benefit").

Applying the above principles, [*36] the court in *Wesleyan* held that "it would be entirely reasonable to attribute any contacts of the eight subsidiary corporations to the [parent] . . . on the grounds either that [the parent] exerted greater than normal control over its subsidiaries, or that the subsidiaries acted as agents, or that the subsidiaries were merely empty shells." 964 F. Supp. at 1261. The court based this decision on the fact that the parent and the subsidiaries had the same principal place of business and phone number and shared the same executives, directors, and shareholders. *Id.*

Accordingly, this Court finds that Clark Enterprises and Clark Onterie, through their ownership interest in the shell companies have an ownership interest in real property located in Illinois, and therefore, this Court has jurisdiction over Clark Enterprises and Clark Onterie under 735 ILCS 5/2-209(a)(3). Additionally, as explained in more detail above, this Court holds that it would not be unreasonable to exercise personal jurisdiction over Clark Enterprises and Clark Onterie.

In sum, this Court DENIES the Motion to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction as to BFGI, Clark Enterprises [*37] and Clark Onterie and GRANTS the motion with respect to BFTGI.

## II. Motion to Dismiss for Failure to State a Claim

In addition to the 12(b)(2) motion, Defendants have moved to dismiss, pursuant to Rule 12(b)(6), for failure to state a claim. [7]

> [7]   Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie

have moved to dismiss all claims, while LMA has only moved to dismiss Counts II, IV, V, and VI.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. *See, e.g., McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir. 1992); *Gillman v. Burlington N. R.R. Co.*, 878 F.2d 1020, 1022 (7th Cir. 1989). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief.   [*38] *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Kunik v. Racine County, Wis.*, 946 F.2d 1574, 1579 (7th Cir. 1991) (*citing Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)).

The court will accept all well-pled factual allegations in the complaint as true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n.2, 53 L. Ed. 2d 557, 97 S. Ct. 2490 (1977). In addition, the court will construe the complaint liberally and will view the allegations in the light most favorable to the non-moving party. *Craigs, Inc. v. General Electric Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992).

Before discussing the merits of Defendants' Rule 12(b)(6) motion, however, this Court must first determine which state's substantive law applies to Plaintiffs' claims. Federal courts sitting in diversity jurisdiction apply the choice-of-law [*39] rules of the state in which the court sits. *Midwest Grain Prods. of Ill., Inc. v. Productization, Inc.*, 228 F.3d 784, 787 (7th Cir. 2000). [8] Accordingly, this Court will apply Illinois choice-of-law rules to determine which state's law applies to the claims at issue.

> [8]   Plaintiffs unfortunately overlooked this basic principle in their choice of law argument. The cases they cited in their brief apply the choice-of-law rules of Massachusetts, *McAdams v. Mass. Mut. Life Ins. Co.*, 2002 U.S. Dist. LEXIS 9944, 2002 WL 1067449 (D. Mass. May 15, 2002), and California, *Nibeel v. McDonald's Corp.*, 1998 U.S. Dist. LEXIS 13425, 1998 WL 547286 (N.D. Ill. Aug. 1998) (the court applied California choice-of-law rules because the case was transferred from California). Consequently, the cases cited by plaintiff are inapposite.

The parties here agree that the law of Massachusetts applies to Plaintiffs' breach of contract claim (Count III) because the Franklin Partnership Agreement ("the Agreement") contains a choice-of-law provision [*40] which states that: "this Agreement shall be construed and enforced in accordance with the law of the State [Massachusetts]." The litigants, however, disagree on how broadly or narrowly this Court should apply the Agreement's choice-of-law provision. Plaintiffs contend that the provision applies to all of their claims, while Defendants assert that it only applies to the breach of contract claim. Applying Illinois choice-of-law rules, this Court finds that the answer lies between both parties' positions.

In determining the breadth of a contractual choice-of-law provision under Illinois law, courts apply a two part analysis. Medline Indus. Inc. v. Maersk Med. Ltd., 2002 U.S. Dist. LEXIS 22244, 230 F. Supp. 2d 857, 2002 WL 31557181, at *3-4 (N.D. Ill. Nov. 14, 2002); Precision Screen Mach. Inc. v. Elexon, Inc., 1996 U.S. Dist. LEXIS 12487, 1996 WL 495564, *2-3 (N.D. Ill. Aug. 28, 1996).

First, the court should examine the language of the contract's choice-of-law clause to determine if the parties "intended [it] to govern all claims between them." Medline Indus. Inc., 230 F. Supp. 2d 857, 2002 U.S. Dist. LEXIS 22244, 2002 WL 31557181, at *3-4. In making this determination, it must be clear that the parties intended to [*41] apply the choice-of-law provision "to all disputes related" to the contract. Union Oil Co. of Ca. v. John Brown E&C, 1994 U.S. Dist. LEXIS 13930, 1994 WL 535108, at *3 (N.D. Ill. Sept. 30, 1994). See also Kuehn v. Children's Hosp. of Los Angeles, 119 F.3d 1296, 1302 (7th Cir. 1997)(a contractual choice-of-law provision "will not be construed to govern tort as well as contract disputes unless it is clear that is what the parties intended"), In Union Oil Co., 1994 U.S. Dist. LEXIS 13930, 1994 WL 53108, at *1, 3, the court held that a choice-of-law provision, which stated that "this contract shall be construed, interpreted, and enforced in accordance with the law and jurisprudence of the State of California," did not demonstrate that the parties clearly intended to apply California law to claims not related to the contract. Similarly, in Precision Screen Mach. Inc., 1996 U.S. Dist. LEXIS 12487, 1996 WL 495564, *2-3, the court held that a choice-of-law provision, which stated that the contract "shall be governed and construed in accordance with, the internal laws of the State of New Jersey," did not indicate a clear intent to apply New Jersey law to all disputes.

Here, the choice-of-law provision states [*42] that "this Agreement shall be construed and enforced in accordance with the law of the State [Massachusetts]." Based on this language, the Court finds that the parties did not clearly intend the Agreement's choice-of-law provision to broadly apply to all disputes arising out of the Agreement.

The parties' intent, however, is not determinative. "Tort claims that are dependent upon the contract are subject to [the] contract's choice-of-law clause[,] regardless of the breadth of the clause." Medline Indus. Inc., 230 F. Supp. 2d 857, 2002 U.S. Dist. LEXIS 22244, 2002 WL 31557181, at *3. See also Precision Screen Mach. Inc, 1996 U.S. Dist. LEXIS 12487, 1996 WL 495564, *2-3 (noting that under Illinois law, courts have applied contractual choice-of-law provisions to tort claims, where that tort "was dependent on the contract"). In determining whether a tort claim is dependent upon the contract, courts examine whether: (1) "the [claim] alleges a wrong based upon interpretation and construction of the contract," Medline Indus. Inc., 230 F. Supp. 2d 857, 2002 U.S. Dist. LEXIS 22244, 2002 WL 31557181, at *3; (2) the "tort claims [are] closely related to the parties' contractual relationship," Miyano Mach. USA, Inc. v. Zonar, 1994 U.S. Dist. LEXIS 6772, 1994 WL 233649, at *2 (N.D. Ill. May 23, 1994); [*43] and (3) the tort claim "could exist without" the contractual agreement which contains the choice-of-law provision, Precision Screen Mach. Inc, 1996 U.S. Dist. LEXIS 12487, 1996 WL 495564, *2-3.

After examining each of Plaintiffs' claims, this Court finds that the claims for breach of fiduciary duty, breach of good faith and fair dealing, and intentional interference with contractual relations are dependent on the Agreement. The breach of fiduciary duty claim (Count I) alleges that based on the Agreement, Defendants, as general partners, owed Plaintiffs, as limited partners, a fiduciary duty of trust, loyalty, due care, candor, and fidelity. (See Compl. at PP 13-16.) Likewise, the claim for breach of good faith and fair dealing (Count IV) alleges that this duty originates from the Agreement. (See id. at P 91.) Thus, without the existence of the Agreement, Defendants would not have owed Plaintiffs a fiduciary duty or a duty of good faith and fair dealing, and thus, these claims could not have existed without the contract and are based upon and closely related to the contract.

Similarly, Plaintiffs' claim for intentional interference with contractual relations [*44] (Count V) alleges that the Agreement is a valid and enforceable contract and that Defendants' actions interfered with Plaintiffs' legal rights under the Agreement. Therefore, the Court finds that this claim likewise could not have existed without the Agreement and is based upon and closely related to the Agreement.

In contrast to these counts, the Court finds that Plaintiffs' claim under the Illinois Consumer Fraud Act (Count II), for negligent misrepresentation (Count VII), and for fraud (Count VI) are independent of the Agree-

ment, and therefore, not governed by the Agreement's choice-of-law provision. All three of these claims are premised, not upon the Agreement, but on alleged misstatements and omissions which Defendants made to Plaintiffs in the February 23 Memorandum and in the course of the buy-out of the limited partners' interests in the Franklin Partnership. Thus, these claims, while related to the Agreement, are not based upon the interpretation of the Agreement and could exist without the Agreement. *See Chicago Printing Co. v. Heidelberg USA, Inc.*, 2001 U.S. Dist. LEXIS 15331, 2001 WL 1134862, *3 (N.D. Ill. Sept. 25, 2001) (holding that a contractual choice-of-law provision did not [*45] apply to a claim for negligent misrepresentation because the claim was separate from the contract); *Mellon Bank, N.A. v. Miglin*, 1995 U.S. Dist. LEXIS 681, 1995 WL 230492, at *7 (N.D. Ill. Jan. 10, 1995) (holding that a claim for negligent misrepresentation "arose independently from the contract").

Accordingly, this Court will apply Massachusetts's law, per the Agreement's choice-of-law provision, to Counts I, IV, and V. As for Counts II, VI, and VII, this Court must apply Illinois choice of law rules in determining which jurisdiction's substantive law applies to these counts. *See Medline Indus. Inc.*, 230 F. Supp. 2d 857, 2002 U.S. Dist. LEXIS 22244, 2002 WL 31557181, at *4 (holding that courts should follow the state's choice-of-law rules where the contractual choice-of-law provision does not apply).

In determining which substantive law to apply to tort claims, Illinois law requires courts to use the "most significant relationship test." *Id.* Under this test, courts examine four factors: (1) the place of injury; (2) the place of the tortious conduct; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. *Id.* Generally, the "place of injury" controls unless another [*46] state has a more significant interest. *Id.*

Applying these factors to the present case, this Court finds that Illinois has the most significant relationship to Counts II, VI, and VII. The place of injury is where Plaintiffs live -- Illinois and Minnesota. As explained above, the relationship of the parties is centered around the Onterie Center which is located in Illinois. Likewise, the alleged tortious conduct took place in Illinois. Consequently, this Court finds that Illinois law governs Counts II, VI, and VII.

In sum, this Court will apply Massachusetts's law to Counts I, III, IV, and V and Illinois law to Counts II, VI, and VII. The Court will now discuss each of these claims in turn.

**A. Breach of Fiduciary Duty (Count I)**

Defendants contend that except for the two general partners -- Milk Street and LMA -- Plaintiffs have failed to state a claim for breach of fiduciary duty because the other Defendants, who were not general partners, did not owe Plaintiffs a fiduciary duty. In response, Plaintiffs argue that the non-general partner Defendants owed them a fiduciary duty because they owned and/or controlled the general partners and assisted in and profited from the [*47] general partners' alleged wrong doing.

Under Massachusetts' law, a general partner owes the limited partners a "fiduciary duty of the 'utmost good faith and loyalty'" and must consider the limited partners' "welfare and refrain from acting for purely private gain." *Wartski v. Bedford*, 926 F.2d 11, 13-14 (1st Cir. 1991) (quoting *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (Mass. 1952)).

While Massachusetts has not addressed the issue, several other states have held that limited partners may bring a breach of fiduciary claim against the parents and affiliates of the general partner where the limited partners allege that the parents and affiliates controlled the affairs of the general partner and caused or participated in the breach of the fiduciary duty. *See Wallace v. Wood*, 752 A.2d 1175, 1181-82 (Del. Ch. 1999); *Chase Pratt, LLC v. Aetna Life Ins. Co.*, 1999 Conn. Super. LEXIS 917, 1999 WL 229214, at *6-7 (Conn. Super. Ct. Mar. 19, 1999).

Here, after examining the Complaints, this Court finds that Plaintiffs have sufficiently alleged that Defendants controlled the general partners (Milk Street and LMA) and participated in or caused the alleged [*48] wrongful conduct. For example, Plaintiffs allege that "the general and limited partners of Milk Street were all employees and owners of Boston Financial" (Compl. at P 23), and that the Boston Financial entities (BFTGI, BFGI, and BFGLP) controlled the Franklin Partnership. (*Id.* at P 6.) Plaintiffs also allege that through its control of Milk Street, the Boston Financial entities participated in the scheme to improperly get the limited partners to sell their interests in the Franklin Partnership. (*See id.* at PP 37-49, 48-51, and 66-72.) Plaintiffs further allege that Lend Lease owns and controls the Boston Financial entities, and that through its control of the Boston Financial entities, Lend Lease controlled Milk Street. (*Id.* P 6.) Consequently, this Court finds that Plaintiffs have sufficiently alleged that BFTGI, BFGI, BFGLP, and Lend Lease controlled Milk Street and participated in or caused the alleged wrongful conduct.

Likewise, Plaintiffs allege that the other general partner of the Franklin Partnership -- LMA -- is a "wholly owned subsidiary" of Lake Michigan and that Clark Onterie (a "wholly owned subsidiary of Clark Enterprises") is the majority owner of Lake Michigan.

[*49] (*Id.* PP 9-12.) While Plaintiffs do not specifically allege that Lake Michigan, Clark Onterie, and Clark Enterprises caused or participated in the alleged wrongful conduct, Plaintiffs allege that all Defendants "aided, abetted, [or] assisted" the general partners in breaching their fiduciary duties. Consequently, construing the complaint liberally and viewing the allegations in the light most favorable to Plaintiffs, *Craigs, Inc.*, 12 F.3d at 688, this Court finds that Plaintiffs have sufficiently alleged that Lake Michigan, Clark Onterie, and Clark Enterprises controlled LMA and participated in or caused the alleged wrongful conduct.

Accordingly, the Court DENIES the motion to dismiss as to Count I.

**B. Illinois Consumer Fraud Act (Count II)**

Defendants contend that Plaintiffs lack standing to bring a claim under the Illinois Consumer Fraud And Deceptive Business Practices Act ("ICFA") because they fail to allege that: (1) they were "consumers" under the ICFA; and (2) the transaction at issue implicated consumer protection concerns.

The ICFA defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the [*50] ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS § 505/1(e). "Merchandise" is defined to include "any objects, wares, goods, commodities, intangibles, real estate . . ., or services." 815 ILCS § 505/1(b). Illinois courts "liberally construe" the ICFA and "give a broad definition to consumer." *Randazzo v. Harris Bank Palatine*, 104 F. Supp. 2d 949, 954 (N.D. Ill. 2000). *See also Bell Enter. Venture Santanna Natural Gas Corp.*, 2001 U.S. Dist. LEXIS 23684, 2001 WL 1609417, at *4 (N.D. Ill. Dec. 12, 2001) ("the ICFA broadly defines a consumer").

Although no Illinois court appears to have addressed whether the purchasers of an interest in a limited partnership, whose only asset is real property, are consumers within the ICFA, courts have held that purchasers of real estate, *see Randels v. Best Real Estate, Inc.* 243 Ill. App. 3d 801, 612 N.E.2d 984, 184 Ill. Dec. 108 (Ill. App. Ct. 1993), securities, *Wislow v. Wong*, 713 F. Supp. 1103, 1107 (N.D. Ill. 1989), and franchise licenses, *Bixby's Food Sys., Inc. v. McKay*, 985 F. Supp. 802, 807 (N.D. Ill. 1997), are "consumers" within [*51] the scope of the ICFA.

In *Bixby's Food Sys., Inc.*, 985 F. Supp. at 807, a franchisee brought an ICFA claim against its franchisor. The defendant moved to dismiss on the grounds that the plaintiff did not have standing because the franchisee was not a "consumer" under the ICFA. *Id.* Denying this motion, the court held that Illinois courts have "broadly

defined" merchandise and that franchise rights could constitute "intangibles" under a broad construction of merchandise. *Id.*

Here, Plaintiffs purchased an interest in the Franklin Partnership, whose sole asset was the Onterie Center. Thus, Plaintiffs' purchase is akin to the purchase of both securities and real estate (such as a Real Estate Investment Trust). Given the broad construction of the ICFA, this Court finds that Plaintiffs have alleged sufficient facts at this time to fall within the ICFA's broad definition of consumer.

Defendants' second contention -- that the transaction at issue does not implicate consumer protection concerns -- is likewise unpersuasive. When the plaintiff itself is a consumer, the plaintiff does not need to show that the transaction implicates consumer protection concerns; this [*52] factor only comes into play when the purchaser is a business. *See Industrial Specialty Chems. v. Cummins Engine Co.*, 902 F. Supp. 805, 812 (N.D. Ill. 1995); *Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1237 (N.D. Ill. 1990). A plaintiff/consumer may bring a claim under the ICFA based upon a single, isolated injury, and [] need not [allege] wide-spread effect on consumers generally." *Indus. Specialty Chem., Inc.*, 902 F. Supp. at 812. Here, Plaintiffs have alleged injury both to themselves and to the numerous other limited partners.

Accordingly, this Court finds that Plaintiffs have standing to bring an ICFA claim, and the Court therefore DENIES the motion to dismiss as to Count II.

**C. Breach of Contract (Count III)**

Defendants have also moved to dismiss the breach of contract claim, as to all of the Defendants who were not general partners, on the grounds that only the general partners -- Milk Street and LMA -- were parties/signatories to the Franklin Partnership Agreement. Defendants are correct in noting that it is well settled black letter law that only parties to a contract are bound by that [*53] contract. 17B CSJ Contracts § 630 (2002); *In re Tri-Star Tech. Co., Inc.*, 260 B.R. 319, 327 (Bankr. D. Mass. 2001).

In an attempt to get around this rule, Plaintiffs contend that -- as they did in their breach of fiduciary argument -- the non-general partner Defendants are liable for breach of contract because they owned and/or controlled the general partners and assisted in and profited from the general partners' breach of contract. Plaintiffs, however, have failed to cite, and this Court has not found, any law which supports this unique argument. One of the cases discussed above, *Wallace*, 752 A.2d 1175 at 1181-82, which held that affiliates and parents could be liable for breach of fiduciary duty for controlling and causing the

wrongful conduct of the general partner, also held that the parents and affiliates were not liable for breach of contract for a contract to which they were not parties -- only the signatory/general partner was liable for the breach. *Id.* at 1180.

Accordingly, this Court GRANTS the motion to dismiss Count III as to the non-general partner Defendants -- Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark [*54] Enterprises, and Clark Onterie.

## D. Breach of Good Faith and Fair Dealing (Count IV)

Defendants contend that Count IV should be dismissed because Illinois does not recognize an independent claim for breach of good faith and fair dealing. As discussed above, however, Massachusetts' law applies to this claim, and Massachusetts does recognize an independent claim for breach of the covenant of good faith and fair dealing which is implied in every contract. *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 583 N.E.2d 806, 820 (Mass. 1991). Under this theory, "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Id.* To state a claim for breach of good faith and fair dealing, the plaintiff must allege that: "(1) a contract existed between the parties; and (2) the defendant acted in bad faith, causing the plaintiff to be deprived of a benefit promised under the contract." *Id.*

Here, it is undisputed that a contract (the Franklin Partnership Agreement) existed between the general partners (Milk Street and LMA) and the Plaintiffs, who were two of the limited [*55] partners. As discussed above, however, Plaintiffs have not alleged that a contract existed between them and the non-general partner Defendants. Plaintiffs also allege that Defendants "have acted to deprive the Limited Partners of the fruits of the Partnership Agreement." (Compl. at P 90.) Consequently, this Court finds that Plaintiffs have properly stated a claim for breach of good faith and fair dealing against the general partners -- Milk Street and LMA -- but not against the remaining Defendants. The Court thus DENIES the motion to dismiss Count IV as to LMA but GRANTS the motion as to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie.

## E. Intentional Interference with Contractual Relations (Count V)

Defendants contend that Plaintiffs have failed to sufficiently allege a claim for intentional interference with contractual relations. To state a claim for intentional interference with contractual relations under Massachusetts law, a plaintiff must allege that: "(1) [the plaintiff] had a

contract with a third party, (2) the defendant knowingly induced the third party to break the contract, and (3) the plaintiff was harmed by the defendant's [*56] actions." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 21 (Mass. 1990). [9] Additionally, the plaintiff must allege that "what the defendant intentionally did was wrongful or improper in its means or ends." *Id.*

> 9    Defendants cite only to Illinois law on intentional interference with contractual relations, which is essentially identical to Massachusetts law. *See Strosberg v. Brauvin Realty Servs.*, 295 Ill. App. 3d 17, 691 N.E.2d 834, 845, 229 Ill. Dec. 361 (Ill. App. Ct. 1998).

Here, Defendants contend that Plaintiffs have failed to allege that any Defendant used any improper means to induce a third party to breach a contract or that any Defendant was aware of a contract. As explained above, however, Plaintiffs have alleged that Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie controlled the general partners of the Franklin Partnership and participated in or caused the alleged wrongful conduct. Likewise, in paragraphs [*57] 96-98 of the Complaint, Plaintiffs allege that: (1) there was a valid contract between Plaintiffs and a third party (the Franklin Partnership Agreement between the limited partners and the general partners); (2) Defendants "improperly and intentionally" interfered with these contractual relations which caused the general partners to breach the Agreement with the limited partners; and (3) as a result of this interference, Plaintiffs (and the other limited partners) incurred damages.

Consequently, this Court finds that Plaintiffs have sufficiently alleged a claim for intentional interference with contractual relations, and thus, the motion to dismiss is DENIED as to Count V.

## F. Fraud (Count VI)

Defendants have also moved to dismiss Counts VI (fraud claim) and II (ICFA claim) on the grounds that these claims fail to specifically plead fraud as required by Federal Rule of Civil Procedure 9(b).

Rule 9(b) provides that "the circumstances constituting fraud . . . shall be stated with particularity." [10] Fed. R. Civ. P. 9(b). Circumstances constituting fraud "include the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, [*58] and the method by which the misrepresentation was communicated to the plaintiff." *General Elec. Capital v. Lease Resolution*, 128 F.3d 1074, 1078 (7th Cir.1997). In other words, Rule 9(b) requires a plaintiff to plead "the who, what, when, where and how" of the

fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). The purpose underlying Rule 9(b)'s particularity requirement is to: (1) protect the defendant's reputation; (2) minimize "strike suits and fishing expeditions"; and (3) provide notice of the claim. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir.1994). However, although a plaintiff must plead the circumstances of the alleged fraud with particularity, "malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

> 10 Claims under the ICFA must also comply with Rule 9(b)'s requirements. *See Swift v. First USA Bank*, 1999 U.S. Dist. LEXIS 8208, 1999 WL 965449, at *5 (N.D. Ill. 1999).

[*59] Here, a careful review of the Complaint reveals that Plaintiffs have adequately pled facts setting forth "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *General Elec. Capital*, 128 F.3d at 1078. For example, as discussed above, the February Memorandum was mailed to Plaintiffs either directly by Defendants or indirectly by Defendants through affiliated companies on February 23, 1999. The February Memorandum proposed a buy-out of the Franklin Partnership whereby LMA would replace Milk Street as the Franklin Partnership's general partner, acquire the limited partners' interests, and ultimately acquire the Onterie Center. Plaintiffs allege that the February Memorandum was "false and misleading" in that it: (1) misrepresented Onterie's value in order to induce the Limited Partners to grant their consents; (2) failed to disclose pervasive conflicts of interest which were part of the buy-out scheme; and (3) left out pertinent and fundamental information which Defendants were required to disclose. The details of each of these [*60] misrepresentations are fully alleged in the Complaint, so as to comply with Rule 9(b)'s particularity requirement. As a result of the misrepresentations in the February Memorandum, Plaintiffs allege that the Defendants improperly acquired the limited partners interests "for far less than their true value" and caused the limited partners to unnecessarily incur "huge tax liabilities."

Accordingly, this Court finds that Plaintiffs have alleged sufficient facts to meet Rule 9(b)'s particularity requirement, and thus, the motion to dismiss Count VI is DENIED.

### G. Negligent Misrepresentation (Count VII)

Lastly, Defendants contend that Plaintiffs have failed to adequately plead a claim for negligent misrepresentation under Illinois law. To state a claim for negli-

gent misrepresentation, the plaintiff must allege that the defendant: "(1) made a negligent misrepresentation of material fact; (2) is in the business of providing investment information; and (3) made the misrepresentation while guiding [the plaintiff] in [its] business relations with third parties." *Lennon v. Christoph*, 1997 U.S. Dist. LEXIS 1231, 1997 WL 57150, at *26 (N.D. Ill. Feb. 7, 1997). The "pivotal[]" inquiry in determining [*61] whether the defendant is "in the business of supplying investment information," is whether the defendant is "in the business of supplying information for the guidance of other[s] in their transactions." *Canel v. Lincoln Nat'l Bank*, 1998 U.S. Dist. LEXIS 12519, 1998 WL 1760544, at *9 (N.D. Ill. Aug. 6, 1998).

Courts applying the above elements have held that "the tort of negligent misrepresentation is a narrow one." *Lennon*, 1997 U.S. Dist. LEXIS 1231, 1997 WL 57150, at *26. For example, in *Canel*, 1998 U.S. Dist. LEXIS 12519, 1998 WL 1760544, at *9, in recommending that the district court grant summary judgment as to a claim for negligent misrepresentation, the magistrate judge found that the plaintiff failed to show that the defendant was in "the business of supplying information" because the defendant only supplied information to the plaintiff for "a specific isolated transaction." *Id.* Similarly, in *Lennon*, 1997 U.S. Dist. LEXIS 1231, 1997 WL 57150, at *26, in granting summary judgment for a claim of negligent misrepresentation, the court held that the plaintiff did not demonstrate that the defendant was "in the business of supplying information" because the defendant provided the investment information for the purpose [*62] of guiding the plaintiffs in making their own investment decisions, not for the plaintiffs to use "in their business relations with third parties," as required by Illinois law.

Here, after carefully reviewing the Complaint, this Court finds that Plaintiffs have failed to allege that Defendants are in the business of providing investment information. Plaintiffs allege that Defendants only provided investment information for this specific transaction to guide Plaintiffs in making their own investment decisions, not for use in their business relations with third parties. Consequently, this Court finds that Plaintiffs have failed to sufficiently plead a claim for negligent misrepresentation, and therefore, GRANTS the motion to dismiss as to Count VII.

In Sum, the Defendants' Rule 12(b)(6) motions are GRANTED as to Counts III and IV with respect to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie and Count VII with respect to all moving Defendants, while the motion is DENIED as to Counts I, II, V, and VI with respect to all Defendants and Count IV with respect to LMA.

2003 U.S. Dist. LEXIS 806, *

With respect to the counts which have been dismissed, the Court grants Plaintiffs [*63] leave to file an amended complaint within 21 days consistent with their Rule 11 obligations.

## CONCLUSION

For the reasons discussed above, this Court:

. DENIES the Motion to Dismiss Under Rule 12(b)(2) For Lack of Personal Jurisdiction [37-1, 36-1, and 9-1] as to BFGI, Clar Enterprises and Clark Onterie and GRANTS the motion with respect to BFTGI; and

. GRANTS the Motion to Dismiss Under Rule 12(b)(6) For Failure to State a Claim [37-1, 36-1, 9-1, 7-1] as to Counts III and IV with respect to Lend Lease, BFTGI, BFGI, BFGLP, Lake Michigan, Clark Enterprises, and Clark Onterie and Count VII with respect to all moving Defendants, and DENIES the motion as to Counts I, II, V, and VI with respect to all Defendants and Count IV with respect to LMA.

It is so ordered.

**ENTER:**

**BLANCHE M. MANNING**

**U.S. DISTRICT COURT JUDGE**

DATE: 1/17/03

# EXHIBIT G

LEXSEE 2002 U.S. DIST. LEXIS 22333



Cited
As of: Aug 29, 2008

**CLARK PRODUCTS, INC., Plaintiff, v. PENNY RYMAL, HERMAN BAERGEN, and MTD SYSTEMS, INC., Defendants.**

**No. 02 C 6893**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2002 U.S. Dist. LEXIS 22333**

**November 18, 2002, Decided
November 19, 2002, Docketed**

**DISPOSITION:** [*1] Defendants' motions for dismissal granted in part. Pursuant to Federal Rule of Civil Procedure 12(b)(3) action dismissed without prejudice for improper venue.

**COUNSEL:** For CLARK PRODUCTS, INC., plaintiff: Dana Shelton Connell, Stefanie W. Kohen, Dorothy Elizabeth Larkin, Littler Mendelson, P.C., Chicago, IL.

For PENNY RYMAL, defendant: Richard Peter Carey, Mandel, Lipton & Stevenson, Ltd., Chicago, IL.

For PENNY RYMAL, defendant: Courtney E. Morgan, Jr., Brian A Calandra, Mazur, Morgan, Myers & Kittel PLLC, Detroit, MI.

For HERMAN BAERGEN, MTD SYSTEMS, INC., defendants: Patricia Costello Slovak, Schiff, Hardin & Waite, Chicago, IL.

For HERMAN BAERGEN, MTD SYSTEMS, INC., defendants: Daniel J. Bernard, Vercruysse Metz & Murray, P.C., Bingham Farms, MI.

**JUDGES:** Suzanne B. Conlon, United States District [*2] Judge.

**OPINION BY:** Suzanne B. Conlon

**OPINION.**

**MEMORANDUM OPINION AND ORDER**

In this diversity action, Clark Products, Inc. ("Clark Products") sues Penny Rymal ("Rymal") and Herman Baergen ("Baergen") for breach of implied contract (Count I), breach of fiduciary duty (Count II), breach of duty of loyalty (Count III), usurpation of corporate opportunity (Count IV), tortious interference with business expectancy (Count V), civil conspiracy (Count V), unjust enrichment and restitution (Count VII) and fraudulent misrepresentation and/or concealment (Count VIII). Clark Products names MTD System, Inc. ("MTD") as a defendant to Counts V through VII. Rymal, Baergen and MTD (collectively, "defendants") move to dismiss the complaint based on lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). Alternatively, defendants move to transfer the case to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a). In addition, Rymal moves to dismiss the complaint based on the prior filing of *Rymal v. Herman Baergen et al.*, No. 01-3226 pending in the Circuit Court for [*3] the County of Macomb, Michigan ("the Michigan action") and Clark Products' failure to properly plead diversity jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

**BACKGROUND**

Defendants' motions to dismiss for lack of personal jurisdiction must be considered first. *See Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94, 140 L. Ed. 2d 210, 118 S. Ct. 1003 (1998)("Without jurisdiction

the court cannot proceed at all in any cause"). *See also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 143 L. Ed. 2d 760, 119 S. Ct. 1563 (1999)(a district court may consider personal jurisdiction first). In deciding a motion to dismiss for lack of personal jurisdiction, the court accepts all well-pleaded jurisdictional allegations in the complaint as true unless controverted by affidavit or deposition. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987); *J. Walker & Sons, Ltd. v. DeMert & Dougherty, Inc.*, 821 F.2d 399, 402 (7th Cir. 1987). Any conflict presented by affidavit or deposition must be resolved in Clark Products' favor. *Id.* However, any unrefuted facts offered by defendants will be accepted [*4] as true. *Facilitec Corp. v. Grease Stopper, Inc.*, 2002 U.S. Dist. LEXIS 2178, No. 01 C 2971, 2002 WL 226758, at *2 (N.D. Ill. Feb. 13, 2002).

Clark Products is an Illinois corporation with its principal place of business in Elk Grove, Illinois. Complaint ("Compl.") at PP 1-2. Clark Products is engaged in the distribution of food service equipment and supplies as well as janitorial and sanitation supplies. *Id.* at P 1. Clark Products employed Baergen and Rymal as managers at its Detroit, Michigan division. *Id.* at PP 22-30. In 1989, a Clark Products' customer approached Baergen about the possibility of Clark Products delivering films to the customer's movie theaters. *Id.* at P 39. Baergen declined the opportunity on behalf of Clark Products. *Id.* at P 41. Thereafter, he and Rymal formed MTD as an independent film delivery business to service this customer and others. *Id.* at P 42, 44.

According to Baergen and Rymal, MTD is a Michigan corporation doing business exclusively within the state of Michigan. Baergen Aff. at P 6; Rymal Aff. at P 10. MTD has never had any customers in Illinois. *Id.* Baergen and Rymal have never lived, worked or owned property in Illinois. Baergen Aff. [*5] at PP 3-5; Rymal Aff. at PP 3-8. During the relevant time period, Baergen and Rymal's only contact with Illinois was through their positions with Clark Products. *Id.*

## DISCUSSION

### I. Personal Jurisdiction

Defendants claim the court lacks personal jurisdiction over them. In a diversity case, a federal district court sitting in Illinois may assert personal jurisdiction over a non-resident defendant if an Illinois state court would have jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). Illinois authorizes personal jurisdiction on any basis permitted by the Illinois Constitution and the United States Constitution. *Id.* The Illinois Supreme Court has noted that federal law may be used as guidance for construction of the Illinois due process clause. *Lewis v. Spagnolo*, 186 Ill.2d 198, 227,

710 N.E.2d 798, 812, 238 Ill. Dec. 1 (1999). Absent any authority supporting a broader construction, the Illinois due process clause may be interpreted the same as the federal due process clause. *Id.* Consequently, the court confines its jurisdictional analysis to whether federal due process permits jurisdiction [*6] over defendants.

Federal due process requires defendants to have "certain minimum contacts with [Illinois] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). In Illinois, defendants may be subject to either general or specific jurisdiction. *RAR*, 107 F.3d at 1275.

### A. General Jurisdiction

Clark Products first contends that the court has general jurisdiction over defendants because they "have availed themselves of the privilege of conducting activities" within Illinois. Response at 4. General jurisdiction exists only where the defendant has continuous and systematic general business contacts with the forum such that he could reasonably foresee being haled into court in that state for any matter. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980). Defendants' limited contacts with Illinois does not satisfy this standard. MTD does not do any business in Illinois and the individual defendants' contact with Illinois is limited [*7] to sporadic business travel on behalf of Clark Products. Based on this record, the court cannot assert general jurisdiction over defendants.

### B. Specific Jurisdiction

Clark Products next contends that the court has specific jurisdiction over defendants because an Illinois corporation was injured as a result of defendants' alleged tortious activities. The court may assert specific jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984). Defendants need not be physically present in Illinois to have sufficient minimum contacts with Illinois. *Hanson v. Denckla*, 357 U.S. 235, 251-53, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958). Rather, the crucial inquiry is whether their conduct was such that they should have reasonably anticipated being haled into court here. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). The individual defendants knew they were working for an Illinois corporation. During their employment, they allegedly [*8] misappropriated a business opportunity belonging Clark Products to form MTD. As a result, Clark Products claims it was injured by defendants' actions in Illinois. Under these circum-

stances, it was foreseeable that defendants would be required to answer for their actions in Illinois. Indeed, "[one] who commits tortious acts against an Illinois business should reasonable anticipate being haled into an Illinois court." *Telular Corp. v. Vitech America, Inc.*, 1996 U.S. Dist. LEXIS 15574, No. 96 C 4749, at *2 (N.D. Ill. Oct. 21, 1996). *See also Janmark Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997)("the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor"). [1] Therefore, Clark Products' allegations are sufficient to establish personal jurisdiction over defendants. *See Digital Merchant Systems, Inc. v. Oglesby*, 1999 U.S. Dist. LEXIS 18824, No. 98 C 8033, 1999 WL 1101769, at *3-4 (N.D. Ill. Nov. 30, 1999)(defendants' knowledge that they were dealing with Illinois corporation at time of alleged tortious conduct sufficient to satisfy minimum contacts).

> 1 Baergen and MTD argue that "*Janmark* was wrongly decided, and it is clearly at odds with every other circuit to decide this issue." Reply at 2-3 n. 2. Nevertheless, *Janmark* remains the law in this circuit and is binding on this court.

[*9] Nevertheless, defendants attempt to refute Clark Products' allegations by claiming it was not injured as a result of their actions. In support of their claim, defendants offer deposition testimony given by Clark Products' chairman in the Michigan action. However, defendants may not offer this deposition testimony because the Michigan action does not involve the same subject matter as this action. *See* Fed. R. Civ. P. 32(a)(4)(depositions taken in prior action may be used in subsequent action "involving the same subject matter". . . "between the same parties"). In the Michigan action, Rymal sues Clark Products, Baergen and MTD for sex discrimination and failure to pay earned commissions in violation of state law. Rymal Motion at Ex. 4. Indeed, Clark Products' motion to amend its pleadings in the Michigan action to include the claims alleged here was denied. Baergen and MTD Motion at Ex. C. Moreover, the cited deposition testimony fails to confirm that Clark Products was not injured by defendants' actions. Rather, Clark Products' chairman repeatedly testified that he lacked knowledge of Clark Products' interest in the film delivery business and loss of customers, but the division [*10] presidents could provide the requested information. *See, e.g.*, Baergen and MTD Reply, Ex. D at 21-22, 138, 162-165. As a result, defendants fail to refute Clark Products' allegations regarding their minimum contacts with Illinois.

Nor have defendants offered any reason why jurisdiction in Illinois would be unreasonable. *See Burger King*, 471 U.S. at 477 ("where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case

that the presence of some other considerations would render jurisdiction unreasonable"). Defendants do not offer any evidence demonstrating why it would be unfair, inconvenient or burdensome to litigate in Illinois. Absent a compelling countervailing reason, assertion of specific jurisdiction over defendants comports with federal due process.

**C. Fiduciary Shield Doctrine**

Rymal claims the fiduciary shield doctrine protects her from suit in Illinois. The fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) [*11] (internal citations omitted). The fiduciary shield doctrine has two exceptions: "(1) the shield is removed if the individual's personal interests motivated his actions; and (2) the shield generally does not apply when the individual's actions are discretionary." *Jones v. Sabis Educational Systems, Inc.*, 52 F. Supp.2d 868, 884 (N.D. Ill. 1999)(citations omitted). Both exceptions apply to Rymal's alleged conduct.

First, Rymal's failure to offer the purported business opportunity to Clark Products inured to her benefit by allowing her to continue working at Clark Products while earning additional income from MTD. Second, Rymal has not demonstrated her failure to disclose the business opportunity was anything but voluntary. *See Brujis v. Shaw*, 876 F. Supp. 975, 980 (N.D. Ill. 1995)(fiduciary shield doctrine does not protect individual in a position to decide whether or not to perform the alleged tortious acts). In sum, Rymal voluntarily chose to remain silent to advance her own personal interests in MTD. Consequently, the fiduciary shield doctrine does not protect Rymal from suit in Illinois.

**II. Venue**

Defendants next claim that venue is improper [*12] in Illinois. Section 1391(a) provides:

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situation, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is com-

menced, if there is no district in which the
action may otherwise be brought.

28 U.S.C. § 1391(a). Clark Products argues venue is
proper under § 1391(a)(2). However, all the tortious acts
underlying Clark Products' injury in Illinois occurred in
Michigan. Indeed, Clark Products concedes that "the acts
alleged to have caused harm to Clark may well have
taken place in Michigan." Response at 12. Under these
circumstances, venue in the Northern District of Illinois
is improper. *See Digital Merchant Systems*, 1999 U.S.
Dist. LEXIS 18824, 1999 WL 1101769, at *5 (Section
1391(a)(2) does [*13]  not apply where tortious acts
causing injury within forum state occurred outside of
forum state).

Nevertheless, Clark Products claims transfer, rather
than dismissal, is appropriate. Section 1406(a) provides:

The district court of a district in which
is filed a case laying venue in the wrong
division or district shall dismiss, or if it be
in the interest of justice, transfer such case
to any district or division in which it
could have been brought.

28 U.S.C. § 1406(a). Clark Products has not offered any
reason why transfer is required to preserve the interests
of justice. Therefore, transfer to the Eastern District of
Michigan is inappropriate under 28 U.S.C. § 1406(a).

**CONCLUSION**

Although the court may assert personal jurisdiction
over defendants, venue is not proper in the Northern District
of Illinois. Rymal's remaining arguments are moot.

November 18, 2002

ENTER:

Suzanne B. Conlon

United States District Judge

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing
before the Court. The issues have been tried or heard
and a decision has been rendered.

IT  IS  [*14]   HEREBY  ORDERED  AND
ADJUDGED that this action is dismissed without prejudice.

Date: 11/18/2002

# EXHIBIT H

LEXSEE 2002 US DIST LEXIS 4177


Caution
As of: Aug 29, 2008

**INTERNATIONAL FINANCIAL SERVICES CORPORATION, Plaintiff, v.
DIDDE CORPORATION, DIDDE WEB PRESS CORPORATION, CHROMAS
TECHNOLOGIES, INC., WEBTRON CORPORATION, ZIGZAG, CHROMAS
TECHNOLOGIES CANADA, INC., GERALD R. ("JAY") BROWN, DAVID
DIDDE, ROBERT ANDERSON, DAVID THOMPSON, FRANCOIS DALLAIRE,
FRANK LAUGHLIN, Defendants.**

**No. 00 C 6433**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**2002 U.S. Dist. LEXIS 4177**

**March 13, 2002, Decided
March 13, 2002, Filed; March 14, 2002, Date Docketed**

**DISPOSITION:** [*1] Defendant Laughlin's motion to dismiss for lack of personal jurisdiction GRANTED. Plaintiff's motion to supplement its response DENIED. Joint motion for judgment on the pleadings by Defendants Brown, Didde, Thompson and Anderson GRANTED; Defendants dismissed from Complaint.

**COUNSEL:** For INTERNATIONAL FINANCIAL SERVICES CORPORATION, plaintiff: Steven Joseph Roeder, Douglas Alan Albritton, Freeborn & Peters, James E. Mahoney, Griffith & Jacobsen, David Charles Kluever, Andrew Lloyd Platt, Kluever & Platt P.C., Chicago, IL.

For DIDDE CORPORATION, DIDDE WEB PRESS CORPORATION, GERALD R BROWN, defendants: William M. Hannay, Schiff, Hardin & Waite, Chicago, IL.

For DIDDE CORPORATION, DIDDE WEB PRESS CORPORATION, defendants: Mick Lerner, Law Office of Mick Lerner PA, Overland Park, KS.

For CHROMAS TECHNOLOGIES, INC., CHROMAS TECHNOLOGIES CANADA, INC., FRANK LAUGHLIN, defendants: Damon E. Dunn, Dara Sa-

hebjami, Funkhouser [*2] Vegosen Liebman & Dunn, Ltd., Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

***MEMORANDUM OPINION AND ORDER***

Before this court is (1) Defendant Frank Laughlin's ("Laughlin") Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(2) & (6); (2) Plaintiff's Motion for leave to supplement its response in opposition to Defendant Frank Laughlin's Motion to Dismiss; and (3) the Joint Motion of Defendants Brown, Didde, Thompson and Anderson for judgment on the pleadings under Fed. R. Civ. P. 12(c) due to lack of personal jurisdiction. For the reasons set forth below, Laughlin's motion to dismiss is granted, plaintiff's motion for leave to supplement its response is denied and Brown, Didde, Thompson and Anderson's motion for judgment on the pleadings is granted.

**I. Factual Background**

Plaintiff, International Financial Services Corporation ("IFSC") filed a five count Amended Complaint in

this Court alleging breach of contract, fraud, conspiracy to defraud, unjust enrichment, and constructive trust against, inter alia, Laughlin and Didde Web Press Corporation ("DWP"), Didde, Brown, Thompson and Anderson. According to the [*3] Amended Complaint, IFSC's claims arise from a three-cornered commercial transaction between DWP, Label Tech, Inc., and IFSC in 1999. DWP manufactured and sold commercial printing presses. On September 24, 1999, Label Tech, a corporation based in Texas, contracted to purchase a Webtron Folding Carton Press (the "Equipment") from DWP. According to Label Tech's agreement with DWP, 50% of the total purchase price was to be paid within 120 days of the order. On September 28, 1999, IFSC entered into a lease agreement with Label Tech to fund the manufacture of the Equipment by DWP. IFSC alleges that the timetable for the payments was based on DWP's need to finance the purchase of components from third parties.

With respect to its fraud claims against Laughlin, IFSC alleges that certain employees of the "various Didde entities" held monthly meetings in Florida to discuss cash flow operations and that Laughlin allegedly participated in several such meetings. At one of those meetings, on or about November or December of 1999, IFSC alleges that Laughlin's superiors "instructed Laughlin" to contact IFSC's president, Bob Seeds ("Seeds"), in order to request the advance of additional funds to be [*4] used to finance the Equipment. IFSC alleges that Laughlin made the call to Seeds "as directed." Allegedly, Laughlin told Seeds that "more money was needed to fund manufacture of the Equipment," and "the previous payment had been used to buy O.E.M. parts for the Equipment, that the press was on schedule, and that the requested additional payment was being used to pay for O.E.M. parts that CT had already contracted to buy for the manufacture of the Equipment." IFSC alleges that those statements were false and that Laughlin's superiors knew they were false when they directed Laughlin to make them. In so doing, IFSC charges that Laughlin committed an act of fraud against IFSC and participated in a conspiracy to defraud IFSC.

Laughlin is a resident of Florida and has never had an office, a telephone number, or a bank account in Illinois. Laughlin was employed by DWP at the time of the alleged fraud. David Didde is an officer of DWP and Didde Corporation. David Didde's first contact with IFSC in connection with the transaction was in the late Fall of 2000 after the payments in issue had been made. At that time, he traveled to Chicago with others to meet creditors, one of which was IFSC. [*5] Dave Thompson was an officer of DWP and Didde Corporation. Thompson had a telephone conversation with Seeds in the Summer of 2000, after the payments in issue had been made. He also attended the meeting of creditors in Chi-

cago referenced above. Robert Anderson was an officer of Didde Corporation and of a division of DWP. Anderson attended two trade shows in Illinois in 1999 and 2000 as a representative of the Didde corporate entities. Gerald R. Brown was an officer of both Didde Corporation and DWP. Brown recalls one telephone coversation with IFS in the Spring of 2000 initiated by Seeds, after the payments in issue had been made.

## II. Standards

Once a defendant has challenged a court's jurisdiction over his or her person, the plaintiff has the burden of showing personal jurisdiction. *RAR Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). In determining whether the plaintiff has met his or her burden of proving personal jurisdiction, the court may receive and consider affidavits from both parties. *Glass v. Kemper Corp.*, 930 F. Supp. 332, 337 (N.D. Ill. 1996). The court resolves factual disputes in the pleadings and affidavit in [*6] favor of the plaintiff but takes as true facts contained in the defendant's affidavit that the plaintiff does not dispute. *Id.*

When ruling on a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), a district court accepts the allegations pleaded in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 493 (7th Cir. 1998). Accordingly, a motion for judgment on the pleadings should not be granted unless it appears beyond doubt that the plaintiff can prove no facts that would support his claim for relief. *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989).

## III. Analysis

Laughlin moves for dismissal of the Amended Complaint with respect to Laughlin pursuant to Rule 12(b)(2) claiming that this Court lacks personal jurisdiction over him. According to Laughlin, the fiduciary shield doctrine would prohibit the assertion of personal jurisdiction over him in Illinois because Laughlin was at all relevant times acting as a corporate employee at the direction of his employer. Laughlin also argues that Counts II and III of the Amended Complaint [*7] should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Laughlin maintains that IFSC cannot maintain a cause of action for fraud (Count II) against Laughlin individually because Laughlin was at all relevant times acting with the knowledge and under the direction of his then employer. Further, Laughlin argues that IFSC cannot maintain a claim for an alleged civil conspiracy (Count III) between a corporation, its employees and officers.

Brown, Didde, Thompson and Anderson move for judgment on the pleadings claiming that (1) this Court lacks personal jurisdiction over them due to the fiduciary shield doctrine; (2) IFSC failed to join an indispensable party, Labeltech; (3) IFSC cannot maintain a cause of action against them personally for conduct they engaged in solely as representatives of DWP; (4) fellow officers of a corporation cannot be held liable on a conspiracy to defraud theory; (5) IFSC cannot establish reliance, a prerequisite of fraud; and (6) the loss IFSC suffered was not a direct result of any alleged reliance upon representations.

In a case based on diversity of jurisdiction, a federal district court sitting in Illinois has [*8] personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. *RAR, Inc.*, 107 F.3d at 1275. In considering a challenge to personal jurisdiction, the court must look to state statutory law, state due process law, and federal due process law. *RAR*, 107 F.3d at 1276. Under the Illinois long-arm provision, a court may exercise jurisdiction over nonresident defendants, "as to any cause of action arising from" the commission of a tortious act with the state. 735 IICS 5/2-209(a)(2). The Illinois long-arm statute further states, "A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). Finally, where jurisdiction is predicated on subsection (a), only causes of action arising from the enumerated acts may be asserted against a nonresident defendant. 735 ILCS 5/2-209(f). To satisfy the requirements of federal due process, the nonresident defendant must have sufficient minimum contacts with the forum state such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial [*9] justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). In determining whether sufficient minimum contacts exist, courts consider whether a defendant could "reasonably anticipate being haled into court" in Illinois. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). This requirement is satisfied when the defendant intentionally directs his activities at forum state residents and the litigation arises from injuries allegedly caused by those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). The

IFSC argues that this Court has personal jurisdiction over Laughlin because a defendant need not be physically present in a state to submit to personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). Where a relationship is naturally based on telephone and mail contacts, those contacts can justify jurisdiction over a defendant. *Heritage House Restaurants, Inc. v. Continental Funding*

*Group, Inc.*, 906 F.2d 276, 281 (7th Cir. 1990). [*10] IFSC further argues that because Laughlin initiated telephone calls to IFSC in Illinois and made fraudulent representations to induce IFSC to advance more money, Laughlin intended to affect Illinois interests and thus is subject to jurisdiction under the Illinois long-arm statute. *See FMC Corp. v. Varonos*, 892 F.2d 1308, 1313, n. 9 (7th Cir. 1989).

Even assuming, *arguendo*, that jurisdiction is proper based on the Illinois long-arm statute and federal due process, the fiduciary shield doctrine prevents the exercise of personal jurisdiction over Laughlin. The doctrine similarly bars this Court from exercising personal jurisdiction over Brown, Didde, Thompson and Anderson. [1] "The fiduciary shield doctrine prevents the court from exercising personal jurisdiction over an individual whose contacts with Illinois are solely the result of acts as a representative or fiduciary of a corporation." *Central States, SE and SW Areas Pension Fund v. Edwards*, 1996 U.S. Dist. LEXIS 9519, 1996 WL 385344, n. 10 (N.D. Ill. 1996); *see also Rollins*, 141 Ill. 2d 244 at 276, 565 N.E.2d 1302, 152 Ill. Dec. 384 Therefore, even to the extent that minimum contacts exist between IFSC and DWP, Laughlin, Brown, Didde, Thompson and [*11] Anderson are shielded from exercise of personal jurisdiction over them in Illinois because the alleged tortious acts were performed in their representative capacities. *Plastic Film Corp. of America, Inc. v. Unipac, Inc.*, 128 F. Supp. 2d 1143 (N.D. Ill. 2001) (nonresident corporate officer defending against Illinois fraud case protected from the exercise of court's jurisdiction by fiduciary shield doctrine).

> 1 Brown, Didde, Thompson and Anderson's argument regarding personal jurisdiction focuses on the fiduciary shield doctrine, not on the Illinois long arm statute.

Laughlin's telephone call simply does not suffice to establish personal jurisdiction in Illinois. *Alpert v. Bertsch*, 235 Ill. App. 3d 452 at 461, 601 N.E.2d 1031, 176 Ill. Dec. 333. In *Alpert*, the court affirmed an order quashing service where the plaintiff, like IFSC, premised personal jurisdiction over nonresident shareholders and directors of a corporation upon allegedly false statements they made in telephone calls placed from out of state to the plaintiff [*12] in Illinois. The court found that it lacked personal jurisdiction under the fiduciary shield doctrine because the telephone calls into Illinois were made in defendants' representative or fiduciary capacities on behalf of the corporation. *Id.* Even if the telephone calls would subject the company to jurisdiction in Illinois, they would not suffice to hale the individual defendants into court because the alleged statements were made by the individual defendants as representatives of

the company, and not in furtherance of their own personal interest. *Id.* at 461-2. The court concluded that it was unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts were acts performed for the benefit of his employer. *Id.* at 461.

Indeed, IFSC alleges facts that affirmatively demonstrate the applicability of the fiduciary shield doctrine to Laughlin because Laughlin's alleged misrepresentations were made pursuant to express instructions from his employer. *See Robinson v. Sabis Education Systems, Inc.*, 1999 U.S. Dist. LEXIS 9091, No. 98 C 4251, 1999 WL 412642 at [n3] (no personal jurisdiction under fiduciary [*13] shield doctrine where complaint affirmatively alleged that defendant was ordered to perform the complained of action by his superior). Given that IFSC alleges that Laughlin was instructed by his employer to make the alleged telephone call to IFSC, it is manifestly unfair to use this act as a basis to assert personal jurisdiction over him as an individual. *Glass v. Kemper Corporation*, 930 F. Supp. 332, 342 (N.D. Ill. 1996) (where defendant was acting at employer's direction when he allegedly committed fraud, he "falls squarely within the fiduciary shield doctrine with respect to any contacts with Illinois related to or arising out of his fraudulent acts.")

IFSC attempts to supplement its response in opposition to Laughlin's motion to dismiss by submitting a second affidavit by Robert G. Seeds, the president of IFSC. In the affidavit, Seeds alleges that in September 2000 he spoke with Laughlin at a Label Expo trade show in Illinois. During the conversation, Laughlin allegedly told Seeds that "he felt really bad about what had happened." According to Seeds, Laughlin opined that "bad stuff" had happened at Didde and asked him not to sue until after DWP received funds [*14] from American Capital Strategies. These statements in no way support IFSC's claims against Laughlin because they were allegedly made in September 2000, nearly a year after IFSC advanced the $ 187,034.20 on December 16, 1999, which concluded the only fraud alleged in the amended complaint. If IFSC believes that these statements constitute a second fraud claim (e.g. false statements made to induce IFSC to forbear), it should plead that. The statements do not support jurisdiction under the current complaint nor do they avoid the effect of the fiduciary shield doctrine. Consequently, IFSC's motion to supplement its response is denied and Laughlin is dismissed as a defendant to the Amended Complaint.

IFSC argues that Brown, Didde, Thompson and Anderson should not be protected by the fiduciary shield doctrine because they are high ranking officers and engaged in intentional, tortious, and fraudulent conduct over matters in which they had control and discretion. The fiduciary shield doctrine will not prevent jurisdiction over an individual defendant where the corporation is the individual's "alter ego." *State Security Ins. Co. v. Hall*, 530 F. Supp. 94, 98 (N.D. Ill. 1981). [*15] However, just because an individual is a member of management or holds controlling positions in a corporation does not nullify the protection of the fiduciary shield. *Id.; see also Kula v. J.K. Schofield & Co., Inc.*, 668 F. Supp. 1126, 1129 (N.D. Ill. 1987). This is because Illinois recognizes that corporate officers, directors and shareholders are separate and distinct from the corporation. *Kula*, 668 F. Supp. at 1129.

In *State Security*, an individual defendant was a major stockholder, president and chief operating agent of a company acquired by the corporate defendant and president of a corporate defendant, and had numerous contacts with the plaintiff. Without further facts that the corporation was a "shell," the court refused to pierce the fiduciary shield. *State Security*, 530 F. Supp. at 98. Similarly, IFSC has alleged nothing more in its complaint other than Brown, Didde, Thompson and Anderson's status with respect to DWP and the alleged actions they took in that capacity. Thus, Brown, Didde, Thompson and Anderson are not subject to the personal jurisdiction of this Court.

## Conclusion

For the foregoing reasons, Laughlin's [*16] motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) is GRANTED. IFSC's motion to supplement its response to Laughlin's motion to dismiss is DENIED. The joint motion for judgment on the pleadings by Brown, Didde, Thompson and Anderson is GRANTED. As this Court lacks personal jurisdiction over Laughlin, Brown, Didde, Thompson and Anderson, they are dismissed from the Amended Complaint and this Court need not address their remaining arguments in support of their motions to dismiss and for judgment on the pleadings, respectively.

Enter:

David H. Coar

United States District Judge

Dated: March 13, 2002

# EXHIBIT I

LEXSEE 1999 U.S. DIST. LEXIS 9091


Caution
As of: Aug 29, 2008

**ANDRENA ROBINSON, Plaintiff, v. SABIS (R) EDUCATION SYSTEMS, INC.;
INTERNATIONAL SCHOOL OF MINNESOTA, INC.; SABIS (R)
INTERNATIONAL SCHOOL; CHICAGO SCHOOL FOUNDATION, INC.;
JAMES MURPHY, KARLA LIFFMAN LIVNEY; LEILA C. SAAD, RALPH
BISTANY; AL BISTANY; UDO SCHULZ, NADIA REDA; FERN BISTANY; JOY
N'DAOU; JIM BOWDEN; SAM REDDICK, AND SABIS (R) SCHOOL
NETWORK, Defendants.**

**No. 98 C 4251**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**1999 U.S. Dist. LEXIS 9091**

**May 26, 1999, Decided
May 28, 1999, Docketed**

**DISPOSITION:** [*1] Rennick's and Schulz's motions to dismiss granted and Plaintiff's complaint dismissed only as to Rennick and Schulz.

**COUNSEL:** For ANDRENA ROBINSON, plaintiff: William Gerard Berg, Donald G. Peterson, French, Kezelis & Kominiarek, P.C., Chicago, IL.

For ANDRENA ROBINSON, plaintiff: Terry Alan Fox, Attorney at Law, Chicago, IL.

For SABIS EDUCATIONAL SYSTEMS, INC., INTERNATIONAL SCHOOL OF MINNESOTA, INC., CHICAGO INTERNATIONAL CHARTER SCHOOL, CHARTER SCHOOL FOUNDATION, AL BISTANY, UDO SCHULZ, NADIA REDA, FERN BISTANY, JOY N'DAOU, JIM BOWDEN, SAM REDDICK, defendants: Michael David Richman, Clifford J. Shapiro, Lisa Murray Madigan, Henry Pietrkowski, Sachnoff & Weaver, Ltd., Chicago, IL.

For CHICAGO INTERNATIONAL CHARTER SCHOOL, JAMES MURPHY, KARLA LIFFMAN LIVNEY, defendants: Michael Dean Karpeles, Carrie M. Garcia, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL.

**JUDGES:** David H. Coar, United States District Judge.

**OPINION BY:** David H. Coar

**OPINION**

***MEMORANDUM OPINION AND ORDER***

Before this court is Defendants Sam Rennick's ("Rennick") [1] and Udo Schulz's ("Schulz") motion to dismiss Plaintiff Andrena Robinson's ("Plaintiff") complaint pursuant to Fed. R. Civ. P. [*2] 12(b)(2) for lack of personal jurisdiction only as to Rennick and Schulz. The claims against Rennick and Schulz include Count V(B) (violation of 42 U.S.C. § 1981), V(C) (conspiracy in violation of 52 U.S.C. § 1985), V(E) (violation of 42 U.S.C. § 1983), VI(B) (state law false light claim), VI(C) (state law tortious interference claim), VI(D) (state law tortious interference with prospective business advantage), VI(H) (wrongful eviction/false imprisonment), and VI(I) (intentional infliction of emotional distress). For the following reasons, Rennick's and Schulz's motion to dismiss is granted. This case remains open as to all other defendants. All other motions remain pending..

1 Defendant Rennick was apparently misidentified in the complaint as "Sam Reddick." It is undisputed that he is the person to whom the complaint refers.

## I. Standards

Once a defendant has challenged a court's jurisdiction over his or her person, the plaintiff has the burden of showing personal jurisdiction. *RAR, Inc. v. Turner* [*3] *Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). In determining whether the plaintiff has met his or her burden of proving personal jurisdiction, the court may receive and consider affidavits from both parties. *Glass v. Kemper Corp.*, 930 F. Supp. 332, 337 (N.D. Ill. 1996). The court resolves factual disputes in the pleadings and affidavit in favor of the plaintiff but takes as true facts contained in the defendant's affidavit that the plaintiff does not dispute. *Id.*

## II. Facts

### A. Defendant Rennick

Plaintiff alleges that Rennick resides in Minnesota and, for all material times, provided legal services as an attorney to Defendant SABIS as an in-house counsel. (Cpt. P 16.) Plaintiff has sued Rennick in his official and individual capacity. (Cpt. P 16.) Plaintiff's only other allegations regarding Rennick lump Rennick in with a number of other defendants alleged to have done wrongful actions. (*See, e.g.*, Cpt. P 108.)

In an affidavit, Rennick states that he is General Counsel for International School of Minnesota ("ISM"), d/b/a SABIS Educational Systems, Inc. and that he resides and conducts business in Minnesota. (Rennick Aff. P 2.) Rennick has no business [*4] or other office located in the State of Illinois, is not and never has been a resident or citizen of the State of Illinois, does not own nor has ever owned property (personal or real) located in the State of Illinois, and does not pay taxes to the State of Illinois. (Rennick Aff. P 5.) Rennick states that, as General Counsel of ISM, he takes direction from Ralph Bistany, the Director General of ISM, who is not a resident or citizen of the State of Illinois. (Rennick Aff. P 4.) Rennick avers that, other than performing his job with ISM, he has no personal contacts with the State of Illinois. (Rennick Aff. P 5.) Rennick states that the only trip that he made to the State of Illinois in reference to this case occurred when, at the direction of Ralph Bistany on or about February 10, 1998, Rennick was instructed to terminate the employment of Dr. Glen Jones. (Rennick Aff. P 6.) As directed by Ralph Bistany, Rennick flew to Chicago for the express purpose of terminating Jones' employment, met with Jones, and informed Jones that he was terminated; Rennick then returned to Minnesota.

(Rennick Aff. P 6.) Rennick stated that he had no contact with Plaintiff on his trip to Illinois, had no role [*5] in Plaintiff's termination with SABIS, and, to his knowledge, has never met Plaintiff. (Rennick Aff. P 7.) Plaintiff does not dispute Rennick's affidavit.

### B. Defendant Schulz

Plaintiff alleges that Schulz resides in Minnesota and, for all material times, was paid by and acted for the benefit of SABIS. (Cpt. P 18.) Plaintiff alleges that Schulz had the following contacts with Illinois: that Schulz came to Chicago between December 13, 1997 and December 19, 1997 and met with co-defendant Joy N'Daou ("N'Daou") and with Dr. Glen Jones ("Jones") [2] to communicate the "commands" of co-defendant Ralph Bistany, "Director General" of SABIS, that Jones not hire males for the lower grades, (Cpt. PP 48-52); that Bistany, through himself and through "SABIS(R) agents include Joy N'Daou and Udo Schulz" pressured Jones to fire a qualified female candidate who was not a "native speaker" of Spanish, (Cpt. PP 54-57); that N'Daou told Jones that she had spoken to, among others, Schulz about Jones' objections to the employment practices of SABIS. (Cpt. P 62.c) Other than paragraphs generally lumping Schulz together with other defendants, (*see, e.g.*, P 108), these are the only allegations [*6] regarding Schulz.

2 Jones is the plaintiff in a similar case, docket number 98 C 4252, filed before Judge Gettleman of this court.

In an affidavit, Schulz states that he is employed by ISM as Vice President in charge of Business Development. (Schulz Aff. P 3.) Schulz states that he is a permanent alien residing and conducting business in Minnesota. (Schulz Aff. PP 2-3.) Schulz states that he is not currently a resident or citizen of the State of Illinois and has not been a resident or citizen of the State of Illinois since 1973, when he was employed by a different employer. (Schulz Aff. P 5.) Schulz currently owns no property (personal or real) that is located in Illinois, does not have an Illinois drivers' license, and does not pay any taxes to the State of Illinois. (Schulz Aff. P 6.) Schulz's duties include the opening of new SABIS schools; Schulz reports directly to Ralph Bistany at SABIS. (Schulz Aff. P 3.) Schulz states that N'Daou reported to him (over the telephone or in person at the SABIS office in [*7] Minnesota) regarding the opening of the SABIS school at issue in Plaintiff's reports. (Schulz Aff. P 4.) Schulz made around 1 or 2 short business trips a month to Illinois over a period of roughly two years in connection with the opening of the SABIS school at issue in this case. (Schulz Aff. P 7.) Schulz's business trips to Chicago on behalf of SABIS involved participating on such issues as real estate matters regarding the school, con-

1999 U.S. Dist. LEXIS 9091, *

tract matters regarding SABIS and Defendant Chicago Charter School Foundation, funding and financial matters regarding the school, and various other matters concerning the opening and start-up of the school. (Schulz Aff. P 7.) Schulz states that all of the trips that he made to Chicago were made solely in his capacity as a representative on behalf of SABIS and that none of the trips were made for personal or non-business reasons. (Schulz Aff. P 7.) Schulz avers that he has no contacts with the State of Illinois other than through his business affiliations with SABIS. (Schulz Aff. P 6.) Plaintiff does not dispute Schulz's Affidavit.

## III. Analysis

While this case is founded on federal question jurisdiction, not diversity, the only real dispute [*8] regarding personal jurisdiction is whether Plaintiff has shown that Defendants Rennick and Schulz meet the familiar personal jurisdiction test for Illinois used in diversity cases. Because this is a federal question case, Plaintiff must demonstrate "1) that haling the defendant into court accords with the Due Process Clause of the Fifth Amendment; and 2) that defendant is amenable to service of process from the court." *Perry v. Delaney*, 5 F. Supp. 2d 617, 619 (C.D. Ill. 1998) (citing *United States v. De Ortiz*, 910 F.2d 376, 381-82 (7th Cir. 1990). Defendants do not deny that they meet the "national contacts" test for the Fifth Amendment due process clause prong, because Rennick and Schulz each resides and conducts business in the United States. *Perry*, 5 F. Supp. 2d at 619. The "amenable to service" prong in cases, like this one, where there is no federal statute permitting national service of process, reduces to the question of whether an Illinois state court would have jurisdiction over the defendants. *Id.* at 620. *See* Fed. R. Civ. P. 4(k)(1)(A) ("Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant [*9] (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located."). The court looks to the question of whether an Illinois state court could have jurisdiction over Rennick and Schulz.

When considering a challenge to personal jurisdiction, the court looks to state statutory and due process law and to federal due process law. *RAR*, 107 F.3d at 1276. In Illinois, statutory law authorizes personal jurisdiction over defendants to the full extent of due process. *Id.*

The parties assume that Rennick and Schulz each had the minimum contacts with Illinois necessary to meet the requirements of federal due process law. At issue in this motion is the "fiduciary shield" limitation on personal jurisdiction, pursuant to which Illinois courts will not exercise personal jurisdiction over a defendant whose only contacts with Illinois were in the capacity of fiduciary of another entity. *Rollins v. Ellwood*, 141 Ill. 2d 244, 276, 565 N.E.2d 1302, 1316-17, 152 Ill. Dec. 384 (1990). The Illinois Supreme Court first accepted the fiduciary shield doctrine in the case of *Rollins v. Ellwood*, where it applied the doctrine to [*10] a Maryland police officer who came to Illinois solely to arrest a person. *Id.* at 279-80, 565 N.E.2d at 1318. There are three basic limitations on the fiduciary shield doctrine: where the defendant was motivated in part or solely by personal interest, as opposed to the interests of the corporation, *Ozonology Inc. v. Campbell*, 1998 U.S. Dist. LEXIS 15743, 1998 WL 704161, *6 (N.D. Ill. 1998); where "the defendant is the alter ego of the entity for which he is a fiduciary," *Clipp Designs, Inc. v Tag Bags, Inc.*, 996 F. Supp. 766, 768 (N.D. Ill. 1998); and, possibly, where the defendant was a director or officer who had discretion regarding whether the contacts occurred. *Perry*, 5 F. Supp. 2d at 620. [3] Plaintiff proffers no evidence indicating personal interest on the part of either Rennick or Schulz, that Sabis is a sham for which Rennick or Schulz acted as the "alter ego," or that Rennick or Schulz had discretion about their contacts with the State of Illinois. Plaintiff does not dispute Rennick's and Schulz's Affidavits, asserting that they acted solely in their capacity as employees of Sabis.

> 3   The question of whether the fiduciary shield doctrine should apply to a fiduciary, acting solely in his principal's benefit where the principal is not a "sham," who had discretion over his contacts with the State of Illinois is unsettled. *Perry*, F. Supp. 2d at 620. *See also Krok v. Burns & Wilcox, Ltd.*, 1999 U.S. Dist. LEXIS 6095, *14 n.1, 1999 WL 262125, *5 n.1 (N.D. Ill. 1999). Here, the factual assertions do not indicate that either Rennick or Schulz exercised discretion; indeed, Plaintiff's own allegations indicate that the person ordering the actions in this case was Ralph Bistany. Accordingly, while the court analyzes the question of discretion, the court need not determine whether a showing of discretion bars application of the fiduciary shield doctrine.

[*11] Plaintiff's remaining challenges to the application of the fiduciary shield doctrine fail. Plaintiff cites to a single Illinois Appellate Court decision. The appellate court discussed limiting the reach of the the fiduciary shield doctrine to cases like *Rollins*, where the nature of the principal-fiduciary relationship is similar to that of "a paramilitary organization with a chain of command" requiring unquestioning acceptance of orders in order to maintain "the authority and respect which is the foundation of the effective and efficient operation of a police force." *Renner v. Grand Trunk Western Railroad Co.*, 263 Ill. App. 3d 547, 550, 641 N.E.2d 1, 3, 204 Ill.

1999 U.S. Dist. LEXIS 9091, *

Dec. 42 (1st Dist. 1994). This attempt to treat *Renner* as a bar on the application of the fiduciary shield doctrine in non-police contexts fails because many courts have applied the fiduciary shield doctrine to cases, like this one, that address personal jurisdiction of employees of non-police entities. *See, e.g., Giddens v. Steak and Ale of Illinois, Inc.*, 994 F. Supp. 942, 944-45 (N.D. Ill. 1998) (applying fiduciary shield doctrine to find that the court did not have personal jurisdiction over a restaurant [*12] manager who attended meetings in Illinois); *Alpert v. Bertsch*, 235 Ill. App. 3d 452, 461, 176 Ill. Dec. 333, 601 N.E.2d 1031 (1st Dist. 1992) (applying fiduciary shield doctrine to find that the court did not have personal jurisdiction over employees of corporation who negotiated stock options in Illinois on behalf of the corporation), *appeal denied*, 148 Ill. 2d 639, 610 N.E.2d 1259 (1998). Similarly, Plaintiff's reference to general principles of equity also fails. It is true that "the doctrine is usually said to be discretionary or 'equitable,' rather than absolute, an entitlement." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 914 (7th Cir. 1994), *cert. denied*, 514 U.S. 1111, 115 S. Ct. 1964, 131 L. Ed. 2d 855 (1995). However, the measure that most courts use in determining whether equity militates in favor of application of the fiduciary shield doctrine are the limitations already discussed in this case. *See, e.g., Clipp Designs*, 996 F. Supp. at 768-69 (finding that plaintiff had not established that application of the fiduciary shield doctrine would be inequitable where plaintiff failed to establish any of the limitations). Accordingly, the court grants Rennick's [*13] and Schulz's motions to dismiss pursuant to Rule 12(b)(2).

## IV. Conclusion

For the foregoing reasons, the court grants Rennick's and Schulz's motions to dismiss and dismisses Plaintiff's complaint only as to Rennick and Schulz. This case remains open as to all other defendants. All other motions to dismiss remain pending.

Enter:

David H. Coar

United States District Judge

Dated: May 26, 1999